UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20331-CR-JORDAN/O'SULLIVAN

UNITED STATES OF AMERICA

vs.

HAFIZ MUHAMMAD SHER ALI KHAN, et al.,

     Defendants.

_____/

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR REVOCATION OF DETENTION ORDERS FOR HAFIZ KHAN AND IZHAR KHAN

The United States, through undersigned counsel, hereby opposes defendants Hafiz Khan's and Izhar Khan's motions for revocation of their pretrial detention orders (DE 42, 43). Magistrate Judge Garber ordered both defendants detained prior to trial pursuant to 18 U.S.C. § 3142 (DE 27). For the reasons stated below, Magistrate Judge Garber's decision – made after a detailed hearing which included cross-examination of a government witness, testimony by a defense witness, as well as a proffer of testimony by the defense – is well-founded, consistent with the statutory presumption favoring detention in terrorist support cases, and fully justified by the record.[1]  This Court should not release these defendants into the community.

### Procedural History

Defendant Hafiz Khan ("Hafiz") and his son, co-defendant Izhar Khan ("Izhar"), were

_____

[1] This consolidated response addresses both defendants' motions. Although the defendants are entitled to individualized consideration, this is a conspiracy case, and the evidence against Hafiz Khan cannot be analyzed without also taking into account the evidence against his co-conspirator Izhar – and vice versa. Moreover, as discussed below, Izhar has access to the same network of contacts and funding sources in Pakistan that makes his father a danger and risk of flight.

1

arrested on May 14, 2011. Another of Hafiz's sons, Irfan, was also arrested in Los Angeles on the same day.  These three men, along with three associates in Pakistan, are charged with conspiring to provide, and providing, material support to a conspiracy to murder, kidnap, and maim persons overseas, in violation of 18 U.S.C. § 2339A; and with conspiring to provide material support to a foreign terrorist organization (FTO), in violation of 18 U.S.C. § 2339B. Hafiz is additionally charged in Count 4 with providing material support to an FTO, in violation of § 2339B.

On May 23, 2011, Magistrate Judge Garber conducted a hearing on the government's request to detain Hafiz Khan and Izhar Khan pending trial.[2]  During that hearing, the government proffered evidence that the defendants, along with conspirators in the United States and in Pakistan, provided financial assistance and other material support to the Pakistani Taliban, a designated FTO that has engaged in repeated acts of terrorism and violence.  The court subsequently allowed the defendants to cross-examine one of the case agents from the Federal Bureau of Investigation. The court also received testimony from a witness on behalf of Hafiz, and a proffer of testimony on behalf of Izhar. The court then allowed argument from the parties. After hearing argument, the court announced its decision that both Hafiz and Izhar should be detained through trial.  On May 25, 2011, the Court entered a written order memorializing its decision, *see* Ex.1 (DE 27), finding that the defendants posed both a danger to the community and a risk of flight.

Specifically, the Court concluded "by clear and convincing evidence, that the defendants pose a danger to the community," and further concluded that "the defendants present a serious risk of flight, which is supported by a preponderance of the evidence."  DE 27 at 3. The court

---

[2]On May 19, 2011, co-defendant Irfan Khan was ordered detained pending trial after a detention hearing in Los Angeles.  Irfan is now in Miami and was arraigned on June 8, 2011.

found that:

> [T]he government's evidence against these defendants, including recordings obtained under the Foreign Intelligence Surveillance Act, is compelling. As stated by this Court on the record at the hearing, Hafiz Khan was extremely active in Pakistani Taliban matters, using his extensive contacts and financial resources to play a leadership role in the offense and threatening death to Americans. Izhar Khan also participated in the offense. . . . The pertinent history and characteristics of the defendants, as set forth in the pre-trial services reports and addressed at the hearing, likewise provide evidence of both defendants' danger to the community and their incentive, and ability, to flee.

*Id.* As this passage makes clear, contrary to Izhar's claim in his motion, the court did in fact make particularized findings regarding Izhar, separate and apart from those regarding Hafiz.

According to the court, Izhar:

> played an important, if more narrow, role in facilitating these offenses. Izhar collected money in the United States that was intended for mujahideen in Pakistan, sent money to Pakistan to a Pakistani Taliban sympathizer, and gave money himself to the mujahideen while traveling in Pakistan in 2009 (a trip not disclosed in his pre-trial services report).

*Id.*

### Summary of the Evidence of Danger and Risk of Flight

This case is about individuals in South Florida who, along with associates in Pakistan, provided precisely the kind of support that the Pakistani Taliban requires to continue its campaign of violence and terror. These defendants did not plot to carry out attacks here in America. But the money and assistance they provided to their Pakistani Taliban contacts made, and makes, such attacks possible.

That group has made no secret of its intent to attack targets in Pakistan and the United States. A month ago, after the killing of Osama Bin Laden, the Pakistani Taliban threatened the United States, saying that the President of Pakistan and the Pakistani Army would be its first targets, and America would be its second target. When asked how the Pakistani Taliban would

3

take revenge on America, a Taliban spokesman said, "We already have our people in America, and we are sending more there." *See* Ex. 3. Subsequently, the Pakistani Taliban attacked a convoy from the American consulate in Peshawar, Pakistan, killing and wounding an unknown number of people barely 50 miles from where these defendants sent their money. Since the release of the statement by the Pakistani Taliban spokesman, additional violent attacks have occurred in Pakistan, killing and injuring many people. Paragraphs 2 through 6 of the Indictment lay out more of the group's violence, including its murder of American soldiers and the attempted bombing of New York's Times Square last May.

Hafiz Khan and other co-conspirators enthusiastically endorsed this violence. For example, upon learning that four American soldiers were killed in Afghanistan, Hafiz declared his wish that 400,000 more Americans were killed, and prayed that the American Army be destroyed. Khan later stated, "May God kill 50,000 more of them" after hearing that seven American troops had died in a helicopter crash. Hafiz has also praised al Qaeda and called for a global jihad, and in what he thought were secret conversations with a source, praised the Times Square bomber, and expressed his wish that the bomber had succeeded. When it came to the Pakistani government, Army, and its civilian sympathizers, Hafiz was particularly brutal and profane, calling for the most extreme violence, including suicide attacks, and for blood to spill in the streets. See Ex. 2 at 12-14.

The evidence shows the defendants' knowing and intentional support for the Pakistani Taliban's campaign, through financial transfers to Pakistani Taliban militants and contacts. As set forth in the indictment, Hafiz and his sons collected and sent money for the Pakistani Taliban, which was then received and distributed by co-conspirators in Pakistan (including Islamist fighters, or mujahideen). The indictment identifies as overt acts some, but not all, of those

4

transactions. The transfers began no later than 2008 and continued into 2010, past the official designation of the Pakistani Taliban as an FTO in August 2010.

Hafiz maintains bank accounts in the United States and multiple accounts in Pakistan and has sent money in a variety of ways, assisted by his sons and other co-conspirators. He has stated in recordings that he uses complicated methods of sending money precisely in order to avoid detection, and there is evidence that all defendants who sent money structured their transactions with intent to avoid suspicion.  Hafiz is also in charge of a madrassa he founded when he lived in northwest Pakistan prior to coming to the United States. A madrassa is an Islamic school.  The madrassa was shut down by the Pakistani Army in mid-2009 when the Army launched a military offensive to displace the Taliban.  Hafiz acknowledged in recorded calls that Taliban militants were staying at his madrassa, and that Taliban fighters stayed at the madrassa in the past.  Hafiz also claimed, in one recording, that children went from his madrassa to train under the Pakistani Taliban leader Fazlullah to learn to kill Americans in Afghanistan.

Hafiz was the linchpin of this network of trusted recipients and intermediaries.  Other conspirators played an essential role, however, including Izhar.  Izhar, who like his father is an Imam at a South Florida mosque, was more cautious on the phone.  Nonetheless, he played an important part in facilitating the conspiracy.  For example, in July 2009, Hafiz asked Izhar to collect money that was being donated by a local woman for the mujahideen. Izhar did so and Hafiz subsequently deposited it into the U.S. bank account from which he sent money to Pakistan.  Around the same time, Izhar sent $900 dollars to co-defendant Amina Khan. Amina is Izhar's sister and co-conspirator, and has been identified in multiple recordings as a Pakistani Taliban supporter, and indeed in the calls is identified as the main conduit for money to go from America to a mujahideen.

Additionally, as proffered at the detention hearing, a mujahideen in Karachi, Pakistan named Noor Muhammad told a source in 2010 to thank Izhar for Izhar's support of the Taliban for the past five years, and singled out a payment of 10,000 rupees by Izhar to Muhammad for that purpose. Travel records confirm that Izhar was indeed in Karachi in Spring 2009. Muhammad is an injured Taliban fighter in hiding who preaches for the mujahideen.[3]

### Legal Standards

Under 18 U.S.C. § 3145, a defendant may seek the district court's review of a Magistrate Judge's detention order.  That review is *de novo*.  *See United States v. King*, 849 F.2d 485, 489-90 (11th Cir. 1987).  However, where appropriate, such as in this matter, it is sufficient for the court to sustain the Magistrate Judge's order simply by adopting his findings of fact and conclusions of law.  *See id.*[4]

Detention is proper when the government has shown *either* that the defendant, if released, would pose a danger to the community, *or* that he would pose a risk of flight. 18 U.S.C. §

---

[3]  This is only a summary of the government's evidence which was proffered and established through testimony at the detention hearing.

[4] As the Eleventh Circuit has explained, the district court has essentially three options to affirm a Magistrate Judge's detention order. One, "the district court may determine that the magistrate's factual findings are supported and that the magistrate's legal conclusions are correct. The court may then explicitly adopt the magistrate's pretrial detention order.  *King*, 849 F.2d at 490. Two, "if the district court . . . agrees with the magistrate's recommendation that pretrial detention is necessary, yet finds that some of the magistrate's legal conclusions are incorrect or that certain of the magistrate's factual findings are not clearly supported, the court should so state in writing."  *Id.* Three, if the Court "determines that additional evidence is necessary or that factual issues remain unresolved, the court may conduct an evidentiary hearing for these purposes. In this instance, the district court must enter written factual findings and written reasons supporting its decision. Of course, if the district court concludes that the additional evidence does not affect the validity of the magistrate's findings and conclusions, the court may state the reasons therefor and then explicitly adopt the magistrate's pretrial detention order."  *Id.* at 490-91.  Here, Hafiz and Izhar's "additional" evidence either was effectively presented to, and considered already by, the Magistrate Judge, or does not affect the validity of his order.  *Id.* at 491.

3142(e)(1).  Of critical importance, the analysis of dangerousness and risk of flight in this case takes place against the backdrop of a statutory presumption that detention is warranted.  Section 3142(e) creates a statutory presumption in cases where a person is charged with certain terrorism offenses that no condition or combination of conditions of bond will reasonably assure the appearance of the defendant or the safety of the community. 18 U.S.C. § 3142(e); *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (applying this presumption in terrorism case and reversing district court's decision to release the defendants after a magistrate judge had ordered them detained).  That presumption applies here.[5]  The presumption does not ultimately shift the burden of persuasion, but does remain a fact militating against release, which must be weighed with the other relevant factors set forth in Section 3142(g).  *See Stone*, 608 F.3d 945-46. As the Sixth Circuit wrote recently in similar circumstances, "[t]he presumption remains as a factor because it is not simply an evidentiary tool designed for the courts.  Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *Id.*

A defendant must be held on grounds of danger when the government shows by clear and

---

[5]Section 3142(e) provides in pertinent part:

> Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense listed in section 2332b(g)(5)(B) of Title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed . . . .

18 U.S.C. § 3142(e).  Offenses listed under section 2332b(g)(5)(B) include §§ 2339A, which prohibits conspiring to provide and providing material support to terrorists, and 2339B, which prohibits conspiring to provide and providing material support to a foreign terrorist organization.  Each of those counts carries a 15 year maximum.  Accordingly, the presumption applies here.

convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of the community. *United States v. Rodriguez*, 897 F. Supp. 1461, 1463 (S.D. Fla. 1995). The issue is whether releasing the defendant would pose a danger to the community that would not exist if the defendant were detained. *Id.* The community in question is not merely the Southern District of Florida; it is everyone, whether in the United States or in Pakistan or elsewhere, who may be in jeopardy if the defendants were released and thereby effectively allowed to continue their material support for violence. *See United States v. Hir*, 517 F.3d 1081, 1089 (9th Cir. 2008) ("where a defendant is charged with committing a crime under United States law that had a substantial harmful effect on a community overseas, we hold that a court should consider the danger that would be posed to that community if the defendant were released pending trial").

Alternatively, a defendant may be detained if the government shows, by a preponderance of the evidence, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required. 18 U.S.C. § 3142(e)(1).

Aside from the statutory presumption, the factors the Court must consider in determining whether the defendant poses a danger to the community or risk of flight are:

(1)  The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2)  the weight of evidence against the person;

(3)  the history and characteristics of the person, including--

(A)  the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and [. . .]

(4)  the nature and seriousness of the danger to any person or the community that

would be posed by the person's release.

18 U.S.C. § 3142(g).

The factors set forth in section 3142(g) show undeniably, as Magistrate Judge Garber found, that Hafiz and Izhar must be detained pending trial.

<u>Argument</u>

**1.     <u>The Nature and Circumstances of these Offenses Support Detention.</u>**

As set forth above, the charges and potential penalties in this case are serious, among the *most* serious in federal law.  All of the charges carry a 15 year maximum sentence, and the defendants' Sentencing Guidelines, with the terrorism enhancement under USSG § 3A1.4, would be at or near that maximum. These charges, on their face, indicate a strong threat to society, and create a powerful incentive for the defendants to flee.

**2.     <u>The Weight of the Evidence, Especially Regarding the Defendants' Threat to the Community if Released, Supports Detention</u>.**

The evidence against Hafiz and Izhar, particularly regarding their potential danger, is strong.  Magistrate Judge Garber properly characterized that proof as "compelling" (DE27 at 3), and the summary provided earlier in this motion reinforces that conclusion.  The defendants do nothing but nitpick at the government's proffer, completely failing to cast doubt on the evidence.

Rather than confront the proof against them, the defendants raise a host of issues that do not mitigate the danger they pose.  We address those issues, as we understand them, below.

### A. Confrontation

Hafiz Khan complains that he did not receive "true confrontation" of the FISA recordings of telephone conversations which comprise some, but not all, of the evidence in this matter.[6] There is absolutely no requirement that, in order to detain a defendant, the government must produce at the pretrial detention stage the transcripts implicating him. Such a rule would be wholly impractical as well as contrary to the well-settled principle that a detention hearing cannot be turned into a mini-trial under the guise of disputing weight of the evidence. *See, e.g., Stone,* 608 F.3d at 948 (observing that "[t]his factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt," and citing other decisions for the rule that § 3142(g) "'neither requires nor permits a pretrial determination of guilt'"); *United States v. Martir,* 782 F.2d 1141, 1145 (2nd Cir. 1986) ("[A] detention hearing is not to serve as a mini-trial . . . or as a discovery tool for the defendant. Accordingly, a government proffer need not always spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."). Moreover, in a detention hearing, it is well-established that hearsay is admissible and the defendant has no right of confrontation. *See, e.g.,* 18 U.S.C. § 3142(f); *Pennsylvania v. Ritchie,* 480 U.S. 39, 41 (1987) ("The right of confrontation is a trial right"); *United States v. Hernandez,* 2011 WL 1516482, at *8-15 (D.N.M. April 20, 2011) (holding that the Confrontation Clause does not apply to detention hearings, extensively citing to pre-*Crawford* and post-*Crawford* law).

Here, Judge Garber provided more latitude than required to these defendants, allowing them fulsome cross-examination of the case agent about the content of the calls. The agent also

---

[6] While FISA recordings comprise much of the evidence in this case, there are additional substantial sources of evidence, such as confidential source recordings and financial documentation.

confirmed under oath – in response to direct questioning from the court – that the government's proffer was a correct and accurate summary of the transcripts.  Ex. 2 at 28.[6]  The defense will have the opportunity to "confront" the FISA recordings during trial. The pre-trial detention hearing is an inappropriate forum for that exercise, and Khan's purported inability to receive and address the transcripts in this case at such a hearing is no basis for release.

### B.      Translations

Hafiz argues that certain words in the Pashto language (which is used by defendants in the FISA recordings) can have multiple meanings which may vary depending on their context. This argument again does nothing for his cause.  Khan put this proposition to the agent during cross-examination, and the agent explained that the recorded statements upon which the government's case is built do not have ambiguous meanings.  Ex. 2 at 30.  The agent also rejected Khan's suggestion that, because Taliban can mean "students," perhaps Hafiz was only ever really discussing the children at his madrassa in Pakistan.  This suggestion is particularly unfounded because Khan often used the term mujahideen or another word for militants besides Taliban.  Moreover, Khan referred to the Taliban in contexts that had absolutely nothing to do with the legitimate activities of school children, such as praising the murder of American soldiers or the bombing of Pakistani Army soldiers and the rape of their wives.  And of course, if Khan were merely referring to children at his madrassa, he would hardly have placed such an emphasis on secrecy, or exclaimed in one conversation, which he thought was private, that a terrorist

---

[6]Judge Garber would have been well within his discretion to not even allow cross-examination of a government agent for purposes of the detention hearing. *See, e.g., United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987).  As the Court is aware, the FISA calls remain classified and/or subject to anticipated protective orders that are not yet in place.

complaint should be filed against him.

### C.    Madrassa

Hafiz next contends that the government's case is weak because Khan's madrassa in Pakistan mainly educated young girls. This argument ignores the fact that the Indictment does not revolve solely around Khan's madrassa, but arises out of the broader financial support that he, Izhar and others provided directly to Taliban contacts and go-betweens. *See, e.g.*, Indictment ¶ 16a-e. It also ignores Khan's stark admission that children from his madrassa trained to kill Americans. Ex. 2 at 16-17. In any event, it is clear from the record that not all of the students are female, as Hafiz knows full well. *See* Ex. 2 at 33.

### D.    Openness of Transfers

Hafiz next asserts that he could not have been doing anything wrong because he sent money openly to Pakistan. That argument is wrong. Contrary to his claim, Hafiz did not send funds for the Pakistani Taliban openly. Rather, he and his co-defendants frequently discussed covert methods for sending money to avoid detection, whether it was structuring payments or sending money through intermediaries who would deliver money to the ultimate Pakistani Taliban recipients in accordance with his instructions. *See* Ex. 2 at 37. To highlight just a few examples, while co-defendant Amina is Hafiz's daughter and Izhar's sister, she was also identified in recordings as the conduit for providing money to the Taliban in lieu of sending money directly and openly to the mujahideen. Likewise, in July 2010, Hafiz Khan stated in a recorded conversation that when sending money for guns, a person cannot do so in the name of the Taliban. Instead, money must be sent through a loyal person over there, who will take the money and buy guns, although you are not supposed to say it. *See* Ex. 2 at 15-16. Some (by no means all) of Hafiz's transfer dealings may have been open, but only in the sense that records for

them exist.  The true purpose and use of the funds he sent was not.

### E.       First Amendment

Hafiz suggests that his activity was protected by the First Amendment.  The First

Amendment protects pure speech, but does not protect criminal *acts*.  The Indictment accuses

Hafiz, Izhar and their co-defendants with specific action meant to further the Pakistani Taliban's

violence, including financial assistance and other material support.  The defendants' statements

not only provide evidence of their intent to support violence, but include specific instructions and

directions regarding the distribution of funds to militants.  The First Amendment certainly does

not provide a cloak for active terrorist support.[7]

### F.       Tracing Funds to Taliban

Hafiz asserts that the government failed to show whether and how funds were actually

used by the Pakistani Taliban.  This claim not only ignores legal elements of a conspiracy (which

does not require any completed conduct), but fundamentally misunderstands the proof.  It is the

words of Hafiz Khan and his associates, on the recordings, that confirm the defendants' scheme

to funnel money to the Taliban.  For example, as was stated in the proffer, Hafiz Khan sent

---

[7]*See United States v. Rahman*, 189 F.3d 88, 117 (2nd Cir. 1999) ("Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching."); *see also Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) (upholding § 2339B against First Amendment challenge)*; Holy Land Foundation for Relief and Development v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (noting that "the law is well established that there is no constitutional right to fund terrorism"); *People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d 1238, 1244-45 (D.C. Cir. 2003); *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1026 (7th Cir. 2002); *United States v. Lindh*, 212 F.Supp.2d 541, 579 (E.D. Va. 2002) ("The First Amendment's guarantee of associational freedom is no license to supply terrorist organizations with resources or material support in any form, including services as a combatant. Those who choose to furnish such material support to terrorists cannot hide or shield their conduct behind the First Amendment.").

thousands of dollars to co-defendant Ali Rehman; Khan himself identified Rehman as the man who takes money from Hafiz's bank accounts for the purchase of guns for the Taliban. *See* Ex. 2 at 14. We know that the defendants sent money and other resources to the Taliban not only because bank records and other documents confirm these transactions, but also because the defendants themselves said so – repeatedly and unambiguously, in a wide variety of settings. That is more than enough to establish criminal liability.

### G. Proof Against Izhar

Izhar makes the additional argument that the Magistrate Judge did not consider the proof against him individually. As discussed above, the premise of that argument is wrong, because Judge Garber plainly did exactly what Izhar says he did not, *supra* at 3. Izhar's argument is particularly faulty because he omits significant portions of the government's proffer regarding his misconduct. Izhar contends in his motion that the only evidence against him was (1) that he sent a $900 transfer to Amina; and (2) that Hafiz asked Izhar to pick up a $300 check that Izhar knew was approved for the mujahideen.[8] Notably, however, Izhar neglects to mention the government's evidence that a mujahideen named Noor Muhammad told a government source in 2010 that Izhar had supported the Taliban financially for the last five years, and asked the source to thank Izhar for giving him 10,000 rupees the last time Izhar was in Karachi. *See* Ex. 2 at 18.

### H. FTO Designation Date

Izhar also contends (as does his father) that the Pakistani Taliban was not formally

---

[8]Even if these were the only acts, they would be sufficient to convict Izhar on all counts against him, including the conspiracy. Amina, as noted, has been identified multiple times in the recordings as a Taliban supporter and sympathizer, as well as the main conduit to distribute money to a mujahideen. As for the $300 check, Izhar collected that item despite knowing its purpose, and ensured that it was deposited into Hafiz Khan's U.S. bank account from which money was sent to Pakistan.

designated as an FTO until mid 2010.  This argument does nothing to lessen their dangerousness. In any event, as the government pointed out during the detention hearing, the FTO designation is not even an element of Counts 1 and 3, which charges these defendants and others with providing material support to a conspiracy to murder, kidnap and maim persons overseas, in violation of § 2339A.  Section 2339B (which is charged in Counts 2 and 4) does not require proof that the defendants knew about the designation itself, but instead simply requires proof that they knew the organization "has engaged or engages in terrorist activity."  18 U.S.C. § 2339B(a)(1).

In sum, the weight of the evidence against these defendants is strong, certainly for the limited purpose of evaluating the defendants' request for release.  It also reinforces the danger to the community posed by these defendants if they were released – we do not believe that this Court should take such a chance on this record.

### 3.    The History and Characteristics of these Defendants Support Detention.

The history and characteristics of these defendants, as Judge Garber found, support their detention.  They have demonstrated a willingness to fund and support terrorism despite knowing of the Pakistani Taliban's violence.  The broader perspective reinforces the danger posed should Hafiz and Izhar be released.  These defendants actively supported the Pakistani Taliban, which three times in the past month has threatened to do, through its people in America, what it attempted to do in Times Square last year.  Hafiz Khan was an enthusiastic advocate of this kind of violence. It is not merely the immediate risk of harm, however, but also the ongoing threat of public safety that would result if the defendants were released and thereby allowed to continue their funding and support for this terrorist organization.  Simply put, if Hafiz Khan and Izhar are not detained, there is effectively no way to stop them from communicating and continuing to

15

support and finance terrorism.

Moreover, specific characteristics of each defendant establish a serious risk of flight. Both Hafiz and Izhar have a powerful incentive to flee, as already discussed, in light of the serious charges they are facing. Even proof of a single instance of conspiring to provide, or providing, material support would subject the defendants to up to a 15-year sentence. The only question as to flight is whether these defendants can get outside the jurisdiction of the Court, wherever it may be.  Living in the Southern District of Florida, it does not take much effort or any length of time to get outside the jurisdiction of this country.

Both Hafiz and Izhar have extensive contacts in Pakistan, including family and friends, many of whom are Taliban supporters. Prior to learning of the charges against him, Hafiz had already specifically discussed his desire to leave the United States permanently to go live in Pakistan, and encouraged Izhar to join him. *See* Exhibit 2, at 21. This desire can only have escalated in light of the prison time they face if convicted of the serious charges against them.

Additionally, Hafiz frequently talked about creating false travel documents to sponsor family and potential Taliban contacts, including Izhar's wife/fiancée, to come to the United States, resorting to bribery of government officials to accomplish such fraudulent goals. *See* Ex. 2 at 23.  Deception is second nature to Hafiz, who stated that he would lie to support his goal, and discussed extensively in the calls methods of sending money to the Pakistani Taliban without detection.

Izhar, meanwhile, was misleading at best to Pretrial Services about multiple material facts, including a visa application for his wife/fiancée.

- First, regarding travel outside the United States, Izhar only divulged that he went

16

to Saudi Arabia in 2009.  However, he actually went to Pakistan in 2009, a trip which he completely failed to acknowledge to Pretrial Services. *See* Ex. 2 at 25.  Notably, on that trip, Izhar went to Karachi, home of his co-conspirator Noor Muhammad.  Izhar also failed to disclose his 2010 Saudi Arabia trip as well as two recent trips to Canada. *Id.*

- Second, Izhar told Pretrial Services that he was residing in North Lauderdale, Florida, when in fact he was spending virtually every day and night living at the mosque where he was arrested early in the morning of May 14.  *Id.*  Izhar had actually been renting out his North Lauderdale residence for a year, *id.*, which leads to a further  misleading statement made to Pretrial Services.  Izhar was receiving $800 per month in cash from this rental income, which he failed to disclose. *Id.*

- As to his relationships, Izhar told Pretrial Services that he was not married, nor did he mention a fiancée. *Id.* at 26. However, according to marriage certificates found during post-arrest searches as well as telephone calls, Izhar is married. *Id.*  This matters because he has a pending application with U.S. immigration to obtain for her a K-1 visa, which is only applicable for fiancées, not spouses. *Id.*   These misleading statements hardly inspire confidence that Izhar would fulfill any promises to this Court regarding bond.

Defendants do little to counter these facts about their history and characteristics.  Hafiz argues that he has only traveled once in recent years, but in recordings he repeatedly expressed his desire and intent to leave the United States.  Izhar, of course, cannot even make such an argument, as he has traveled extensively and is certainly familiar with exit procedures; indeed, at the time of arrest, his passport was in the glove compartment of his car.

Hafiz also suggests that he has limited funds.  This argument is particularly unconvincing,

given that he has multiple bank accounts (including several U.S. dollar bank accounts in Pakistan) and sent at least $200,000 to Pakistan since 2003.  While we do not allege that all of this money went to the Pakistani Taliban, it certainly undermines any claim that Hafiz does not have access to large quantities of money.  To the contrary, Hafiz has demonstrated an impressive ability to raise and distribute substantial sums, which are easily accessible to his sons as well, who assist their father in sending money overseas.  Additionally, in the calls, Hafiz discusses his vast land holdings and stores in Pakistan from which he earns additional income. *See* Ex. 2 at 21-22.  Those resources are available to support him, and Izhar, should they flee.

Hafiz also highlights his age, but a terrorist financier can be any age – Omar Abdel-Rahman, the "Blind Sheikh," was in his 60s when he directed the violent Islamist conspiracy that led to his conviction.  So too is Ayman al-Zawahiri.  Age was never an impediment for Hafiz to commit these crimes, nor would it be an impediment to him should he be released.  He would simply continue to support terrorists as he has done so in the past, with a phone, his contacts, and his bank accounts, and there would be no way to stop him from doing so.

Hafiz also asserts his need for medications and specific dietary restrictions as a reason for release; however, the Bureau of Prisons (BOP) is more than adequately equipped to handle his needs, as it has for other aging defendants or defendants with dietary concerns.[9]  To date, this Office has not been contacted regarding any issues pertaining to Hafiz's confinement.  If they

---

[9]Hafiz's list of purportedly necessary medications is at odds with the information he provided to Pretrial Services.  In that interview, Hafiz described his health as "fair," and listed two types of medication, not seven.  Moreover, in recorded calls as recently as October 2010, Hafiz stated that he has done well and has not had too many health issues.  The Court should not take at face value Hafiz's claim of dire medical needs; whatever the truth, however, BOP is well-equipped to handle any issues, and those needs cannot be used as an excuse to put the public in jeopardy.

should come up, we will work with the defense and BOP to come to a resolution, as is the procedure in every case.  As to the defendants' placement in the Special Housing Unit (SHU), that is a determination made by BOP, to protect other inmates, prison employees and the defendants themselves.  *See Defreitas v. Lindsay*, 2008 WL 4850195, at \*2 (E.D.N.Y. 2008).

Finally, both Hafiz and Izhar reference family in the United States, presumably as evidence of ties to the community.  Hafiz emphasizes that prior to his arrest he lived with his wife and son, suggesting that he could remain in that home with his family. Aside from the fact that the defendants' contacts overseas are far deeper and more extensive than here, what the defendants fail to mention is that Hafiz's son, Ikram Khan, has been reported in Pakistani papers as being a confirmed member of the Pakistani Taliban, *see* Exhibit 4, the very terrorist organization this indictment charges Hafiz, Izhar and Irfan with supporting. Additionally, these newspapers report that Ikram Khan is wanted by the Pakistani police in five separate cases of terrorism, including attacking and murdering police, security forces, and civilians in Pakistan. *See* Ex. 4.  The danger of allowing Hafiz or Izhar to have access to family members such as Ikram, an individual identified by Pakistani newspapers as a member of the Pakistani Taliban who has actively engaged in conducting terrorist attacks, is glaring.  Any suggestion that Hafiz be released and allowed to live with this son is impossible in light of the overt danger presented by such a situation.  The history and characteristics of these defendants fully warrant detention.

4.    **The Nature and Seriousness of the Danger Posed by these Defendants If Released Is Extremely Serious and Further Supports Detention.**

As set forth above, these defendants pose a serious risk to the community – here and in Pakistan – and no conditions can be fashioned that would ensure an end to their covert support for violence.  *United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008), a recent terrorism

prosecution, is instructive. There, the defendants suggested a variety of detailed, restrictive release conditions such as banning communications with anyone overseas, GPS monitoring, banning the provision of money or packages overseas, and banning the use of false names. The court found these suggestions insufficient to warrant release, noting that "[a]lthough these proposed conditions of release are strict, they contain one critical flaw. In order to be effective, they depend on [the defendant's] good faith compliance." *Id.* Similarly, in *United States v. Tortora,* 922 F.2d 880 (1ˢᵗ Cir. 1990), the First Circuit reversed the district court's order of release under a similar set of apparently strict conditions, finding that any extensive set of conditions had "an Achilles' heel . . . their success depends largely on the defendant's good faith- or lack of it. They can be too easily circumvented or manipulated." *Id.* at 886-87. As the Ninth Circuit put it in *Hir*, certain crimes, such as terrorist support, that "involve communications and that are therefore not readily susceptible to effective monitoring" cannot feasibly be prevented by restrictive bond conditions. 517 F.3d at 1093; *see also United States v. Goba,* 240 F. Supp.2d 242, 258 (W.D.N.Y. 2003) (denying motions to revoke pretrial detention of suspected terrorism supporters and recognizing that home detention and electronic monitoring does not provide sufficient protection to the public).[10]

## Conclusion

For all of these reasons, the defendants' motion for release pending trial should be denied

---

[10] Both Hafiz and Izhar discuss their lack of prior criminal history as a factor for release. However, as explained by the Ninth Circuit in *Hir*, a defendant's "history as a law-abiding citizen and his significant ties to the local community do not outweigh the extremely serious nature of the offenses with which he is charged, including his willingness to provide dangerous materials for use against civilians, while attempting to disguise his role in the affair, the weight of the evidence against him, and the nature and gravity of the danger that would be posed by his release." 517 F.3d at 1091.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


By:    /s/ John C. Shipley
    John C. Shipley
    Assistant United States Attorney
    FL Bar No. 0069670
    United States Attorney's Office
    99 N.E. 4th Street, Suite 800
    Miami, Florida 33132-2111
    Telephone Number (305) 961-9111
    john.shipley@usdoj.gov

    /s/ Sivashree Sundaram
    Sivashree Sundaram
    Assistant United States Attorney
    District Court No. A5501212
    United States Attorney's Office
    99 N.E. 4th Street, Suite 800
    Miami, Florida 33132-2111
    Telephone Number (305) 961-9430
    Fax Number (305) 536-4676
    sivashree.sundaram2@usdoj.gov

    Stephen Ponticiello
    Bridget Behling
    Trial Attorneys
    Counterterrorism Section,
    National Security Division
    United States Department of Justice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2011, I electronically filed the foregoing with the Clerk

of the Court using CM/ECF for electronic delivery to all counsel of record.


<u>/s/ Sivashree Sundaram</u>
Sivashree Sundaram
Assistant United States Attorney