# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 11-CR-20331-JORDAN/GARBER

THE UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                                          MIAMI, FLORIDA
                                             MAY 23, 2011

HAFIZ MUHAMMAD SHER ALI KHAN,
IZHAR KHAN,
IRFAN KHAN,
ALI REHMAN,
also known as
FAISAL ALI REHMAN
& AMINA KHAN,

                    Defendants.

------------------------------------------------------------------

TRANSCRIPT OF ARRAIGNMENT AND PRETRIAL DETENTION HEARING
BEFORE THE HONORABLE BARRY L. GARBER,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

                              UNITED STATES ATTORNEY'S OFFICE
                              FOR THE SOUTHERN DISTRICT OF FLORIDA
                              99 N.E. 4th Street
                              Miami, Florida 33132
                              BY: JOHN C. SHIPLEY, JR., A.U.S.A.
                              BY: SIVASHREE SUNDARAM, A.U.S.A.

REPORTED BY:                  JERALD M. MEYERS, RPR-CM
                              TELEPHONE:  954-431-4757

FOR THE DEFENDANT HAFIZ MUHAMMAD SHER ALI KHAN:

                              WAHID, VIZCAINO & MAHER, LLP
                              3191 Coral Way
                              Suite 406
                              Miami, Florida 33145
                              BY: KHURRUM B. WAHID, ESQ.

FOR THE DEFENDANT IZHAR KHAN:

                              BY: JOSEPH S. ROSENBAUM, ESQ.
                              Grove Forest Plaza
                              2937 S.W. 27th Avenue
                              Suite 101
                              Miami, Florida 33133

(Proceedings interpreted in Arabic for the defendant Hafiz Muhammad Sher Ali Khan)

REPORTED BY:        J.M. COURT REPORTING, INC.
                    JERALD M. MEYERS, RPR
                    1601 N.W. 109th Terrace
                    Pembroke Pines, Florida
                    Telephone: 954-431-4757
                    E-mail Address: CRJM@AOL.COM

3

TABLE OF CONTENTS

Witness:  Michael Ferlazzo                                    PAGE


        Cross-Examination by Mr. Wahid ........................ 28

        Cross-Examination by Mr. Rosenbaum .................... 37

Amir Abdel Zaher ......................................... 47

        Direct Examination by Mr. Wahid ...................... 47

Reporter's Certificate ................................... 64

(Call to order of the court)

THE CLERK:  All rise.  The United States District Court for the Southern District of Florida is now in session; the Honorable Barry L. Garber presiding.

THE COURT:  Good morning.  Be seated, please.

MS. SUNDARAM:  Good morning, Your Honor.

THE COURT:  I note that we have a full house, so to speak.  So in order to expedite this proceeding, I am going to insist on absolute quiet.

Any breach of that requirement will result in your being excluded from the courtroom.

All right.  Will you call the case, please.

THE CLERK:  Yes, Judge.  The United States of America versus Hafiz Muhammad Sher Ali Khan and Izhar Khan, case number 11-20331-Criminal-Jordan.

Would counsel please state their appearances for the record.

MR. SHIPLEY:  Good morning, Your Honor.  John Shipley and Sivashree Sundaram for the United States.  Good morning.

THE COURT:  Okay.

MR. WAHID:  Good morning, Your Honor.  Khurrum Wahid for Hafiz Khan.

MR. ROSENBAUM:  Good morning, Your Honor.  Joe Rosenbaum on behalf of Izhar Khan.

THE COURT:  All right.  Mr. Wahid, have you entered a

permanent appearance?

MR. WAHID:  I did this morning enter a permanent appearance.

THE COURT:  All right.  Very well.  And, Mr. Rosenbaum, how much time do you need to determine if you will be permanent?

MR. ROSENBAUM:  A week would be fine.

THE COURT:  One week from today report re: counsel as to the defendant Izhar Khan.

Can we proceed with the arraignment of Hafiz Muhammad Sher Ali Khan at this time?

MR. WAHID:  Yes, Your Honor.  At this time Mr. Hafiz Khan enters a plea of not guilty, request a standing discovery order and trial by jury.

THE COURT:  All right.  Do you waive reading of the indictment?

MR. WAHID:  Yes, Your Honor.

THE COURT:  All right.  The standing discovery order will be entered and the trial date will be set by Judge Jordan's chambers.

MR. WAHID:  And, also, Your Honor, I would request that, as to time-wise, this case be deemed complex

THE COURT:  Well, I think it speaks for itself on the face of the indictment.  All right?

MR. WAHID:  Thank you.

THE COURT:  Mr. Rosenbaum, at your appearance one week from today we will take the arraignment of your client as well.

MR. ROSENBAUM:  That will be fine, Your Honor.  Thank you.

THE COURT:  All right.  Now, we are here for a pretrial detention hearing as to both defendants.

The court wants counsel to understand that this is not a discovery proceeding.  We are limiting the testimony, as required by law, to anything regarding risk of flight or danger in the community if either of these defendants should be released on bond.  Is that understood?

MR. WAHID:  Yes, Your Honor.

MR. ROSENBAUM:  Yes, Your Honor.

THE COURT:  All right.  Government, you can proceed initially by proffer, if you would.  You have a witness, I assume?

MR. SHIPLEY:  Good morning, Your Honor.  Yes, I do.

THE COURT:  All right.

MR. SHIPLEY:  I do have an agent available.

THE COURT:  All right, sir.  Would you proceed by proffer.

MR. SHIPLEY:  Yes, Your Honor.

Just a couple of initial matters.  First of all, in terms of what my argument and presentation will be this morning, I am going to make a brief introduction.

I will proffer a summary of the facts.  Obviously, as the court is aware, this is an indicted case, and then address the risk of flight and the dangerousness factors.

THE COURT:  All right.

MR. SHIPLEY:  I would also advise the court that on Thursday of last week the third defendant in the case, Irfan Khan, had a detention hearing in Los Angeles and was detained in that proceeding as well.

THE COURT:  Of course I am not bound by that.  You understand that.

MR. SHIPLEY:  Absolutely, Your Honor.

THE COURT:  All right.

MR. SHIPLEY:  I just wanted the court to be aware of that fact.

Your Honor, 3 weeks ago, after the killing of Osama bin Laden, the Pakistani Taliban, a designated foreign terrorist organization and a group supported by these defendants, threatened the United States of America, saying that, "The president of Pakistan and the Pakistani Army would be our first targets and America will be our second targets."

The next day, when asked how the Pakistani Taliban would take revenge on America, a Taliban spokesman said, "We already have our people in America, and we are sending more there."

Just 3 days ago that group attacked a convoy from the

American Consulate in Peshawar, Pakistan, wounding an unknown number of people about 50 miles from where these defendants have sent their money.  Of course, there is more news this morning about the violence of that group.

This case is about individuals in South Florida who, along with associates in Pakistan, have provided precisely the kind of support that the Pakistani Taliban and groups like it require to continue their campaign of violence and terror.

These defendants did not plot to carry out attacks here in America, but the money and the assistance they provided to the Pakistani Taliban and their contacts in Pakistan made and continues to make such attacks possible.

For these reasons, and the reasons I will discuss more, we ask that the defendants be detained on both the basis of danger and risk of flight.

Let me start by reminding the court of several indisputable facts here.

First, there is a presumption in this case that the defendants must be detained under 18, U.S.C. 3142(e).  This court is certainly familiar with how the presumption works.

And, as a general matter, it not only affects the order of proof, but remains a factor throughout the proceeding and has weight as evidence because it reflects Congress' substantive judgment that a particular class of offenders should ordinarily be detained prior to trial, and I am actually

quoting that from a case of the United States versus Stone, 608 F.3d at 945, a 2010 opinion from the 6th Circuit, reversing a decision by other judges refusing to grant detention to defendants in the terrorism case.  So we start here with that presumption.

Second, as I mentioned, this is an indicted case.

THE COURT:  Let me interrupt you.

MR. SHIPLEY:  Yes, Your Honor.

THE COURT:  Is it your understanding that the burden of proof is less than what it is in an ordinary application for a pretrial detention?

MR. SHIPLEY:  Your Honor, I don't think the burden of proof is ultimately different.  I think under the statute it is still clear and convincing evidence for dangerousness and burden of persuasion on risk of flight.

However, the only point I wanted to make to the court was that, as the 6th Circuit has recognized, particularly in the terrorism context, the presumption does not just go away.

It doesn't just shift the initial burden of presentation.  It is something that the court needs to take into account, and the 6th Circuit actually used the word as evidence in the court making its determination.  So it doesn't ultimately shift the burden once we get past the initial presentation.

THE COURT:  All right.  Thank you.

MR. SHIPLEY:  Yes, Your Honor.

So, as I was saying, secondly, this is an indicted case.  We are prepared to make a proffer of the facts relative to detention, but the grand jury, by its indictment, has already found probable cause for these charges.

Third, these charges and the penalties they carry are extremely serious.  They are more among the most serious in federal law.

They all carry a 15 year maximum sentence on each count, and the defendants' guidelines, with the terrorism enhancement, which we believe would apply in this case, will be at or about that maximum.

Given the severity of those charges, they certainly have every incentive to flee as this goes forward.

So, with those three facts in mind, let me provide the court with a brief summary of what this case is about.

The evidence against these defendants is substantial. It is the defendants' own words, along with financial records, that underlie their guilt.

These words, some of which are paraphrased in the indictment, and some of which I will be summarizing today, appear in recorded telephone conversations which have been translated into English.

The defendants have been given notice that some of these recordings are pursuant to the Foreign Intelligence

Surveillance Act.  Others were recorded by a confidential human source.

On that front, Your Honor, let me be clear.  Despite the involvement of a source for a limited period of time, the defendants transfers to Pakistan, their financial transfers were always at their own initiative, and the source had no involvement in any of the transactions identified in the indictment.

It is those transfers and the defendants plans to send money on many other occasions that underlie these charges of conspiracy and substantive material support.

So what do those records and the financial records show in this case?  First, they show the defendants support for the Pakistani Taliban and its violent campaign against the Pakistani Government and its perceived allies of the United States.

The indictment in the initial paragraphs lays out some of the Pakistani Taliban's violence, including its murder of American soldiers and the attempted bombing of Times Square last May.

The defendant, Hafiz Khan, who I may refer to sometimes simply as "Khan" for shorthand, enthusiastically endorsed this violence.

For example, in a recorded conversation, upon learning that four American soldiers were killed in Afghanistan, Khan

declared his wish that 400,000 more were killed and prayed that the American army would be destroyed.

THE COURT:  Where was that statement obtained?

MR. SHIPLEY:  That was a recorded conversation, Your Honor.

THE COURT:  All right.

MR. SHIPLEY:  And, unless I specify otherwise, all of these are recorded conversations in this case that I am summarizing for the court and have been translated from their original language, Pashto or Urdu.

Khan later stated, in another recorded conversation, "May God kill 50,000 more of them," after hearing that 7 American troops had died in a helicopter crash.

Khan also in the recordings praised al-Qaeda, called for a global jihad in what he thought were secret conversations with the source and praised the Times Square bombing and expressed the wish that he had succeeded.

These are the defendant's words, Your Honor, in recorded conversations.

When it came to the Pakistani government, Khan was particularly brutal and profane, typical as the conversation from July of 2009.

In that conversation, Khan learned that an attack in a area of Swat, which had resulted in the death of many Pakistani army soldiers, upon hearing that information, Khan exclaimed,

"As long as the soldiers have died in the infidel way" -- that's a phrase that he used -- "as a result of it, then it is good."

He then wished that not just soldiers, but also their officers had died in the infidel way and exclaimed, "F-their wives."

When an associate pointed out that one of the dead was, indeed, an officer, Khan exclaimed, "Oh, Allah, thanks to you, thanks to you, may God drown all of these leaders in the ocean.  May God bring a revolution like Kohmani that their blood is shed in this land."

Khan's support for violence was not limited to Pakistani officials and soldiers.  He called for attacks on civilian supporters for the government and believed that innocent casualties were an inevitable byproduct of the Taliban mission.

In one recorded conversation, Khan actually complained, "Doesn't one of them have the guts to do a suicide attack so they can teach them a lesson?"

Khan's violence creeds are praised in the recordings by his co-conspirators who recount the same acts of violence.

In addition to those statements of intent and purpose, Your Honor, we have the defendants knowing and intentional support for the Pakistani Taliban through financial transfers to militants and contacts.

14

As set forth in the indictment, Khan and his sons collected and sent money for the Taliban which was then received and distributed by co-conspirators in Pakistan.

Khan sent his own money, as well as money given by others for the Taliban cause.

The indictment identifies as overt acts some but not all of those transactions.

Just to highlight a few examples, of which there are many, Khan has sent tens of thousands of dollars to co-defendant Ali Rehman, who is in Pakistan who Khan himself identified in recorded conversations as the man who buys guns from his accounts for the Taliban.

In August of 2009, Khan sent approximately $1,000 to a contact in Peshawar, Pakistan where there was additional violence in just the last several days, intending that money for the delivery to the Mujahideen.  These are from recorded conversations.

The money transfers continued into 2010 and continued past the official designation of the Pakistani Taliban as a foreign terrorist organization.

In addition to the specific transfers reflected in the recordings and corroborated I would say, Your Honor, by bank records, there are many instances where Khan discusses sending or having sent money to the Taliban.

In December of 2009, Khan asked an associate whether

Taliban commanders in a Swat village had received his money.

Subsequent comments clarify that, indeed, he was inquiring about whether that money had reached the fighters.

In another call his son, Izhar Khan, reminded Khan that, "When we have sent money for the Taliban, we have sent it through you."

And in still another call, Khan and co-defendant Irfan, who is in Los Angeles, discussed when they would next send money to the Sharia people.  Sharia being the strict form of Islamic law that groups like the Pakistani Taliban seek to establish.

Throughout this process Khan provided advice.  He has provided contacts and sought to avoid detection.

It should come as no surprise to anyone here that people may not have known about the extent of Khan's support for violence and terrorism overseas.

There has not been an individual convicted of material support in this country from José Padilla and Adam Hussein to the Times Square Bomber who openly proclaimed their support and their activity on behalf of a violent group.

In fact, in July of 2010, Khan told the source, in what he thought was a private conversation, that, "When sending money for guns, you cannot do so in the name of the Taliban.

Instead, a person will be over there.  You send him the money and you give it to him for guns, but you are not

supposed to say it," and Khan's funding must also be understood, in context in Pakistan's Northwest frontier where he is originally from, weapons are widely available and can cost next to nothing.

In fact, in recorded conversations, Khan actually discusses the different types of weapons that are available in the gun markets of the Pakistan-Afghanistan border, referring to the availability of Chinese counterfeit weapons, Russian weapons left over from the war in the 1980's, and even new American ones.

Let me focus a little more on the individual defendants here and first add just a few more facts about defendant Hafiz Khan.

In addition to being the Imam of the Flagler Mosque here in Miami, he is in charge of a madrassa or an Islamic school that he founded in Northwest Pakistan.

The madrassa was shut down by the Pakistani Army in mid 2009 when the army launched an offensive to remove the Taliban out of the Swat Valley.

Khan acknowledged in recorded calls that Taliban militants have stayed at his mosque and later admitted to the source the Taliban fighters have stayed in madrassa in the past.

He also claimed in one recording that children from his madrassa went to train under the Taliban leader Fasula to

learn to kill Americans in Afghanistan.

These are recorded conversations, Your Honor.  These are not the government's imaginings.

Khan maintains bank accounts in the United States and multiple accounts in Pakistan and has sent money in a variety of ways, assisted by his sons and by co-conspirators.

He has stated in recordings that he uses complicated methods of sending money precisely to avoid detection.  And dispute some speculation about Khan's wealth, let's be clear:

He has at least three U.S. dollar bank accounts in Pakistan and has sent over $100,000, far in excess of his salary to Pakistan since 2008 in or about when the conspiracy began, and over 200,000 going back to 2005.

Now, we do not allege that all of that money was for militancy, but there should be no doubt and no illusions about the access of this man to a significant amount of money.

He was the linchpin of a network of trusted recipients and intermediaries, and at one point, indeed, Khan actually exclaimed, in a recorded conversation, "Why don't they file a terrorist complaint against me?  I am the one who has done this work," only to be told not to discuss such things over the phone.

Now, the defendant Izhar, who is also an imam, was more careful than his father on the telephone.  Nevertheless, he played an important role in facilitating the conspiracy.

For example, in July of 2009, his father asked him to collect money that was being donated by a local woman for the Mujahideen. His words.

Izhar did so, and Khan subsequently deposited into his U.S. bank account, his father's U.S. bank account for which the money went to Pakistan.

Around the same time, Izhar sent $900 to co-defendant Amina Khan. Amina is Izhar's sister and has been identified in multiple recordings as a Taliban supporter, and we know from calls that she was the main conduit for money to go from America to a particular Mujahideen.

We know as well that another Mujahideen in Karachi, Pakistan, named Nor Muhammad, told the source in 2010 to thank Izhar for Izhar's support of the Taliban for the past 5 years, and singled out payment of 10,000 rubies by Izhar for that purpose when Izhar was in Karachi.

We know from travel records that Izhar was, indeed, in Karachi in the spring of 2009. Nor Muhammad is an injured Taliban fighter in hiding who was about to embark on a preaching tour for the Mujahideen.

Against this backdrop, Your Honor, let me talk specifically about danger and about risk of flight.

As I mentioned at the outset, these defendants actively supported the Pakistani Taliban which left no ambiguity about its intent to continue its campaign of violence

19

in Pakistan and also in the United States.

Networks of violence and terror do not just require people willing to commit suicide attacks.  They need people to provide money.  They need people to provide context.

That is the role of these individuals as they characteristically would be in a material support case.

We know that Hafiz Khan was an advocate for violence in secret, in terms that I am certain that would shock anyone in this courtroom.

Izhar, too, was perfectly prepared to finance the Mujahideen.

Now, that they have been indicted and the Pakistani Taliban is under threat, we don't know what will occur, but more pointedly, Your Honor, unless these defendants are detained, there is no way for this court to insure that they are not continuing to send money to Pakistan to support terrorism.

The concern is not just people here in this community, in South Florida, but people in Pakistan.

Many courts, including the 9th Circuit in a case called Jere, had made clear that in a detention hearing the court needs to consider the danger, not just to the immediate community, but to the community as well as overseas.

And if Your Honor wants a citation, I am happy to provide it to you, but I think that's a very fairly well-known

proposition.  And let's be clear, Your Honor.

Neither Hafiz Khan's age nor his condition has been an impediment to support for Taliban violence.  He has committed these crimes with as little sometimes as a phone, his contacts and his bank accounts.  Age is no limitation to that support.

It has been no limitation and would not be a limitation for him to continuing to do so without detention.

His kind of support can be conducted at any age.  The blind sheik was in his 60's.  Ayman al-Zawahri is in his 60's.

Age is not a limitation for an individual who is prepared to support terrorism through violence and his contacts.

So, Your Honor, on both of those regards, especially taking into account the presumption, we believe there is a powerful danger to the community, not just here, but also in Pakistan as well.

As for flight, Your Honor, that's a risk posed by both defendants.

On the issues of flight, let me first talk about Hafiz Khan.  I am sure the defense will say, and I think we have all read comments to this effect, "Well, he is an older man.  What risk does he pose going anywhere?"

It is nonsense, Your Honor.  The only question for risk of flight is can this individual, or his co-defendant, get outside the jurisdiction of this court, wherever that may be;

whether it is Pakistan, whether it is in the Bahamas, it don't matter.

We live in Miami.  It doesn't take much to get outside of this court's reach.

This defendant has a powerful incentive to flee, particularly given his age, and even a single instance of conviction, a single instance of material support or a conviction on the conspiracy charge subjects him up to 15 years which he will be at by virtue of the terrorism enhancement.

Okay.  And so it is clear, we have alleged much more than that, but the court needs to bear in mind a conviction on even a single count would subject him to that punishment.

Khan has said, in recorded conversations, that he is not happy in what he has called retched America, and at least prior to indictment has said he planned to return to Pakistan once his work here is complete.

As recently as last year, he indicated that he has no plans to stay in this country and, in fact, that's why he would not buy a house in this country, and he told his co-defendant Izhar to leave the United States as well.

Once outside of the United States, the defendant has an extensive network in Pakistan to fund him wherever he may be.

We know from the calls and other information that he has land holdings and business income in Pakistan itself,

including multiple shops and land.

We know, as I mentioned, that he has multiple U.S. dollar bank accounts that he keeps in Pakistan and, of course, he has his family and co-defendants and a vast number of contacts who are over in Pakistan.

This is a continuing investigation, Your Honor, and the defendant would do what it takes to escape these charges.

It is not just the obvious facts, though, of the nature of this case. Deception is second nature to this individual.

Khan was especially careful in his dealings about the Taliban around the mosque. At the Flagler mosque. In fact, there are recorded conversations where he says he cannot talk about these things openly because, if found out, there would be trouble.

More than that, he has said in the recordings that he would definitely tell a lie to support the Taliban cause.

He did this in a conversation right after saying he would never acknowledge his activities to these filthy people, referring in context to American law enforcement or Americans.

He was absolutely clear, in furtherance of his goal, he would tell a lie. In fact, his last comments were, "I would definitely for my goal tell a lie. For those you work for, God will forgive you."

In that conversation they then proceeded to talk about

the Taliban context.

Above and beyond that, Your Honor, Khan has discussed immigration related fraud repeatedly in the recordings.

A bond or a restriction on flight, even house arrest, Your Honor, is only as effective as a person seeks to leave in their true name with their true identity.

In fact, Khan frequently discusses creating false documents to deceive Pakistani authorities and to secure entry into the United States for family members and potential Taliban contacts.

In December of 2009, for example, Khan told a co-defendant that he knows special discreet individuals in the embassy, presumably referring to the U.S. Embassy in Islamabad, that take care of false documents for visitor visas to the U.S. because bribery is such a thing that sometimes it works right in the open, other times it does not.

Likewise, in October of 2010, Khan plotted with a co-conspirator to create false birth certificates, stating that he knows a Pakistani government employee who can perform this task, and that money is not an issue.  "I will send money to get it done."

Those facts are relevant not only to danger, in terms of the ability of these defendants to bring people to the United States, but also, of course, to risk of flight.

And we know, as I proffered earlier, that the

defendant has not been honest in collecting money for people.

There are numerous instances where he has solicited money for one cause.  In fact, that money has been designated for other purposes, including Mujahideen.

So that is the United States' argument regarding risk of flight.  In addition to danger, again, there is the presumption.

As to defendant Izhar Khan, he has traveled outside the United States three times since the fall of 2010, travelling to Saudi Arabia and twice to Canada.

In addition, in 2009, he went to Pakistan.  He has the same contacts in Pakistan as his father and access to the same resources and the same money.

In fact, when this defendant was arrested, his U.S. passport was found in the glove compartment of his car.

It is not where I keep mine or I suspect Your Honor keeps yours.  You do that when you are prepared to leave the country.

He also had his Pakistani identification card in his wallet.  That's all he needed to leave the United States.

His travel brings up a related issue.  His statements to Pretrial Services, Your Honor, were misleading, at best, as they are reflected on the Pretrial Services report.

I don't know whether that report has changed since last week.  I haven't reviewed it this morning.  We brought it

back to the court, but let me speak to a few matters that he raised in that report.

His travel.  The only travel indicated was a trip to Saudi Arabia in 2009.  In fact, he went to Pakistan in 2009, which is where he met the Taliban militant preacher Nor Muhammad and provided him money in Karachi.

He totally failed to disclose his travel last year, including his three recent trips outside of the United States, through misleading, at best, regarding his travel.

He was misleading regarding his residence.  He said to Pretrial Services and this court that he was residing at a home in North Lauderdale, Florida.

In fact, he has been spending virtually every day and every night living at the mosque where he was arrested on the morning of May 14th where his personal effects are, including a sleeping bag.

That is because, Your Honor, he is actually renting out his house in North Lauderdale to a family for $800 a month in cash and has been doing so for approximately a year, keeping only a space in the garage.

In that regard as well, Your Honor, the Pretrial Services report, even on as fundamental an issue as where he is living is misleading, at best.

He is also misleading, at best, about his income which is otherwise substantial but not does not reveal his rental

income of $800 a month in cash, and finally he was misleading, at best, about his relationships.

He told Pretrial Services that he is not married. According to documents found during searches, and also from the recordings, it turns out that he is married, based on those documents.

Why does this matter?  In addition, to the falsehood, it turns out the defendant has an application, Izhar Khan, pending with immigration for a K-1 visa for his fiancee.

That visa, which some believe is easier to obtain, is only available if you are legally free to marry and you plan to marry an individual here in the United States.

The point is, Your Honor, these statements hardly inspire confidence that this defendant will follow through on any assurances he may give to this court.

He has the financial means to flee.  He has the income to flee and he has just as powerful an incentive as his co-defendant to do so in the face of these charges.

Your Honor, the question is whether this court can be sure that neither these defendants nor their money will leave the Southern District of Florida.

There is no way for this court to say, in the face of presumption, in the face of this indictment, that that will be the case.

So, Your Honor, I respectfully request the court to