27

detain these defendants pending trial.

THE COURT:  All right, sir.

MR. SHIPLEY:  Thank you.

THE COURT:  Would you call your first witness.

MR. SHIPLEY:  Your Honor, I have Mike Ferlazzo, a special agent with the FBI available.

THE COURT:  All right.  Fine.

THE CLERK:  Right up here, please.  Please raise your right hand.

THE COURT:  Will you swear the witness, please.

THE CLERK:  Please raise your right hand.

MICHAEL FERLAZZO, GOVERNMENT'S WITNESS, SWORN.

THE CLERK:  Thank you.  Please have a seat.  Please state and spell your name for the record.

THE WITNESS:  Michael Ferlazzo.  F-e-r-l-a-z-z-o.

THE CLERK:  Thank you.

THE COURT:  Mr. Ferlazzo, what agency are you with?

THE WITNESS:  The Federal Bureau of Investigation, Your Honor.

THE COURT:  All right.  Counsel for the defendant Ali Khan may proceed.  Again, keep in mind the limitations I have placed on this questioning.

CROSS EXAMINATION

BY MR. WAHID:

Q.  Agent, have you already the phone recordings that the

prosecutor just talked about?

A. I have heard some of them.

Q. Have you heard all of them?

A. No, I have not.

Q. Have you heard the ones that were mentioned today?

A. No.

Q. So you are not able to testify firsthand as to any content of those discussions that the prosecutor talked about today?

A. We rely on our FBI trained linguists.

Q. Okay. Have you heard the translations of those discussions?

A. I am familiar with the transcripts, yes.

Q. You have reviewed all of the transcripts?

A. Yes, I have.

THE COURT: Let me ask you, you have heard the proffer made by the government, have you not?

THE WITNESS: Yes, Your Honor.

THE COURT: With regard to those transcripts that you have read, were they consistent with what the government has told us were in them?

THE WITNESS: Yes, Your Honor. Consistent and factual.

THE COURT: All right. Go ahead.

BY MR. WAHID:

Q. Agent, are you aware that the Pakistani Taliban is

currently a designated foreign terrorist organization?

A.    Yes.

Q.    Are you aware that that happened, that that designation was on August 12th of 2010?

A.    Yes.  It was formally designated by the State Department in August of 2010.

Q.    And would it be fair to say that the majority of financial transactions that are alleged in this particular indictment are prior to August 12th of 2010?

A.    There are a portion before and a portion after.

Q.    Would it be fair to say that based on the indictment, only two transactions are after August 12th of 2010?

A.    That's correct.

Q.    All right.  And all of the other alleged transactions were prior to the Pakistan Taliban being designated or the public essentially be placed on notice that they are being designated as a foreign terrorist organization?

A.    Yes.  They were before then, and it was their actions that led to that designation.  It was not that their actions began with the designation.

Q.    All right.  But there was no public notice that they were designated as a terrorist organization prior to them actually being designed, correct?

A.    The State Department notice was in August of 2010, yes.

Q.    All right.  Now, as I have not been able to hear the phone

calls or any of the actual evidence, I will ask you.

Are you aware that some of the conversations were specifically about a madrassa in Northern Pakistan?

A.   Those are not the conversations that Mr. Shipley spoke about.

Q.   All right.   Are you aware that there are conversations about the madrassa in Northern Pakistan?

A.   Yes.

Q.   All right.   And do you know that madrassa means school?

A.   Yes.

Q.   All right.   And are you aware that in some of those conversations the term "Taliban" was used?

A.   Yes.

Q.   And are you aware that Taliban is also another, is Pashto for students?

A.   I am aware of that, and the Taliban references were clearly in context that the militants are not students.

Q.   And that's your testimony as to all of the conversations?

A.   No.   Not all.

Q.   How many?

A.   I don't have that number of which were references to Taliban militants versus the students, but he definitely spoke of his school.

Q.   And he spoke of the students in the school?

A.   He did.

Q.   And he used the term "Taliban" when he did that?

MR. SHIPLEY:   Objection, Your Honor, both to the form of the question and relevance.  We are really getting into discovery.

THE COURT:   I will sustain the objection as to form. The objection is sustained as to form.  Rephrase your question.

BY MR. WAHID:

Q.   Are you aware if he used the term "Taliban" when he had the conversations about the madrassa?

A.   Yes.

Q.   Okay.  Now, Mr. Shipley mentioned that there were three U.S. dollar bank accounts in Pakistan, correct?

A.   That's correct.

Q.   And do you have any evidence of any wire transfers from here to those bank accounts?

A.   Yes.

Q.   All right.  Have you yourself filled out any reports in this case?

A.   I have not.

Q.   The wire transfers that you have seen, who were they to?

MR. SHIPLEY:   Your Honor, I am going to object.  This is discovery.

THE COURT:   I will sustain the objection.

MR. WAHID:   All right.

THE COURT:   You are outside the bounds of what we

discussed earlier.

BY MR. WAHID:

Q.   The prosecutor had said in his proffer that these wire transfers were or some were for purposes other than to support the Pakistan Taliban, but he said the bulk of it was for supporting the Pakistan Taliban; is that correct?

{MR._STPHAO}:  Actually, Your Honor, may I object? That was not the prosecutor's statement, in fact.

THE COURT:  All right.  Sustained.

MR. SHIPLEY:  He can ask a question.

THE COURT:  Rephrase your if you wish.

MR. WAHID:  Sure.

BY MR. WAHID:

Q.   Were any of the funds in your opinion, based on your review of the phone calls and the wire transfers, for things other than allegedly supporting the Pakistan Taliban?

A.   Yes.  We are not stating that every single dollar sent overseas was for the Taliban.

Q.   All right.  And the funds that were alleged for the Pakistan Taliban versus the ones that were not, were they all going through those same three bank accounts?

MR. SHIPLEY:  Objection, Your Honor.  Again, this is discovery.

THE COURT:  I will sustain the objection.

BY MR. WAHID:

Q.  Prosecutor has said on many occasions here that the funds were designated for the Pakistan Taliban.  How do you know that?

A.  From the defendant's own words identifying these individuals and the roles that they played.

Q.  And do you know if any of those funds actually made it to the Pakistan Taliban?

A.  There are some instances where we can.

Q.  And how do you know that?

A.  Through the recorded conversations.

Q.  So, again, based on the statements made by the defendant or the co-defendants in the phone calls?

A.  That's correct.

Q.  All right.  Do you have any independent evidence to suggest that the Pakistan Taliban actually received funds in Pakistan?

A.  We also have our source, and our source was in Pakistan, and he reported that, that they received it directly.

THE COURT:  Anything further?

MR. WAHID:  Yes, Your.

BY MR. WAHID:

Q.  Are you aware that the madrassa actually had, the majority of the students in that madrassa are young girls?

A.  Yes.  I am aware of that.

Q.  Okay.  And you are aware that the age group tends to be between about 8 to 12 years old for the most part?

Michael Ferlazzo - Cross

34

A.   I am not aware of the age range.

Q.   All right.  They are younger children.  Minors?

A.   That's my understanding.

Q.   All right.  And are you aware that the Taliban does not take girls as fighters?

A.   Yes.

Q.   All right.  Agent, are you aware of the specifics as to what property Mr. Khan owns?

A.   I am familiar with it through the course of the investigation, yes.

Q.   All right.  So you are aware that he owns one home in here in Miami?

A.   From our records and the property records, I do not believe that that is the same Hafiz Khan, if that's what you are referring to.

Q.   Do you know if he has a property on 162nd Place?

A.   No, I do not.  From our review of the records this morning that is a different date of birth.

Q.   Do you know that Mr. Khan has a wife here in Miami?

A.   I do.

Q.   You are also aware that he has been living and working in South Florida since 1996?

A.   Yes.

Q.   You are also aware that his trip to Saudi Arabia was for a religious pilgrimage known as Hodge?

A.   Yes.  I believe in 2005.

Q.   And that he has made no other trips abroad since he has been in the United States?

A.   Yes.

Q.   You are aware that that there was an offensive that the Pakistani Government had against the Taliban in December of 2009?

A.   Yes.  I am familiar with that offensive.

Q.   And that that offensive ended up closing down all of the madrassas in the Swat Valley area, correct?

A.   That's outside the scope of my knowledge.

Q.   All right.  Mr. Shipley had pointed out that this particular madrassa was shut down by the Pakistan Government. Do you recall that?

A.   Yes.  I am aware that Hafiz Khan's mosque was shut down.

Q.   All right.  And are you aware that that was not the only madrassa that was shut down?  That it was not specifically targeted?

A.   I am aware that there are multiple madrassas, yes.

Q.   And that it had to do with safety of people in the region because of the uprising, correct?

          MR. SHIPLEY:  Objection to foundation, Your Honor.

          THE COURT:  Sustained.

          MR. WAHID:  One moment, Your Honor.

BY MR. WAHID:

Q.   Agent, have you looked at what funds Mr. Khan has in his bank accounts here in the United States that he has access to?

A.   Yes.  We have bank accounts for his accounts here.

Q.   All right.  Would it be accurate to say it is no more than $2,700?

MR. SHIPLEY:  Your Honor, I object.  Just for a time frame.

THE COURT:  Yes.  What period of time are you talking about?

MR. WAHID:  Currently.  As of the time of his arrest.

THE WITNESS:  That sounds feasible.  I don't have the actual records from that time frame.

MR. WAHID:  Nothing else, Judge.  All right. Mr. Rosenbaum.

MR. ROSENBAUM:  Thank you, Your Honor.

                    CROSS EXAMINATION

THE COURT:  Again, keep in mind the limitations of your examination.

MR. ROSENBAUM:  Yes, sir.

                    CROSS EXAMINATION

Q.   Agent Ferlazzo?

A.   Yes.

Q.   Good morning.

A.   Good morning.

Q.   Okay.  I am going to ask you questions just about Izhar

Khan, my client.

A.  Yes.

Q.  You are familiar with the indictment, correct?

A.  I am.

Q.  And there are two things in the indictment that the government alleges.  One was that on July 16, 2009, Izhar caused $900 to be sent by a wire transfer to Amina in Pakistan?

A.  That's correct.

Q.  Amina is his sister?

A.  Is his sister and co-defendant, and just before that transaction was identified in a recorded conversation as someone who can provide money to a Taliban militant.

Q.  Okay.  You are talking about Amina?

A.  Amina.

Q.  Okay.  But as far as Izhar goes, the relationship as far as familial is, that is his sister?

A.  That's correct.

Q.  All right.  And he sent $900 to her?

A.  That's correct.

Q.  And the money went to her?

A.  As far as Western Union transactions.

Q.  Okay.  It was a Western Union that was done here to his sister in Pakistan?

A.  That's correct.

Q.  And it was easy to follow, right?

Michael Ferlazzo - Cross

38

A.   Yes.

Q.   It was not concealed.  It was not disguised?

A.   No.

        MR. SHIPLEY:   Well, objection, Your Honor, to the form of the question.

        THE COURT:   Overruled.  You can answer.

BY MR. WAHID:

Q.   It wasn't concealed or disguised?

A.   No.  It was sent through Western Union.

Q.   Okay.  And do you know or do you know why Izhar sent the money to Amina based upon any recordings that you have?

A.   As I said, just before that transaction Hafiz Khan identified Amina to Izhar Khan in a recorded conversation as the one who was providing support to a Taliban militant.

Q.   You don't know what that $900 was used for, do you?

A.   Based on that call, I would assume.

Q.   Not assuming.  Let's take that word out of this courtroom. Not assuming.  Do you know that that $900 went for personal benefit, for the school or for any other activity?

A.   My knowledge on that transaction is from that recorded call.

Q.   Okay.  But you don't know what happened to the $900?

A.   No.

Q.   Do you agree with the prosecutor who stated that Hafiz Khan, the co-defendant, is not always honest when he is

soliciting money?

A. Yes.

Q. Let's go to the other act in the indictment which deals with Izhar. This is on July 11, 2009.

Khan asked Izhar to collect from a donor in the U.S. money that Khan told Izhar had been approved for the Mujahideen.

Are you familiar with that? Was that a recording?

A. Yes.

Q. And that was a phone call between Khan and Izhar?

A. Yes.

Q. And you have listened to the translations?

A. I have read the transcript.

Q. You have read the transcript. And was there any other discussion in that transcript about getting that money?

A. Khan asked him to pick it up and say that it was -- he said that was approved to the Mujahideen.

Q. And that money, was it picked up?

A. It was.

Q. Okay. And how much was it?

A. It was a check for $300.00.

Q. And that check was deposited into whose account?

A. Hafiz Khan's.

Q. And do you know where that $300.00 eventually went?

A. No, I do not.

Michael Ferlazzo - Cross

40

Q.  Now, are you familiar with the travel that Izhar has done recently?

A.  Yes.

Q.  Okay.  And it was mentioned that he went to Saudi Arabia?

A.  That's correct.

Q.  Okay.  Do you know that he went there to attend the holy Hodge?

A.  That's correct.

Q.  And he went to Pakistan?

A.  I am aware of a trip to Pakistan in 2009, yes.

Q.  And that's when he became engaged to his current fiancee?

A.  I am not aware of that.

Q.  And you know that he is not legally married?

A.  From paperwork that I have seen, I have seen a marriage certificate.

Q.  Is it a religious or a civil certificate?

A.  I am not sure.

Q.  And he has processed the form with the United States Government in order to bring her to this country, correct?

A.  He has requested a K-1 fiancee visa.

Q.  A fiancee visa.  And are you familiar with his trip to Canada?

A.  Yes.

Q.  And do you know he went there to give a religious seminar?

A.  I am familiar that he has contacts there, yes.

Q.   And you know he has been in this country since he has been 8 years old, correct?

A.   Correct.

Q.   And that he attended public school here in the South Florida area until he was about 12 or 13 years old?

A.   I don't have specific knowledge of that.

Q.   And that he then went to school up in Buffalo, New York until he finished his studies?

A.   I am familiar with his studies at the Islamic University in Buffalo.

Q.   And that he continuously remained in the United States from when he entered this country when he was 8 years old until just a couple of years ago when he went to the Hodge, the Canadian business trip and to get engaged with his fiancee in Pakistan?

A.   I am aware of that travel.

Q.   Are you aware that he is, besides being a very religious man, that he is very active in his community?

A.   Define "active."

Q.   Raises money for the mosque.

A.   Yes.

Q.   Have you in your interview, and I am sure you have interviewed members of his mosque, there is no teachings or preachings by Izhar regarding any political viewpoints against the United States or Pakistan?

A.   No, not that I am aware of.

Michael Ferlazzo - Cross

42

Q.  And the Pakistani Taliban didn't become a foreign terrorist organization until August of 2010?

A.  That's correct.  It was designated in August.

Q.  And the two dates in the indictment for Izhar Khan are in 2009?

MR. SHIPLEY:  Your Honor, I object only for clarification.  Those are two overt acts in the indictment. They are not the date of the charges.

THE COURT:  Repeat your objection.

MR. SHIPLEY:  To the form of the question, Your Honor, to define the acts in the indictment.  What he is talking about are two overt acts.

THE COURT:  All right.

MR. SHIPLEY:  That's not the time frame of the charges.

THE COURT:  All right.  I will sustain it.  Rephrase your question, counsel.

BY MR. ROSENBAUM:

Q.  As to the overt acts, the only overt acts charged in the indictment are those that occurred prior to the Pakistani Taliban being declared a foreign terrorist organization?

A.  That's correct.

Q.  Do you know of any other funds that Izhar sent to Pakistan after the one we just talked about that occurred in July of 2009?

A.   No.

MR. ROSENBAUM:  I have no other questions, Your Honor.

THE COURT:  All right.  Is the government offering any other testimony?

MR. SHIPLEY:  No, Your Honor.  Thank you.

[The witness was excused].

THE COURT:  All right.  Is the defense offering any testimony in this matter?

MR. WAHID:  Yes, Your Honor.

THE COURT:  All right.

MR. WAHID:  I would like to call a witness, Doctor Amir Abdel Zaher.

THE COURT:  Would you proffer initially what his testimony would be about.

MR. WAHID:  It goes to the character of my client and statements he has made and teachings that he has done in terms of not being in any sort of violence; nothing about bringing down the government of the United States or Pakistan.  Nothing about sending money to support the Pakistan Taliban.

THE COURT:  Those facts are limited to this witness' knowledge?

MR. WAHID:  The thing is the interaction of them with my client.

THE COURT:  Mr. Shipley, do you have an objection?

MR. SHIPLEY:  Your Honor, I do.  If what the defense

wants to proffer is that there are individuals who would come into court and say that they are not familiar with Khan having spoken to the Pakistan Taliban, with Khan having sent this money, that is entirely consistent with what the United States has alleged in this case.

So I don't know what specifically he wants to elicit, but I wouldn't dispute that fact.

In fact, I believe I proffered it to the court. That's the very essence of a material support crime and concealment.

So Your Honor can proceed however the court sees fit, obviously, but I think that's going to be a waste of time because there is no dispute from this side that there are going to be people, probably a large number of people who the defense could bring in to say, "He never talked about that with us.  He didn't preach openly about it," because that's the reality of this case.

THE COURT:  All right.  Would you agree with that, counsel?

MR. WAHID:  Well, I would agree that there are a large number of people who would say that, yes.

THE COURT:  All right.  Is that what your proposed witness would say?

MR. WAHID:  Well, absolutely, and it also goes to the idea that or it goes to spending a lot of time with him, and

Amir Abdel Zaher - Direct

45

both publicly and privately they have never heard him say.

THE COURT: All right. Call the witness forward to be sworn.

MR. SHIPLEY: Your Honor, I don't mean to be disrespectful of the court. May I speak to the agent for one moment --

THE COURT: All right.

MR. SHIPLEY: -- while the testimony proceeds?

THE COURT: All right.

MR. WAHID: We have to swear in the witness, right?

THE CLERK: Yes.

MR. WAHID: Can you state your name? Oh. I am sorry.

THE CLERK: Please raise your right hand.

Please have a seat. Please state and spell your name, for the record.

THE WITNESS: Amir Abdel Zaher. The last name is Abdel, A-b-d-e-l. Z-a-h --

THE CLERK: Excuse me. A-b-d?

THE WITNESS: A-b-d-e-l. Z-a-h-e-r.

THE CLERK: Abdel Zaher.

THE COURT: All right. Proceed, counsel.

MR. WAHID: Thank you.

DIRECT EXAMINATION

BY MR. WAHID:

Q. Mr. Abdel Zaher, what do you do for a living?

46

A.  I am a researcher at the University of Miami.

Q.  Do you know Imam Hafiz Khan?

A.  Yes.

Q.  How long have you known him?

A.  I would say at least 5 years.

Q.  And what kind of interaction?  Like what is the reason you interact with him?

A.  I often seek his counsel and his guidance.  I have heard him instruct the community many times.

I recall even times when I took him to his physician in Broward I got time to spend with him in the car and have private conversations with him.

I spent many nights in the mosque as well, and I have seen him there.  I got to speak with him at times.

Q.  And would you agree that you have spent a substantial amount of time with him?

A.  Yes.

Q.  And would you agree that some of that was not in public? Just you and him?

A.  Definitely.

Q.  Okay.  Have you ever heard him talk about the overthrow of the United States Government?

A.  Never.

Q.  Have you ever heard him talk about the overthrow of the Pakistani Government?

A.   No.

Q.   Has he ever expressed to you any sort of willingness to use violence to achieve any goals?

A.   On the contrary.  He is always speaking about how to treat other people with kindness.  Even non-Muslims.

On my trip with him to the physician, I was even asking him about this question about, you know, some of my relationships with some of my colleagues, et cetera, and he was speaking only about how to treat them kindly and with respect.

Never.  Very far from violence.  More about how to treat them with respect and kindness.

Q.   And have you ever had any interaction with him where he has in any way, you know, talked about the madrassa that he supports in Pakistan?

A.   No.

MR. WAHID:  Okay.  Thank you.

THE COURT:  All right.  Does the government have any questions?  If so, why?

MR. SHIPLEY:  I have no questions, Your Honor.

THE COURT:  Thank you.  You may step down.

[The witness was excused].

THE COURT:  All right.  Any further testimony of any witnesses, Mr. Rosenbaum?

MR. ROSENBAUM:  I would like to call someone for the same type of purpose, or I can proffer it to the court.

Whatever you would like.

THE COURT:  All right.  Would you make your proffer.

MR. ROSENBAUM:  Okay.  There are many individuals, but the individual that I would call would be the president of the Margate mosque who is Yacida Lee who is present in the courtroom, and he would testify that Izhar is a man of peace; that he has never breached or talked about violent overthrow of the United States Government or the government of Pakistan.

He is not a political person.  He is a preacher and totally limits himself to religious studies.  He does not raise -- I misspoke before.  He does not raise money for the mosque.  He does not raise money.  That is done by the president and the board of the mosque for the purposes of the mosque.

Izhar's total being at that mosque is for religious studies and to help other people.  He has been in America most of his life.

He belongs to a gym.  He is a good athlete.  He plays badminton, cricket, and I understand he is the best basketball player at the mosque.  He is a rabid Heat fan.

He is an Americanized person.  He has been here a long time and loves this country, and everyone I spoke to from his mosque up in Margate says it that way.

I understand the government's theory, but there is not a scintilla from anybody I have talked to of all of the members

that say anything different.  He is very respected.  Very religious and very main stream American.

THE COURT:  All right.  I think the government acknowledges that a number of witnesses would so testify.  Isn't that correct, Mr. Shipley?

MR. SHIPLEY:  In sum and in substance, Your Honor.

THE COURT:  All right.  Any further testimony to be offered by either side?

MR. SHIPLEY:  Not for the United States.

THE COURT:  All right.  The court will allow each side ten minutes to make a closing statement with regard to your respective positions.  Government.

MR. SHIPLEY:  Your Honor, would you like me to proceed first?  And maybe since I have made some of my presentation, I can follow the court's preference.

THE COURT:  No.  You proceed first.

MR. SHIPLEY:  Absolutely, Your Honor.

THE COURT:  It is your motion.

MR. SHIPLEY:  Sure.  Your Honor, not having heard any contrary arguments from the defense, I will respond to just a couple of points from the questioning by way of proffer and information.

There were a couple of questions put to the witness about the designation date of the Pakistani Taliban as a foreign terrorist organization.

The court may be familiar with these statutes already, but, of course in the indictment, there are four counts in the indictment.

Two deal with the Statute 18, U.S.C. 2339(b) which deals simply with support for a foreign terrorist organization.

There is no requirement that an individual know the group is designated as a foreign terrorist organization as long as they know it engages in terrorist activity.  That's the mens rea requirement in the statute.

If I haven't persuaded the court that the government has substantial evidence of that, then I haven't succeeded at all in my arguments.

I would also point out that Counts I and III of the indictment concern a different statute, 2339(a) which simply deals with material support meant to further conspiracy to murder, mame or kidnap.

It doesn't matter whether the group has been designated or not.  That was the primary statute in the Pedilla case, for example.  So I just wanted to clarify that for the sake of the court as to that issue.

The only really two factual points as to the content of the calls, Khan is explicit not only about the Taliban, there are references to Taliban as students, but there are also explicit references to the Taliban and many explicit references to Mujahideen militants and other terms that are clearly

referring to militants.  There is no confusion on that front.

In addition, as I proffered initially, there are statements by the defendant, not from the United States, by the defendant describing the fact that children from his madrassa have gone from the madrassa to learn to train to kill Americans, with the specific reference to the Pakistan Taliban leader Fasula.  So, again, these are references from the defendants.

One other factual point, Your Honor, as to the issue of marriage or fiancee, I don't want to overstate that, but since it was referenced in the discussion, what it does show is both an intent to, at a bear minimum, attempt to be misleading with Pretrial Services and to fail to acknowledge a contact in Pakistan.

I can tell the court that we have affidavits, civil marriage certificates and actual letters with signatures of family members indicating that this was a bona fide marriage.

So those documents are available, and those were actually obtained through a search after the arrests.

Your Honor, I won't belabor the points that I made earlier.  The question before this court is whether, in the face of the presumption, which is certainly rebuttal, but reflects Congress' intent as to how cases like this should be handled, the court is confident that these defendants will not engage in any more activity which is harmful to the community

and will show up in court.

There is no basis on this record to say so, given the severity of the charges. These are the defendants' words. The evidence in this case is strong.

We know that they have the ability. They certainly have the means to flee. They have the ability. They have foreign travel.

Certainly Hafiz Khan has not traveled as much, but the capability for him to do so is there and, of course, it is his bank accounts, his family, his co-defendants and his resources in Pakistan that can support him everywhere.

It is not just whether he will go to Pakistan. It is whether he would go anywhere outside of the jurisdiction of the United States. And because those are U.S. dollar bank accounts, he would have no difficulty obtaining access to that money and has, in fact, moved money here from the United States to Pakistan by using those accounts specifically.

He also, of course, has bank accounts here in the United States. But even putting that aside, even if the defendant could not go anywhere, all it takes to provide the kind of support that he has provided is a telephone. That's it.

To give instructions for money to be moved from bank accounts here, from bank accounts in Pakistan, to place calls, be it the middle of the day here, the middle of the night in

Pakistan, or whatever the timing may be for individuals to pick up that money at the bank branches in Pakistan and distribute it, according to his instructions, I can tell the court that in these recordings you see highly detailed directions about how money is supposed to be delivered down to the dollar in terms of different contacts and different purposes.

That ability cannot be monitored, cannot be foreclosed by this court through a bond, and that danger exists to people here and to people in Pakistan, especially when you have a group like the Pakistani Taliban that has engaged in violence, not only for years, but has now, and at least since last May and as recently as two weeks ago, declared an intent to attack American targets through individuals they have in the United States, which is perfectly consistent with the kind of support network that you see in place here.

It does not just take somebody to go blow themselves up.  It requires people to provide the money, the contacts, the inspiration and the resources, and that is what you have in a material support case.

Finally, Your Honor, specifically as to defendant Izhar Khan, this is clearly a man who can travel.  He is a man who has travelled.

Whether or not in recent trips out of the country were for benign purposes, he is clearly comfortable getting on an airplane heading out of the United States.

He had his passport in the glove compartment of his car, and he faces the same incentive to leave, of course, as his father.

So if the court has any questions, I am happy to address them, but the fact of the matter is with the presumption in this case on the indictment, with a proffer made by the United States, I would submit there is powerful substantial and certainly sufficient evidence of both danger to the community and risk of flight.

This court cannot and should not take the chance of relying on the assurances of these defendants, especially when one of the defendants has said in recordings that he unambiguously would lie to support his cause, and another defendant that we know has been misleading, at best, with Pretrial Services.

Thank you, Your Honor.

THE COURT:  All right.

MR. SHIPLEY:  Unless the court has any questions.

THE COURT:  No.  Mr. Wahid.

MR. JONES:  The prosecutor states that all I need is a telephone to do something violent.

Well, the entire case is about being on the telephone. We have actually not or I have never had an opportunity to see any of these calls.

This is all just being stated by Mr. Shipley.  We

don't have a sense of how many calls.  We don't have a sense of the context of these calls.

We all know that we have a First Amendment right to speak about our politics.  And if that is the sum and substance of many of these conversations, those conversations should not have a bearing on this proceeding.

We also know that the Pakistan Taliban, by the government's own admission, was not actually designated until August 12th of 2010, and in all but two transactions that they have alleged in the indictment were prior to that date.

We also know that the evidence that the government seems to have here includes some wire transfers, but they even admit that that money was for multiple purposes.

There is a family there.  There is a madrassa there.  There is no claim, actually, that that Madrassa is not pursuing legitimate goals.

They are claiming that somehow also those students are being trained to be fighters.  We know by their own admission that it is mostly young females.  Females do not get brought into the Taliban as fighters.

We know that there is potential translation and context issues; that the word "Taliban" also means student.  That Madrassa is just a school, and conversations that might be talking about students in the school could be the sum and substance of many of this alleged support of the Pakistan

Taliban.

All we know about the actual, if there was any real support to the Pakistan Taliban comes from potentially the phone calls and the context of those phone calls, and they claim to have a source in Pakistan who received funds directly, and we don't know what those funds were actually used for.

That was not presented to us here today, but if people have families back home and anyone who comes from an immigrant family knows you are going to send money back to your village to support the people in that village.

You are going to support the orphans in the village. You are going to support charitable causes in the village, and that is so far not really being rebutted by the government.

I would also point out that a lot of the conversations that they are talking about as they go over a number of years could be within the context of dealing with the politics of Pakistan over the last number of years, which has been in the news here as well, and we know that there is a constant, even the United States is trying to always figure out who over there is friend or foe, let alone the average citizen here in the United States.

I would also point out that all of the discussions that are on these calls, for the most part, are with family members, and one is more likely to have a conversation with family members about politics and things you are going to be

57

complaining about and you are more likely to be angry about things, those should not be held against Mr. Khan in a criminal manner.

I would also point out that so far that we have seen, the wire transfers that they are talking about, none of them seem to be directed to any Pakistan Taliban members.  Nothing like that has been presented here.

The claims seem to be that these transfers are to family members, and that somehow the family members are turning around and giving it to other parties.

Let me talk a little bit about risk of flight. Mr. Khan has been in this community since 1996.  He has only been out of the country once for the purposes of a religious pilgrimage to Saudi Arabia.

He has strong ties to the community.  He is the religious leader of the oldest mosque in South Florida.

He is somebody who is well-regarded and looked up to by a large contingent of the South Florida Muslim American community.

I believe he owns a home jointly with his son that they rent out, and that he lives in an efficiency that he rents out separately with his wife.

Obviously, his wife is here.  His other family members are here.  He had a stable job up until this charge that he would be able to potentially go back to if allowed back out.

He would be able to surrender all travel documents. And, quite frankly, if it has not been obvious to the United States Government thus far, it is probably obvious to the court that with the publicity generated, it is unlikely that Mr. Khan is going to get through an airport.

We would like to proffer a bond package to the court that we are able to put together; a $500,000 collateralized corporate surety bond. I am sorry. A personal surety bond and a $150,000 collateralized corporate surety bond.

We would, obviously, surrender travel documents and agree to electronic monitoring, home arrest, limiting his movements only for attorney visits.

Finally, I would say to the court that in this situation, so far what we have is a 76 year-old man who the government is claiming essentially said a lot of angry stuff on the telephone and sent money to his family.

That is, in sum and substance, what the United States Government has been able to present. I think that there are absolutely conditions, such as the ones that we have presented, that would allow the safety of the community and would prevent any risk of flight.

THE COURT: All right, sir. Thank you. Mr. Rosenbaum.

MR. ROSENBAUM: Yes, sir. May it please the Court.

As to Izhar Khan, the evidence presented here and in

the four corners of the indictment are thin at best.

The two overt acts are not even connected to any terrorist organization.  You heard the agent on my cross-examination.  He wired $900 to his sister.  That is it.

Izhar is the religious leader of the Margate mosque, a large and prosperous mosque in Margate, and he is a very good one.  He is one of the youngest ones in the country.

He has been in the United States since 1994 when he arrived in South Florida.  He attended public schools here before he went to Buffalo for his religious training.  That is basically what we have, Judge.

The government made some comments about travel.  He can travel.  Well, we all can travel.  It is not hard these days for anybody to travel, but he is not going to travel.  He is Americanized.

They have his passport.  There are conditions of bail that will insure that he is here for everything.

There are people that are willing to put up their properties, not further encumber them.  The properties have a lot of equity in them, Your Honor, and they will sign off on a personal surety bond and some type of corporate surety bond with electronic monitoring in a case like this with very thin evidence would insure his presence.

The government brought up the travel.  It is in his passport where he went.  One was to a Hodge; the holy Hodge in

Saudi Arabia.  He went to Pakistan for his fiancee.

He has got documents in there.  He is not hiding it to bring her over here as his fiancee.  That's it.  Three trips. He has been here since 1994.

You wouldn't want to look at my passport.  I would never get a bond.  I have tons of trips.

The marriage thing.  Let me be a distinction without a difference.  We don't know how it is handled over there or how it is here.

My client maintains it is his fiancee.  People send money back to their families all of the time.

Just sitting here listening to everything, there was very little or no evidence against Izhar Khan.  It is very thin, at best, in the light most favorable to the government.

Based upon that, Your Honor, he is not a danger and he is surely not a risk of flight, and I think there is a combination of conditions which would insure that he is present for each and every proceeding in front of Judge Jordan.

THE COURT:  All right.  Thank you.  All right.  The court is prepared to rule.

I have examined the indictment rather substantially.

I have reviewed the Pretrial Services reports, and I have considered the proffer of the government, as well as the examinations conducted by defense counsel in this case.

The defendant, Hafiz Muhammad Sher Ali Khan, the

61

evidence seems to show or the suggestion seems to show that he is extremely active and has been extremely active in Taliban matters; that he occupied a leadership role in that instance, and that he had unlimited contacts and support, and he has announced, as heard by the government through Title III intercepts, that his goal was to kill Americans.

He is a risk of flight, the court finds, because he has substantial ties inside and outside of the United States, and he is facing, if convicted, as are both defendants, substantial sentences; 15 years as to each count.

The court recalls testimony regarding a conversation in which he claimed that there was no difficulty in getting false travel documents which, of course, adds further to the likelihood of fleeing from this jurisdiction.

The defendant Izhar Khan is similarly involved, although not to the extent that the defendant Hafiz Khan is.

Although the court cannot overlook the purpose and objects of the conspiracy as set forth in the indictment, the court finds that these defendants, both of them, represent a danger in the community and a risk of flight if released on bond; the court further finding there is no condition or combination of conditions I could set that would assure me of their presence in future court proceedings, or minimize or eliminate the danger in the community if released.

Accordingly, the court grants the government's motion

for pretrial detention as to both defendants on risk of flight and danger in the community, finding there is no condition or combination of conditions that I could set to minimize or eliminate those.

Mr. Shipley, will you have a proposed order submitted to my chambers by Wednesday morning; this Wednesday morning setting forth the court's findings and the basis for those findings as well?

MR. SHIPLEY:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  Anything further?  Thank you all.

THE CLERK:  All rise.  Court is adjourned.

Mr. Shipley, the arraignment is going to be Tuesday at 10:00 o'clock.  Next Monday is a holiday.

Mr. Rosenbaum, the arraignment and report re: counsel is Tuesday at 10:00.  Monday is a federal holiday; Memorial Day.  Tuesday, the 31st.

MR. ROSENBAUM:  Karen, in front of Judge Garber or the duty magistrate?

THE CLERK:  The duty magistrate.

MR. ROSENBAUM:  Thank you.

(Whereupon the proceedings were concluded)

63

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of proceedings in the above-entitled matter.

JUNE 2, 2011                    S/JERALD M. MEYERS
_____              _____
        DATE                           JERALD M. MEYERS, RPR-CM