UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

_____
                                                          )
UNITED STATES OF AMERICA                 )        No. 11-20331-CR-SCOLA/
                                                          )        BANDSTRA (s)
            v.                                            )
                                                          )
HAFIZ MUHAMMAD SHER ALI KHAN,    )
ALI REHMAN, a/k/a Faisal Ali Rehman,       )
IRFAN KHAN,                                       )
IZHAR KHAN,                                       )
ALAM ZEB, and                                    )
AMINA KHAN, a/k/a Amina Bibi,              )
                                                          )
            Defendants.                             )
_____)


**GOVERNMENT'S UNCLASSIFIED MEMORANDUM IN OPPOSITION
TO MOTIONS FOR DISCLOSURE OF FISA APPLICATIONS AND ORDERS AND FOR
SUPPRESSION OF EVIDENCE DERIVED FROM FISA INTERCEPTS (DE 212 and 236)**

I.  **INTRODUCTION**

The Government is filing this unclassified memorandum in opposition to Irfan Khan's ("Irfan," "the defendant") Motion for Disclosure of FISA [*i.e.,* Foreign Intelligence Surveillance Act, as Amended] Applications and Orders ("defendant's disclosure motion") (DE212),[1] and his Motion to Suppress Evidence Derived From FISA Intercepts ("defendant's suppression motion") (DE236).  Defendant's motions seek: (1) disclosure of all applications, orders, and related materials submitted to the Foreign Intelligence Surveillance Court ("FISC"), (collectively, the "FISA materials");[2] and (2) suppression of information obtained or derived pursuant to the Foreign Intelligence Surveillance Act, as amended ("FISA").   Because the defendant's two motions rely in large part upon common allegations, conjecture, and speculation, and because the resolution of the motion to disclose in the Government's favor would also mandate denial of the motion to suppress, this response will address both motions.

**CLASSIFIED MATERIAL REDACTED**

The Court should conclude from its *in camera*, *ex parte* review of the relevant FISA materials that the FISA electronic surveillance and physical searches at issue in this case were lawfully authorized and conducted, that the FISA materials should not be disclosed, and that the fruits of the surveillance and physical searches should not be suppressed.  For the reasons set forth below, the Court should deny the defendant's motions.

---

[1] **CLASSIFIED MATERIAL REDACTED**

[2]. **CLASSIFIED MATERIAL REDACTED**

## A.  BACKGROUND

On May 14, 2011, Hafiz Muhammad Sher Ali Khan (Hafiz Khan) and two of his co-defendants, his sons Irfan Khan and Izhar Khan, were arrested pursuant to a federal indictment returned in the Southern District of Florida; the three remaining co-defendants, Ali Rehman, a/k/a Faisal Ali Rehman  (Rehman), Alam Zeb (Zeb),[3] and Amina Khan, a/k/a Amina Bibi (Amina),[4] are at large in Pakistan.  A superseding indictment that is not materially different from the original indictment was returned against the six defendants on August 11, 2011 (DE103).  The defendants are charged in connection with providing money, financial services, and other forms of support to the Pakistani Taliban, a/k/a Tehrik-e Taliban Pakistan, Tehrik-I-Taliban, and Tehreek-e-Taliban, which is a Pakistan-based terrorist organization formed in December 2007 by an alliance of radical Islamic militants.[5]

On September 1, 2010, the United States Department of State ("DOS") formally designated the Pakistani Taliban as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act.  The Pakistani Taliban's objectives include resistance to the lawful Pakistani government, the imposition and enforcement of strict Islamic law, known as Shari'a, and opposition to United States and Coalition armed forces fighting in Afghanistan.  The Pakistani Taliban has links to both al Qaeda and the Taliban in Afghanistan, and has been involved in numerous deadly attacks against United States interests in Afghanistan and Pakistan,

---

[3]   Zeb is Khan's grandson and Amina's son.

[4]   Amina is Khan's daughter and Zeb's mother.

[5]   All six defendants are charged with one count of conspiracy to provide material support to terrorists, in violation of 18 U.S.C. §§ 2339A(a), and 2, including a conspiracy to murder, kidnap, and maim persons in a foreign country, in violation of 18 U.S.C. § 956(a)(1); one count of conspiracy to provide material support to a designated terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1), and 2; one count of providing material support to terrorists, in violation of 18 U.S.C. §§ 2339A(a), and 2; and one count of providing material support to a designated terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1), and 2.

and in the attempt by Faisal Shahzad to detonate an explosive device in New York City's Times Square on May 1, 2010.  The superseding indictment charges that the defendants sought to aid the Pakistani Taliban's fight against the Pakistani government and the United States by conspiring to provide and by providing material support to the Pakistani Taliban by soliciting, collecting, and transferring money from the United States to supporters of the Pakistani Taliban, primarily using bank accounts and wire transfer services in the United States and Pakistan.  The funds transferred to Pakistan were intended to purchase guns for the Pakistani Taliban, to sustain militants and their families, and to promote the goals of the Pakistani Taliban in general.[6]  Hafiz Khan, Irfan Khan, Izhar Khan, and this Court were provided with notice on May 17, 2011, that at trial the Government intends to introduce against the defendants information obtained or derived from electronic surveillance and physical searches conducted pursuant to FISA (DE17, 18, 19).

CLASSIFIED MATERIAL REDACTED

As noted above, on May 17, 2011, the Government provided written notice to the Court and to Hafiz Khan, Irfan Khan, and Izhar Khan pursuant to 50 U.S.C. §§ 1806(c) and 1825(d) that the United States "intends to offer into evidence or otherwise use or disclose in any proceedings in the above-captioned matter,  information obtained and derived from electronic surveillance or physical search conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 (FISA), as amended, 50 U.S.C. §§ 1801-1811, 1821-1829."[7] *See* DE17, 18, 19.

CLASSIFIED MATERIAL REDACTED

---

[6]  This overview is not intended to be a comprehensive catalog of the defendants' actions, nor of the intended uses of the funds transferred to Pakistan, which are detailed in the superseding indictment.

[7] **CLASSIFIED MATERIAL REDACTED**

The Government's pleadings and the supporting FISA materials are submitted not only to oppose both the defendant's motion to disclose and his motion to suppress, but also to support the United States' request, pursuant to FISA, that this Court: (1) conduct an *in camera*, *ex parte* review of the FISA materials; (2) find that the FISA collection at issue was both lawfully authorized and lawfully conducted; and (3) order that none of the classified documents, nor any of the classified information contained therein, be disclosed to the defense, and instead, that they be maintained by the United States under seal.

B. **OVERVIEW OF THE FISA COLLECTION AT ISSUE**

**CLASSIFIED MATERIAL REDACTED**

II. **THE FISA PROCESS**

A. **OVERVIEW OF FISA**

Enacted in 1978, and subsequently amended, FISA authorizes the Chief Justice of the United States to designate eleven United States District Judges to sit as judges of the FISC. 50 U.S.C. § 1803(a)(1). The FISC judges are empowered to consider *ex parte* applications submitted by the Executive Branch for electronic surveillance and physical searches when a significant purpose of the application is to obtain foreign intelligence information, as defined in FISA. Rulings of the FISC are subject to review by the Foreign Intelligence Surveillance Court of Review ("FISC of Review"), which is composed of three United States District or Circuit Judges who are designated by the Chief Justice. 50 U.S.C. § 1803(b). As discussed below, a District Court also has jurisdiction to determine the legality of electronic surveillance and physical

searches authorized by the FISC when the fruits of that intelligence collection are used against an "aggrieved person." [8] *See* 50 U.S.C. §§ 1806(f), 1825(g).

 As originally enacted, FISA required that a high-ranking member of the Executive Branch of Government certify that "the purpose" of the FISA application was to obtain foreign intelligence information. In 2001, FISA was amended as part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act).[9] One change to FISA accomplished by the USA PATRIOT Act was the abrogation of the requirement that the primary purpose of the requested FISA surveillance be the gathering of foreign intelligence information; instead, a high-ranking official is now to certify that the acquisition of foreign intelligence information is "a significant purpose" of the requested surveillance. 18 U.S.C. § 1804(a)6)(B). As discussed in detail in later sections of this memorandum, the "significant purpose" standard is constitutional.

## B.  THE FISA APPLICATION

 FISA provides a statutory procedure whereby the Executive Branch may obtain a judicial order or warrant authorizing the use of electronic surveillance and/or physical searches within the United States where a significant purpose is the collection of foreign intelligence information. *United States v. Johnson*, 952 F.2d 565, 571-72 (1st Cir. 1991); *United States v. Abu-Jihaad*, 630 F.3d 102, 117-118 (2d Cir. 2010); 50 U.S.C. §§ 1804(a)(6)(B), 1823(a)(6)(B). Under FISA,

---

[8] An "aggrieved person" is defined as the target of electronic surveillance or "any other person whose communications or activities were subject to electronic surveillance," 50 U.S.C. § 1801(k), as well as "a person whose premises, property, information, or material is the target of physical search" or "whose premises, property, information, or material was subject to physical search. 50 U.S.C. § 1821(2). Each of the defendants is an "aggrieved person" under FISA, and as noted above, Hafiz Khan, Irfan Khan, and Izhar Khan were provided with notice of their status as such and of the Government's intent to use FISA-obtained or -derived information against them at trial.

[9] Pub. L. No. 107-56, 115 Stat. 271 (2001).

"[f]oreign intelligence information" includes information that "relates to, and if concerning a United States person[10] is necessary to, the ability of the United States to protect against . . . actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power [and/or] sabotage or international terrorism by a foreign power or an agent of a foreign power." 50 U.S.C. §§ 1801(e), 1821(1). "Foreign intelligence information" also includes information with respect to a "foreign power or foreign territory that relates to, and if concerning a United States person is necessary to – (A) the national defense or the security of the United States; or (B) the conduct of the foreign affairs of the United States." 50 U.S.C. §§ 1801(e)(2), 1821(1). With the exception of emergency authorizations, FISA requires that a court order be obtained before any electronic surveillance or physical search may be conducted.[11]

An application to conduct electronic surveillance pursuant to FISA must contain, among other things: (1) the identity of the federal officer making the application; (2) the identity, if known, or a description of the specific target of the electronic surveillance; (3) a statement of the facts and circumstances supporting probable cause to believe that the target is a foreign power or an agent of a foreign power, and that each facility or place at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power; (4) a statement of the proposed minimization procedures to be followed;  (5) a detailed description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance; (6) a certification, discussed below, of a high-ranking official; (7) the manner or means by which the electronic surveillance or physical search will be effected and a statement whether physical entry is required to effect the electronic surveillance; (8) the facts

---

[10] **CLASSIFIED MATERIAL REDACTED**

[11] **CLASSIFIED MATERIAL REDACTED**.

concerning and the action taken on all previous FISA applications involving any of the persons, facilities, places, premises or property specified in the application; and (9) the proposed duration of the electronic surveillance or physical search.  *See* 50 U.S.C. § 1804(a)(1)-(9).

An application to conduct a physical search pursuant to FISA must contain similar information as an application to conduct electronic surveillance.  *See* 50 U.S.C. § 1823(a)(1)-(8). The primary difference is that an application to conduct a physical search must also contain a statement of the facts and circumstances supporting probable cause to believe that "the premises or property to be searched contains foreign intelligence information" and that "each premises or property to be searched is owned, used, possessed by, or is in transit to or from" the target.  *See* 50 U.S.C. §§ 1823(a)(3)(B), (C).

## 1.  <u>The Certification</u>

An application to the FISC for a FISA order or warrant must include a certification from a high-ranking Executive Branch official with national security responsibilities that:

(A) the certifying official deems the information sought to be foreign intelligence information;

(B) a significant purpose of the surveillance is to obtain foreign intelligence information;

(C) such information cannot reasonably be obtained by normal investigative techniques;

(D) designates the type of foreign intelligence information being sought according to the categories described in 50 U.S.C. § 1801(e); and

(E) includes a statement of the basis for the certification that –

(i) the information sought is the type of foreign intelligence information designated; and

(ii) such information cannot reasonably be obtained by normal investigative techniques.

50 U.S.C. § 1804(a).  *See also* 50 U.S.C. § 1823(a) (physical search).

## 2.  **Minimization Procedures**

The Attorney General has adopted, and the FISC has approved, minimization procedures that regulate the acquisition, retention, and dissemination of information obtained through FISA collection about United States persons, including persons who are not the targets of the FISA collection.  FISA requires that such minimization procedures be:

> reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.

50 U.S.C. § 1801(h)(1); *see also* 50 U.S.C. § 1821(4)(A) (physical search).

In addition, minimization procedures also include "procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes."  50 U.S.C. § 1801(h)(3); *see also* 50 U.S.C. § 1821(4)(c) (physical search).

In order to fulfill the statutory requirements discussed above, the Attorney General has adopted standard minimization procedures for FISC-authorized electronic surveillance and physical search that are on file with the FISC and that are incorporated by reference into every relevant FISA application that is submitted to the FISC.  As a result, the eight FISC judges who issued the orders authorizing the FISA collections at issue in this case found that the applicable standard minimization procedures, as well as any supplemental minimization procedures that may

8

have been proposed, met FISA's statutory requirements.  The FISC orders in the dockets at issue

here directed the Government to follow the approved minimization procedures in conducting the

FISA collection.

### 3.  Attorney General's Approval

 FISA further requires that the Attorney General[12] approve applications for electronic

surveillance and/or physical search before they are presented to the FISC.

### C.  THE FISC'S ORDERS

Once approved by the Attorney General, the application is submitted to the FISC and

assigned to one of its judges.  The FISC may approve the requested electronic surveillance or

physical search only upon finding, among other things, that: (1) the application has been made by

a "Federal officer" and has been approved by the Attorney General; (2) there is probable cause to

believe that (a) the target of the electronic surveillance and/or physical search is a foreign power

or an agent of a foreign power, and that (b) the facilities or places at which the electronic

surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a

foreign power [or that the premises or property to be searched is owned, used, possessed by, or is

in transit to or from a foreign power or an agent of a foreign power]; (3) the proposed

minimization procedures meet the statutory requirements set forth in 50 U.S.C. § 1801(h)

(electronic surveillance) and/or 50 U.S.C. § 1821(4) (physical search); (4) the application contains

all of the statements and certifications required by Section 1804 or Section 1823; and (5) if the

---

[12]  As noted above, "Attorney General" means the Attorney General of the United States (or Acting Attorney General), the Deputy Attorney General, or, upon the designation of the Attorney General, the Assistant Attorney General designated as the Assistant Attorney General for National Security.  *See* 50 U.S.C. § 1801(g).

target is a United States person, that the certifications are not clearly erroneous.[13]  50 U.S.C. §§ 1805(a)(1)-(4), 1824(a)(1)-(4).

FISA defines "foreign power" to include "a group engaged in international terrorism or activities in preparation therefore," 50 U.S.C. §§ 1801(a)(4), 1821(1).  As it relates to United States persons, "agent of a foreign power" includes any person who:

> (C) knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power;
>
> \*     \*     \*     \*     \*     \*     \*
> or
>
> (E)  knowingly aids or abets any person in the conduct of activities described in [the subparagraphs above] . . . or knowingly conspires with any person to engage in activities described in [the subparagraphs above.]

50 U.S.C. §§ 1801(b)(2) (electronic surveillance), 1821(1) (physical search).

FISA specifies that no United States person may be considered a foreign power or an agent of a foreign power solely on the basis of activities protected by the First Amendment to the Constitution of the United States.  50 U.S.C. §§ 1805(a)(2)(A), 1824(a)(2)(A).  Although protected First Amendment activities cannot form the sole basis for FISC-authorized electronic surveillance or physical search, they may be considered by the FISC if there is other activity indicative that the target is an agent of a foreign power.  *United States v. Rosen*, 447 F. Supp. 2d 538, 549-50 (E.D. Va. 2006); *United States v. Rahman*, 861 F. Supp. 247, 252 (S.D.N.Y. 1994),

---

[13]  Irfan Khan apparently misunderstands the language of this section.  In his motion to suppress (p. 17) he "contends that the FISA applications were deficient, and the resulting orders invalid, because the government's application failed to include a certificate that . . . the statements and certifications required by 50 U.S.C. § 1804 are not clearly erroneous. . . . 50 U.S.C. § 1805(a)(4)."  There is no requirement in either 50 U.S.C. § 1804 or in 50 U.S.C. § 1805(a)(4) that the Government separately certify that its required certifications are not clearly erroneous.  Moreover, 50 U.S.C. § 1805(a)(4) actually provides that the FISC judge shall issue the requested order if he or she finds that the required certifications are not clearly erroneous; and thus the issuance of an order reflects that such finding was made.

*aff'd*, 189 F.3d 88 (2d Cir. 1999).  Additionally, FISA provides that "[i]n determining whether or not probable cause exists . . . a judge may consider past activities of the target, as well as facts and circumstances relating to current or future activities of the target."  50 U.S.C. §§ 1805(b), 1824(b).

        If the FISC is satisfied that the FISA application meets the statutory provisions and has made all of the necessary findings, the FISC issues an *ex parte* order[14] authorizing the electronic surveillance and/or physical search requested in the application.  50 U.S.C. §§ 1805(a), 1824(a). The order must specify: (1) the identity (or a description of) the specific target of the collection; (2) the nature and location of each facility or place at which the electronic surveillance will be directed or of each of the premises or properties that will be searched; (3) the type of information sought to be acquired and the type of communications or activities that are to be subjected to the electronic surveillance, or the type of information, material, or property that is to be seized, altered, or reproduced through the physical search; (4) the means by which electronic surveillance will be effected and whether physical entry will be necessary to effect that surveillance, or a statement of the manner in which the physical search will be conducted; (5) the period of time during which electronic surveillance is approved and/or the authorized scope of each physical search; and (6) the applicable minimization procedures.  50 U.S.C.  §§ 1805(c)(1), 1824(c)(1). The FISC also retains the authority to review, before the end of the authorized period of electronic surveillance or physical search, the United States' compliance with the requisite minimization procedures.  50 U.S.C. §§ 1805(d)(3), 1824(d)(3).

---

[14] **CLASSIFIED MATERIAL REDACTED**

Under FISA, electronic surveillance and/or physical searches targeting a United States person may be approved for up to ninety days.  50 U.S.C. §§ 1805(d)(1), 1824(d)(1).  Extensions may be granted, but only if the United States submits another application that complies with FISA's requirements.  50 U.S.C. §§ 1805(e)(2), 1824(d)(2).

## III.  <u>DISTRICT COURT REVIEW OF FISC ORDERS</u>

FISA authorizes the use in a criminal prosecution of information obtained or derived from any FISC-authorized electronic surveillance and/or physical search, provided that advance authorization is obtained from the Attorney General, *see* 50 U.S.C. §§ 1806(b), 1825(c), and that proper notice is given to the court and to each aggrieved person against whom the information is to be used, *see* 50 U.S.C. §§ 1806(c), (d), and 1825(d), (e).  Upon receiving notice, an aggrieved person may then move to suppress the use of the FISA information on two grounds: (1) that the information was unlawfully acquired under FISA; or (2) that the electronic surveillance or physical search was not conducted in conformity with the FISC's order(s).  50 U.S.C. §§ 1806(e), 1825(f).  Accordingly, as discussed in detail in later sections, disclosure and suppression motions are evaluated using FISA's probable cause standard, not the probable cause standard for criminal warrants.  *See, e.g.*, *United States v. El-Mezain*, __ F.3d __, 2011 WL 6058592, at *82 (5th Cir. 2011) ("This probable cause standard is different from the standard in the typical criminal case because, rather than focusing on probable cause to believe that a person has committed a crime, the FISA standard focuses on the status of the target as a foreign power or an agent of a foreign power."); *United States v. Duka*, __ F.3d ___, 2011 WL 6794022, at *4 (3d Cir. 2011) (rejecting appellant's challenge to FISA's probable cause standard because it does not require indications that a crime has been committed); *United States v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987).

In his motion, the defendant acknowledges the unique nature of a motion to disclose FISA materials, which is unlike routine criminal discovery motions.  Irfan Khan writes that the "discovery of FISA applications and orders is treated differently from discovery of other forms of similar material."  DE212 at 1.  However, rather than address those different standards, Irfan's motion proceeds to argue for routine criminal discovery of the FISA materials without regard for the *ex parte* process specified in 50 U.S.C. § 1806(f), and without treating the national security concerns seriously.  With respect to the latter, he cites to an immigration case that concerned the use of undisclosed confidential, but not classified, material to support the deportation of an alien, to ridicule the national security claims asserted by the Attorney General as "diffuse claims of national security."  DE212 at 12.  To the contrary, as the Court will see from classified materials in the Sealed Appendix, some of which is discussed and summarized in subsequent sections of this Response, Irfan's disclosure motion seeks disclosure of material whose revelation would have serious and manifest consequences for our national security.

## A.  THE REVIEW IS TO BE CONDUCTED *IN CAMERA* AND *EX PARTE*

In assessing the legality of challenged FISA electronic surveillance or physical searches, the district court, "shall, notwithstanding any other law, if the Attorney General files [as he has filed in this proceeding] an affidavit or declaration under oath that disclosure or an adversary hearing would harm the national security of the United States, review *in camera* and *ex parte* the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted."  50 U.S.C. §§ 1806(f), 1825(g).[15]  On the filing of the Attorney General's affidavit

---

[15]  The defendant cites the language specifying an *in camera* review, but edited out the "*ex parte*" provision. DE212 at 5.

or declaration, the court "may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order or other materials relating to the surveillance [or physical search] *only where such disclosure is necessary* to make an accurate determination of the legality of the surveillance [or search]."[16]  50 U.S.C. §§ 1806(f), 1825(g) (emphasis added).  Thus, the propriety of the disclosure of any FISA applications or orders to the defendant cannot even be considered unless and until the district court has first concluded that it is unable to make an accurate determination of the legality of the collection after reviewing the Government's submissions (and any supplemental pleadings that the district court may request) *in camera* and *ex parte*.  *See El-Mezain*, 2011 WL 6058592, at *84; *Abu-Jihaad*, 630 F.3d at 129; *United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982); *United States v. Islamic American Relief Agency ("IARA")*, Case No. 07-00087-CR-W-NKL, 2009 WL 5169536, at *3-4 (W.D.Mo. December 21, 2009); *United States v. Nicholson*, Case No. 09-CR-40-BR, 2010 WL 1641167, at *4 (D. Or. April 21, 2010) ("After an *in-camera* review, the court 'has the discretion to disclose portions of the documents, under appropriate protective orders, *only if [the court] decides that such disclosure is necessary to make an accurate determination of the legality of the surveillance*.'") (quoting *United States  v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984) (emphasis in *Nicholson*); *United States v. Kashmiri*, 2010 WL 4705159, at *2 (N.D. Ill., November 10, 2010).

---

[16]  In *United States v. Warsame*, 547 F.Supp.2d 982, 987 (D. Minn. 2008), the court addressed the meaning of "necessary" in this context: "[t]he legislative history explains that such disclosure is 'necessary' only where the court's initial review indicates that the question of legality may be complicated" by factual misrepresentations, insufficient identification of the target, or failure to comply with the minimization standards in the order.  Irfan agrees, as he must, that the filing of the Attorney General's affidavit or declaration triggers the procedures under 50 U.S.C. § 1806(f), but he offers a different, and unsupported, interpretation of "necessary."  Irfan states that "disclosure is 'necessary' for counsel to assist the Court," DE212 at 7.  While disclosure to defense counsel might be necessary in order for defense counsel to assist the Court, FISA does not address what might be necessary or useful to the defense.  FISA requires that the Court find that assistance from the defense is necessary to help it make a determination; and that finding is to be made *after* an *in camera*, *ex parte* review of the precise materials that the defense seeks to have disclosed *prior* to such review.

If the district court is able to make an accurate determination of the legality of the surveillance based on its *in camera*, *ex parte* review of the materials submitted by the United States, then the court <u>*may not*</u> order disclosure of any of the FISA materials to the defense, unless otherwise required by due process.  *El-Mezain*, 2011 WL 6058592, at *84; *United States v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984); *Kashmiri*, 2010 WL 4705159, at *2.

### 1. <u>*In Camera, Ex Parte* Review is the Rule</u>

Federal courts have repeatedly and consistently held that FISA "anticipates that an *ex parte*, *in camera* determination is to be the rule," with disclosure and an adversarial hearing being the "exception, occurring *only* when necessary."  *Belfield*, 692 F.2d at 147 (emphasis in original); *accord*, *El-Mezain*, 2011 WL 6058592, at *85 ("[D]isclosure of FISA materials is the exception and *ex parte*, *in camera* determination is the rule.") (citing *Abu Jihaad*, 630 F.3d at 129); *Duggan*, 743 F.2d at 78; *Rosen*, 447 F. Supp. 2d at 546; *Nicholson*, 2010 WL 1641167 at *3-4; *United States v. Spanjol*, 720 F. Supp. 55, 59 (E.D. Pa. 1989), *aff'd*, 958 F.2d 365 (3d Cir. 1992). Indeed, no court has <u>ever</u> found it necessary to disclose FISA materials to a criminal defendant to assist the court's determination of the lawfulness of either electronic surveillance or physical searches under FISA.  *See El-Mezain*, 2011 WL 6058592, at *84 (quoting the district court's statement that no court has ever ordered disclosure); *United States v. Mubayyid*, 521 F. Supp. 2d 125, 130 (D. Mass. 2007) (collecting cases); *Rosen*, 447 F. Supp. 2d at 546 (same); *United States v. Gowadia*, No. 05-00486, 2009 WL 1649714, at *2 (D. Hawaii June 8, 2009); *Kashmiri*, 2010 WL 4705159, at *2; *In re Grand Jury Proceedings of the Special April 2002 Grand Jury* ("*In re Grand Jury Proceedings*"), 347 F.3d 197, 203 (7th Cir. 2003) (noting that no court has ever ordered disclosure of FISA materials).  As a consequence, to the Government's knowledge no

court has ever suppressed FISA-obtained or -derived information at trial, nor held an adversary hearing on motions to disclose or to suppress.

In fact, every court that has addressed a motion to disclose FISA dockets or to suppress FISA materials has been able to reach a conclusion as to the legality of the FISA collection at issue based on its *in camera*, *ex parte* review. *See, e.g.*, *Spanjol*, 720 F. Supp. at 58-59; *United States v. Sattar*, 2003 WL 22137012, at *6 (S.D. N.Y. 2003) (citing *United States v. Nicholson*, 955 F. Supp. 588, 592 & n. 11 (E.D.Va. 1997) ("this court knows of no instance in which a court has required an adversary hearing or disclosure in determining the legality of a FISA surveillance")), *aff'd*, 590 F.3d 93 (2d Cir. 2009); *see also El-Mezain*, 2011 WL 6058592, at *84 (quoting district court's statement that no court has ever held an adversarial hearing to assist the court); *Thomson*, 752 F. Supp. 75, 79 (W.D.N.Y. 1990) (same); *United States v. Abu-Jihaad*, 531 F. Supp. 2d 299, 310 (D. Conn. 2008), *aff'd*, 630 F.3d 102, 129-30 (2d Cir. 2010); *Mubayyid*, 521 F. Supp. 2d at 130; *Rosen*, 447 F. Supp. 2d at 546; *United States v. Isa*, 923 F.2d 1300, 1305 (8th Cir. 1991).

There is nothing extraordinary about the FISA collection authorized here that would justify this case becoming the first "exception" to the rule of three decades of FISA litigation -- that is, the first-ever to order the production and disclosure of highly sensitive and classified FISA dockets.  Here, the FISA dockets are well-organized and easily reviewable by the Court *in camera* and *ex parte*.  In addition, they are fully and facially sufficient to allow the Court to make an accurate determination of the legality of the FISA collection; indeed, they "are straightforward and readily understood." *In re Kevork*, 634 F. Supp. 1002, 1008 (C.D. Cal. 1985), *aff'd*, 788 F.2d 566 (9th Cir. 1986).  Moreover, as in other cases, "[t]he determination of legality in this case is

not complex." *Belfield*, 692 F.2d at 147; *see also Warsame*, 547 F. Supp. 2d at 987 ("issues

presented by the FISA applications are straightforward and uncontroversial"); *Abu-Jihaad*, 531 F.

Supp. 2d at 310; *Thomson*, 752 F. Supp. at 79.  The Government respectfully submits that this

Court, much like the aforementioned courts, is able to review the FISA dockets *in camera* and *ex*

*parte.*

        Irfan also argues that disclosure is appropriate in his case because his attorneys hold

security clearances.[17]  Although his argument is unclear, since it is apparently predicated on the

Classified Information Procedures Act ("CIPA"),[18] which has no substantive application to the

consideration of a motion to disclose FISA materials, the Government notes that whether a

defense attorney possesses a security clearance is irrelevant to the issue of whether he or she is

entitled to review FISA dockets.  *See United States v. Ott*, 827 F.2d 473, 476-77 (9th Cir. 1987)[19];

*Nicholson*, 2010 WL 1641167, at *5  (referencing *Ott* and holding that "[b]ased on its *in-camera*

review . . . the disclosure of FISA materials to [cleared] defense counsel is neither required nor

appropriate"); *United States v. Amawi*, No. 3:06CR719, 2009 WL 961143, at *2 (N.D. Ohio Apr.

7, 2009); *United States v. Bin Laden*, 126 F. Supp. 2d 264, 287 n. 26 (S.D.N.Y. 2000); *see also*

Executive Order 13526, §§ 4.1(a), 6.1(dd), 75 Fed.Reg. 707, 720, 729 (Jan. 5, 2010) (requiring

---

[17] Defendant's disclosure motion at 12-13.

[18] The defendant notes the existence of a CIPA protective order in this case, but fails to mention the crucial distinction between disclosure pursuant to CIPA, which involves the fruits of surveillance, some of which will be evidence in this case, and disclosure of FISA applications, orders, and related materials, which is not evidence against the defendant, and which by statute is only appropriately discussed if this Court is unable to decide the issue before it without the assistance of the defense.

[19]  "[Defendant] next asserts that the *ex parte*, *in camera* proceeding violated due process in this case because his various attorneys all had high security clearances and therefore disclosure to them of the FISA materials would not entail or risk dissemination of sensitive information to non-cleared personnel.  This argument is also unpersuasive. Congress has a legitimate interest in authorizing the Attorney General to invoke procedures designed to ensure that sensitive security information is not unnecessarily disseminated to *anyone* not involved in the surveillance operation in question, whether or not she happens for unrelated reasons to enjoy a security clearance.  We reject the notion that a defendant's due process right to disclosure of FISA materials turns on the qualifications of his counsel." *Id.*

that a "need to know" determination be made prior to the disclosure of classified information to anyone, including those who possess a security clearance); *Badrawi v. Dep't of Homeland Security*, 596 F. Supp. 2d 389, 400 (D.Conn. 2009) (counsel held Top Secret security clearance but did not have a "need to know," and therefore was denied access to documents).  If a court concludes that it is capable of accurately determining the legality of the FISA collection at issue, then even a defense attorney with a security clearance does not have a "need to know" the information in the FISA dockets and is not entitled to their production.

 In addition to the specific harm that would result from the disclosure of the FISA materials in this case, which is detailed in the classified Declaration of a high-ranking FBI official in support of the Attorney General's Declaration and Claim of Privilege, the underlying rationale for non-disclosure is clear: "In the sensitive area of foreign intelligence gathering, the need for extreme caution and sometimes even secrecy may not be overemphasized."  *United States v. Ott*, 827 F.2d 473,477 (9th Cir. 1987) ("Congress has a legitimate interest in authorizing the Attorney General to invoke procedures designed to ensure that sensitive security information is not unnecessarily disseminated to anyone not involved in the surveillance operation in question."); *accord IARA*, 2009 WL 5169536, at *3-4.

Confidentiality is critical to national security.  "If potentially valuable intelligence sources" believe that the United States "will be unable to maintain the confidentiality of its relationship to them, many [of those sources] could well refuse to supply information."  *CIA v. Sims*, 471 U.S. 159, 175 (1985); *see also Phillippi v. CIA*, 655 F.2d 1325, 1332-33 (D.C. Cir. 1981).  When a question is raised as to whether the disclosure of classified sources, methods, techniques, or information would harm the national security, federal courts have expressed a great

reluctance to replace the considered judgment of Executive Branch officials charged with the responsibility of weighing a variety of subtle and complex factors in determining whether the disclosure of information may lead to an unacceptable risk of compromising the intelligence gathering process, and determining whether foreign agents, spies, and terrorists are capable of piecing together a mosaic of information that, when revealed, could reasonably be expected to harm the national security of the United States.  *See Sims*, 471 U.S. at 180; *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) ("Things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods."); *Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980) ("each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself"). An adversary hearing is not only entirely unnecessary to aid the Court in the straightforward task before it, but such a hearing would *create* potential dangers that courts have consistently sought to avoid.

As the *Belfield* court explained:

> Congress recognized the need for the Executive to engage in and employ the fruits of clandestine surveillance without being constantly hamstrung by disclosure requirements. The statute is meant to "reconcile national intelligence and counterintelligence needs with constitutional principles in a way that is consistent with both national security and individual rights." In FISA the privacy rights of individuals are ensured not through mandatory disclosure, but through its provisions for in-depth oversight of FISA surveillance by all three branches of government and by a statutory scheme that to a large degree centers on an expanded conception of minimization that differs from that which governs law enforcement surveillance.

692 F.2d at 148 (footnotes and citations omitted); *see also ACLU Foundation of So. Cal. v. Barr* ("*ACLU Foundation*"), 952 F.2d 457, 465 (D.C. Cir. 1991) (citing *Belfield* for the proposition that Section 1806(f) "is an acceptable means of adjudicating the constitutional rights of persons who have been subjected to FISA surveillance").

### 2.   *In Camera*, *Ex Parte* Review is Constitutional

(Irfan has generally alleged that the Fourth and Fifth Amendments[20] require disclosure of the FISA materials.  He is in error, and the constitutionality of FISA's *in camera*, *ex parte* review provisions has been affirmed by every federal court that has considered the matter.  *See, e.g.*, *El-Mezain*, 2011 WL 6058592, at *85; *Abu-Jihaad*, 630 F.3d at 117; *Spanjol*, 55 F. Supp. at 58; *United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005) ("FISA's requirement that the district court conduct an *ex parte*, *in camera* review of FISA materials does not deprive a defendant of due process."); *Ott*, 827 F.2d at 476-77 (FISA's review procedures do not deprive a defendant of due process); *Gowadia*, 2009 WL 1649714, at *2; *United States v. Jayyousi*, No. 04-60001, 2007 WL 851278, at *7 (S.D. Fla. Mar. 15, 2007), *aff'd*, 657 F.3d  1085 (11th Cir. 2011);[21] *United States v. Benkhla*, 437 F. Supp. 2d 541, 554 (E.D. Va. 2006); *ACLU Foundation*, 952 F.2d at 465; *United States v. Megahey*, 553 F. Supp. 1180, 1194 (E.D.N.Y. 1982) ("*ex parte*, *in camera* procedures provided in 50 U.S.C. § 1806(f) are constitutionally sufficient to determine the lawfulness of the electronic surveillance at issue while safeguarding defendants' fourth

---

[20]  In support of this assertion, Irfan Khan quotes from a civil immigration case involving undisclosed, but not classified, material, and not involving FISA material, national security, or an Attorney General's Declaration and Claim of Privilege.  *See* Defendant's disclosure motion at 7-9, and citation to *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995).

[21]  All citations to *Jayyousi* herein are to Westlaw because they are from a Magistrate Judge's Report and Recommendation that was adopted and incorporated into the Court's Opinion.

amendment rights"); *United States v. Falvey*, 540 F. Supp. 1306, 1315-16 (E.D.N.Y. 1982) (a "massive body of pre-FISA case law of the Supreme Court, [the Second] Circuit and others" supports the conclusion that the legality of electronic surveillance should be determined on an *in camera*, *ex parte* basis); *Belfield*, 692 F.2d at 148-49; *Nicholson*, 2010 WL 1641167, at *3-4.

There remains an unbroken history of federal court holdings that FISA's *in camera, ex parte* review provisions are entirely compatible with the requirements and protections of the Constitution.  As stated by the United States District Court for the Northern District of Georgia, "[t]he defendants do not cite to any authority for [the proposition that FISA is unconstitutional] because there is none.  Every court that has considered FISA's constitutionality has upheld the statute from challenges under the Fourth, Fifth, and Sixth Amendments." *United States v. Ahmed*, Case No. 1:06-CR-147-WSD-CGB, 2009 U.S. Dist. LEXIS 120007, at *30 (N.D. Ga. March 19, 2009) (order denying defendants' motion to disclose and suppress FISA materials).

In summary, FISA mandates a process by which the district court must conduct an initial *in camera, ex parte* review of FISA applications, orders, and related materials in order to determine whether the FISA collection was lawfully authorized and lawfully conducted.  Such *in camera, ex parte* review is the rule in such cases and that procedure is Constitutional.  In this case, the Attorney General has filed the required declaration invoking that procedure, and has declared that disclosure or an adversary hearing would harm national security.[22]  Accordingly, an *in camera, ex parte* review by this Court is the appropriate venue in which to determine whether the FISA collection was lawfully authorized and conducted pursuant to FISA.

---

[22] **CLASSIFIED MATERIAL REDACTED**

### B.  **THE DISTRICT COURT'S SUBSTANTIVE REVIEW**

Although federal courts are not in agreement as to whether the probable cause determinations of the FISC should be reviewed *de novo* or accorded deference, the dockets under review here satisfy either standard.  The Government believes that it is appropriate to accord due deference to the findings of the FISC, but notes that a number of courts have declined to do so, and have instead reviewed the FISC's probable cause determinations *de novo.  Nicholson*, 2010 WL 1641167, at *5.[23]  While decidedly in the minority, other courts, including the Second Circuit in *Abu-Jihaad*, 630 F.3d at 130, have held that the established standard of judicial review applicable to FISA warrants is deferential.  *Accord Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *21-22 (FISC's determination of probable cause should be given deference by the reviewing court) (citing *Illinois v. Gates*, 662 U.S. 213, 236 (1983)).   Either way, the district court's review should determine: (1) whether the certifications submitted by the Executive Branch in support of the FISA application were properly made; (2) whether probable cause existed to authorize the electronic surveillance and/or physical search at issue; and (3) whether the collection was properly minimized.  *See Abu-Jihaad*, 630 F.3d at 130-31.

---

[23]  *See, e.g.*, *Warsame*, 547 F.Supp.2d at 990; *United States v. Hammoud*, 381 F.3d 316, 332 (4th Cir. 2004), *rev'd on other grounds*, 543 U.S. 1097 (2005), *op. reinstated in pertinent part*, 405 F.3d 1034 (4th Cir. 2005); *Rosen*, 447 F.Supp.2d at 545; *Kashmiri*, 2010 WL 4705159, at *1.

### 1.  Certifications are Subject to only Minimal Scrutiny

(U)  Certifications submitted in support of a FISA application should be "subjected to only minimal scrutiny by the courts," *United States v. Badia*, 827 F.2d 1458, 1463 (11th Cir. 1987), and are "presumed valid."  *Duggan*, 743 F.2d at 77 & n.6 (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)); *Nicholson*, 2010 WL 1641167, at *5; *accord United States v. Campa*, 529 F.3d 980, 993 (11th Cir. 2008); *Warsame*, 547 F. Supp. 2d at 990 ("a presumption of validity [is] accorded to the certifications").  When a FISA application is presented to the FISC, "[t]he FISA Judge, in reviewing the application, is not to second-guess the executive branch official's certification that the objective of the surveillance is foreign intelligence information."  *Duggan*, 743 F.2d at 77.  Likewise, Congress intended that the reviewing district court should "have no greater authority to second-guess the executive branch's certifications than has the FISA judge." *Id.; see also In re Grand Jury Proceedings*, 347 F.3d at 204-05; *Badia*, 827 F.2d at 1463; *Rahman*, 861 F. Supp. at 250; *IARA*, 2009 WL 5169536, at *4; *Kashmiri*, 2010 WL 4705159, at *1.

The district court's review should determine whether the certifications were made in accordance with FISA's requirements.  *See Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *20 ("the [c]ourt is not to second-guess whether the certifications were correct, but merely to ensure they were properly made"); *see also Campa*, 529 F.3d at 993 ("in the absence of a *prima facie* showing of a fraudulent statement by the certifying officer, procedural regularity is the only determination to be made if a non-United States person is the target").  If the target is a United States person, then the district court should also ensure that each certification is not "clearly erroneous."  *Id.* at 994; *Duggan*, 743 F.2d at 77; *Kashmiri*, 2010 WL 4705159, at *2.  A certification is clearly

erroneous only when "the reviewing court on the [basis of the] entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see United States v. Garcia*, 413 F.3d 201, 222 (2d Cir. 2005); *IARA*, 2009 WL 5169536, at *4.

### 2.  <u>There is no Basis for the Court to Hold a *Franks* Hearing</u>

The defendant has incorporated into his disclosure motion several references to a *Franks* hearing,[24] and he seeks disclosure of the FISA materials so that he can determine "whether a *Franks* hearing is necessary."[25]  Since a prerequisite to such a hearing would be the filing of a motion under *Franks*, and there is no such motion pending, it would seem that this may be a fishing expedition designed to elude the clear language of 50 U.S.C. § 1806(f) that the Court may disclose FISA material to the defense only when it is unable to determine the lawfulness of the surveillance based on its own *in camera*, *ex parte* review.   FISA makes no mention of disclosing classified material, where the Court is able to conclude that the FISA surveillance was lawfully authorized and conducted, simply to provide fodder for more motions.

When a defendant makes the requisite showing, the Court may conduct a *Franks* hearing to determine if there are material misrepresentations of fact, or omissions of material fact, in the FISA applications sufficient to warrant suppression of the FISA-obtained and -derived evidence.  *See Franks*, 438 U.S. at 171.  In this case, the defendant has completely failed to establish a basis for a hearing through a preliminary showing of any factual errors in the FISA applications.  But

---

[24] DE212 at 7, 10.

[25] DE212 at 7.

Irfan Khan has neither made the predicate showing,[26] nor even seriously attempted to do so.

If a defendant could force disclosure of FISA materials and obtain an adversarial hearing merely by speculating that there *might* be a *Franks* violation somewhere in an application, the disclosure of FISA materials and adversary hearings would be the rule and not the exception. Such a result would violate Congress' clear intention that FISA material should be reviewed *in camera* and *ex parte*, and in a manner consistent with the realities of modern intelligence needs and investigative techniques.

Courts have rejected defendants' attempts to force a *Franks* hearing challenging the validity of FISA orders based on speculation. *See Abu-Jihaad*, 531 F. Supp. 2d at 311; *Hassoun*, 2007 WL 1069127, *4; *Mubayyid*, 521 F. Supp. 2d at 130-31; *Kashmiri*, 2010 WL 4705159, at

---

[26] To merit an evidentiary hearing under *Franks*, the defendant must first make a "concrete and substantial preliminary showing" that: (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the misrepresentation was essential to the finding of probable cause. *Franks*, 438 U.S. at 155-56; *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990); *Kashmiri*, 2010 WL 4705159, at * 6 (defendant "has not made any showing – let alone a substantial one – that an Executive Branch officer knowingly and intentionally, or recklessly, included a false statement in the FISA application [and w]ithout such a showing, he is foreclosed from obtaining a hearing"); *Duggan*, 743 F.2d at 77 n.6. Failure of the defendant "to satisfy either of these two prongs proves fatal to a *Franks* hearing." *Kashmiri*, 2010 WL 4705159, at * 5; *Mubayyid*, 521 F.Supp.2d at 130-31. The defendant's burden in establishing the need for a *Franks* hearing is a heavy one. *United States v. Jeffus*, 22 F.3d 554, 558 (4th Cir. 1994).

In addition, the defendant's "attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171; *Kashmiri*,2010 WL 4705159, at * 6 ("Without producing the requisite offer of proof of impropriety in the FISA application, however, this argument is merely conclusory, and equates to an improper indirect attack on the FISA procedures"). Rather, the defendant must submit allegations of deliberate falsehood or of reckless disregard for the truth, accompanied by an offer of proof. *Franks*, 438 U.S. at 171. Allegations of negligence or innocent mistake are insufficient, *id.*, as are allegations of insignificant or immaterial misrepresentations or omissions. *Colkley*, 899 F. 2d at 301-02. The *Franks* threshold is not met even by an offer of proof of an impropriety that might have affected the outcome of the probable cause determination, but rather requires one that was "necessary to the finding of probable cause." *Id.* Indeed, even if a defendant offers sufficient proof to show that an affidavit involved false statements or omissions, a hearing should not be held if the affidavit would still provide probable cause with the allegedly false material eliminated, or the allegedly omitted information included. *Franks*, 438 U.S. at 171; *Colkley*, 899 F.2d at 300; *United States v. Ketzeback*, 358 F.3d 987, 990 (8th Cir. 2004); *United States v. Martin*, 615 F.2d 318, 328 (5th Cir. 1980). "Thus a *Franks* hearing 'serves to prevent the admission of evidence obtained pursuant to warrants that were issued only because the issuing magistrate was misled into believing that there existed probable cause.'" *United States v. Photogrammetric Data Services*, 259 F.3d 229, 238 (4th Cir. 2001) (internal citation omitted).

*5-6 (noting that the court "has already undertaken a process akin to a *Franks* hearing through its *ex parte*, *in camera* review").

After a thorough *in camera*, *ex parte* review of the FISA applications, this Court should conclude that the applications were legally sufficient, contained no material misstatements of fact and no material factual omissions, and that the certifications were properly made.

### 3.  FISA's "Significant Purpose" Standard is Constitutional

The defendant does not challenge the constitutionality of the "significant purpose" test *per se*[27] in his motion to disclose, but he does remark, erroneously, that it permits the Government to circumvent the Fourth Amendment's requirements "merely by asserting a desire to also gather foreign intelligence."  DE212 at 4, n. 1.  However, he does explicitly raise a constitutional challenge in his later-filed suppression motion.  *See* DE236 at 2-9.  In neither motion does the defendant correctly state of the law or accurately compare pre- and post-USA PATRIOT Act practice.  First, the Government's interest in collecting foreign intelligence must be a "significant" purpose of the surveillance, not a convenient excuse.  Second, the pre-USA PATRIOT Act FISA language, which required that the Government certify that "the purpose" of the surveillance was the acquisition of foreign intelligence information, was interpreted by the courts only to mean "the primary purpose" of the surveillance – and not the sole purpose.  In pre-USA PATRIOT Act

---

[27] The constitutionality of the "significant purpose" test has been repeatedly upheld, most recently in *Duka*, 2011 WL 6794022, at *4.  The defendant relies extensively on *Mayfield v. United States*, 504 F.Supp.2d 1023 (D. Or. 2007) (defendant's motion to suppress at pp. 4, 7-8), but that civil case, which no other court has followed, was vacated on the ground that the plaintiff lacked standing, "[b]ecause the Ninth Circuit Court of Appeals vacated the judgment in that case, *see Mayfield v. United States*, 599 F.3d 964, 973 (9th Cir. 2010), it is no longer good law and we do not address it."  *Duka*, 2011 WL 6794022, at *5, n. 7.  When a judgment is vacated by a higher court "it deprives the [lower] court's opinion of precedential effect."  *Los Angeles County v. Davis*, 440 U.S. 625, 634 n. 6 (1979).

cases, the various courts held that an additional purpose could be something other than the acquisition of foreign intelligence information, such as criminal investigation and prosecution.[28]

As noted above, in 2001, FISA was amended by the USA PATRIOT Act, which *inter alia* required that an Executive Branch official certify that "a significant purpose" of the requested surveillance was to obtain foreign intelligence information.  18 U.S.C. § 1804(a)(6)(B).  The defendant has challenged the constitutionality of the significant-purpose test based on his misunderstanding of the rationale underlying the superseded primary-purpose test.  As the Third Circuit observed in *Duka*, 2011 WL 6794022, at *10, "the dispositive issue is whether the 'significant purpose' test is reasonable. . . . We agree with our sister courts of appeals and the Foreign Intelligence Surveillance Court of Review that the amended FISA's 'significant purpose' standard is reasonable under the Fourth Amendment."  The Government will briefly reprise the arguments supporting the constitutionality of the significant-purpose test by way of providing background and context, and expects that this Court's *in camera* and *ex parte* review of the FISA materials will reveal ample evidence that a significant purpose of the challenged surveillance was to obtain foreign intelligence information.

The primary-purpose test was derived from a consideration of warrantless searches that were conducted pursuant to the Executive's Article II foreign-affairs powers prior to the enactment of FISA, and without any judicial involvement at all.  *See, e.g.*, *Abu Jihaad*, 630 F.3d at 121.  In that context, warrantless surveillance was conducted as an exception to the Fourth

---

[28] In *Johnson*, 952 F.2d at 572, the Court stated clearly that "the investigation of criminal activity cannot be the primary purpose of the surveillance," and did not say that it cannot be a purpose of the surveillance.  The Ninth Circuit specifically refused to define FISA's original "purpose" requirement and upheld a District Court's refusal to suppress evidence derived from FISA surveillance.  In *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988), the Court refused "to draw too fine a distinction between criminal and intelligence investigations," because by definition international terrorism requires the investigation of some activities that also constitute crimes.

Amendment, and was therefore limited by the scope of the Constitution's grant of authority to the Executive to conduct foreign affairs. *United States v. Truong Dinh Hung*, 629 F.2d 908, 912-916 (4th Cir. 1980).[29] Several courts had imported the primary-purpose test from warrantless surveillance into their statutory interpretation of FISA's certification requirement. *See Duggan*, 743 F.2d at 77; *Pelton*, 835 F.2d at 1075-76; *Badia*, 827 F.2d at 1464; *Johnson*, 952 F.2d at 572.[30] However, none of those cases held that the primary-purpose test was Constitutionally mandated, and the Second Circuit has explicitly stated, "in *Duggan*, we construed FISA's original reference to electronic surveillance for 'the purpose' of obtaining foreign intelligence information, as a 'requirement that foreign intelligence information be the *primary* objective . . . we were identifying Congress's intent in enacting FISA, not a constitutional mandate. . . . In short, nothing in *Duggan* erected a constitutional bar to Congress reconsidering and reframing the purpose requirement of FISA." *Abu Jihaad*, 630 F.3d at 123.

The pre-USA PATRIOT Act FISA language required that the Government certify that "the purpose" of the surveillance was the acquisition of foreign intelligence information. By interpreting "the purpose" to mean "the primary purpose" – and not to mean the sole purpose -- the various courts provided that an additional purpose could be something other than the acquisition of foreign intelligence information, such as criminal investigation and prosecution. In

---

[29] In *Truong*, the Fourth Circuit was presented with wholly warrantless surveillance, carried out by the Executive Branch unilaterally and without any judicial involvement whatsoever. The Court crafted the "primary purpose" test to identify the circumstances in which the Executive Branch may constitutionally dispense with judicial oversight altogether. This case, in contrast, involves the constitutional prerequisites for surveillance conducted pursuant to the detailed statutory scheme created by FISA, with its elaborate sets of procedures and rules that subject foreign intelligence surveillance to judicial oversight and approval. There is nothing in *Truong*'s reasoning to suggest that the judicially safeguarded FISA process requires the alternative safeguard of a "primary purpose" limitation that was found to be appropriate when the judiciary was completely excluded from the process.

[30] In *Johnson*, the First Circuit actually construed the purpose requirement in the negative, holding that "the investigation of criminal activity cannot be the primary purpose" of FISA surveillance. *Id.*

*Johnson*, 952 F.2d at 572, the Court stated clearly that "the investigation of criminal activity cannot be the primary purpose of the surveillance," and did not say that it cannot be a purpose of the surveillance.  The Ninth Circuit specifically refused to define FISA's original "purpose" requirement and upheld a District Court's refusal to suppress evidence derived from FISA surveillance.  In *United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988), the Court refused "to draw too fine a distinction between criminal and intelligence investigations," because by definition international terrorism requires the investigation of some activities that also constitute crimes, and "FISA contemplates prosecution based on evidence gathered through surveillance."

Since the primary purpose test was the result of statutory construction and was not a reflection of Constitutional necessity, the abrogation of that language by the USA PATRIOT Act cannot, and does not, create a Constitutional issue.

With the exception of the now-vacated and legally null *Mayfield*, discussed above,[31] every court that has considered the significant-purpose test has held that test to be constitutional. *See In re Sealed Case*, 310 F.3d 717, 746 (FISA Ct. Rev. 2002); *Abu Jihaad*, 630 F.3d at 128 ("[w]e conclude simply that FISA's 'significant purpose' requirement . . . is sufficient to ensure that the executive may only use FISA to obtain a warrant when it is in good faith pursuing foreign intelligence gathering [and the] fact that the government may also be pursuing other purposes, including gathering evidence for criminal prosecution, compels no different conclusion");[32] *United States v. Ning Wen*, 477 F.3d 896, 897 (7th Cir. 2007); *Warsame*, 547 F. Supp. 2d at 992-

---

[31] Moreover, the district court's rationale in *Mayfield* was specifically rejected in *Kashmiri*, 2010 WL 4705159, at *3. It is that discarded rationale, from a legally null opinion, that the defendant urges this Court to adopt.  Defendant's suppression motion at pp. 7-8.

[32] **CLASSIFIED MATERIAL REDACTED**

97; *Mubayyid*, 521 F. Supp. 2d at 139; *United States v. Marzook*, 435 F. Supp. 2d 778, 786 (N.D. Ill. 2006); *Benkahla* 437 F. Supp. 2d at 554; *Jayyousi*, 2007 WL 851278, at \*1.  In fact, in *In re Sealed Case* the Court noted that *Truong*'s reliance on the "primary purpose" test was misconceived because it was based on the false "assertion that once the government moves to criminal prosecution its 'foreign policy concerns recede'. . . . [But] the government's primary purpose is to halt the espionage or terrorism efforts." *Id.* 310 F.3d at 743.   To accomplish that objective, "arresting and prosecuting terrorist agents of, or spies for, a foreign power may well be the best technique to prevent them from successfully continuing their terrorist" activities.  *Id.* at 724.  In short, resort to criminal prosecution does not mean that the Government's foreign policy and national security concerns have fallen out of the equation; it simply means that the Government has chosen prosecution as one means of pursuing those concerns.

As the Third Circuit noted in *Duka*, the "significant purpose" standard "reflects a balance struck by Congress . . . to promote coordination between intelligence and law enforcement officials in combating terrorism, acknowledging that, as a practical matter, these functions inevitably overlap."  2011 WL 6794022, at \*10.  The Court noted that *Keith*, 407 U.S. at 322-23, required that Congress's judgment should on this issue be accorded "some additional measure of deference" by the courts, and added that "even leaving Congress's judgment aside, we conclude that FISA's "significant purpose" standard is reasonable in light of the government's legitimate national security goals."  *Id.*  Irfan's suggestion that the "significant purpose" standard means that FISA is being used to circumvent the Constitution by allowing the Government to conduct purely criminal investigations under its aegis is simply without merit.

### 4. **Probable Cause**

FISA requires a finding of probable cause that the target is a foreign power or an agent of

a foreign power and that each facility or property at which the electronic surveillance and/or

physical search is directed is being used, owned, and/or possessed, or is about to be used, owned,

and/or possessed, by a foreign power or an agent of a foreign power.  It is this standard, not the

standard applied to criminal search warrants, that this Court must apply.  *See Abu-Jihaad*, 630

F.3d at 130-31; *Duka*, 2011 WL 6794022, at *5; *Cavanagh*, 807 F.2d. at 790 (citing *United States*

*v. United States District Court (Keith)*, 407 U.S. 297, 322 (1972)).  This "different, and arguably

lower, probable cause standard . . . reflects the purpose for which FISA search orders are issued."

*Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *22.

### CLASSIFIED MATERIAL REDACTED

### a. **The Fourth Amendment**

Courts have universally agreed that FISA's probable cause standard comports with the

Fourth Amendment.  *See, e.g.*, *Isa*, 923 F.2d at 1304.  Indeed, FISA's probable cause requirement

was crafted by Congress with an eye towards the Fourth Amendment and in recognition of the

unique nature and important purpose served by FISA's intelligence function.  *See, e.g.*, *Kashmiri*,

2010 WL 4705159, at *3 ("[n]o requirement exists to show probable cause of presently occurring

or past criminal activity").

The Supreme Court has stated that "[d]ifferent standards may be compatible with the

Fourth Amendment if they are reasonable both in relation to the legitimate need of Government

for intelligence information and the protected rights of our citizens." *Keith*, 407 U.S. at 322-23

(recognizing that domestic security surveillance "may involve different policy and practical

considerations than the surveillance of 'ordinary crime'").  In *Keith*, the Supreme Court

acknowledged that: (1) the "focus of . . . surveillance [in domestic security investigations] may be

less precise than that directed against more conventional types of crime"; (2) unlike ordinary

criminal investigations, "the gathering of security intelligence is often long range and involves the

interrelation of various sources and types of information;" and (3) the "exact targets of such

surveillance may be more difficult to identify" than in surveillance operations of ordinary crimes

under Title III.  *Id.*  Although *Keith* was decided before FISA's enactment and addressed purely

domestic security surveillance, the rationale underlying *Keith* applies *a fortiori* to foreign

intelligence surveillance, where the Government's interest, at least from a national security

perspective, would typically be more pronounced.

FISA was enacted partly in response to *Keith*.  In constructing FISA's framework,

Congress addressed *Keith's* question whether departures from traditional Fourth Amendment

procedures "are reasonable, both in relation to the legitimate need of Government for intelligence

information and the protected rights of our citizens," and "concluded that such departures are

reasonable." *See* S. Rep. No. 95-701, 95th Cong., 2d Sess., at 11, (quoting *Keith* at 323) *reprinted

in* 1978 U.S.C.C.A.N. 3973, 3980 (1978) ("Senate Report").  Similarly, many courts – including

the Foreign Intelligence Surveillance Court of Review – have relied on *Keith* in holding that FISA

collection conducted pursuant to a FISC order is reasonable under the Fourth Amendment.  *See In

re Sealed Case*, 310 F.3d 717, 738, 746 (FISC of Rev. 2002) (finding that while many of FISA's

requirements differ from those in Title III, few of those differences have constitutional relevance);

*Duka*, 2011 WL 6794022, *6-8 (discussion of factors that establish FISA's reasonableness under

Fourth Amendment analysis); *Duggan*, 743 F.2d at 73-74 (holding that FISA does not violate the

Fourth Amendment); *see also Ning Wen*, 477 F.3d at 898 (holding that FISA is constitutional

despite using "a definition of 'probable cause' that does not depend on whether a domestic crime

has been committed"); *Damrah*, 412 F.3d at 624 (denying as meritless the defendant's claim that

FISA's procedures violate the Fourth Amendment); *Pelton*, 835 F.2d at 1075 (finding FISA's

procedures compatible with the Fourth Amendment); *Cavanagh*, 807 F.2d at 790-91 (holding that

FISA satisfies the Fourth Amendment requirements of probable cause and particularity); *Isa*, 923

F.2d at 1302 (affirming district court's conclusion that FISA collection did not violate the Fourth

Amendment and rejecting defendant's challenge to FISA's lower probable cause threshold);

*Warsame*, 547 F. Supp. 2d at 993-94 (holding that FISA's probable cause and particularity

requirements satisfy the reasonableness requirement of the Fourth Amendment); *Mubayyid*, 521

F. Supp. 2d at 135-41 (rejecting claim that FISA violates the Fourth Amendment's judicial

review, probable cause, notice, and particularity requirements); *Falvey*, 540 F. Supp. at 1311-14

(finding that FISA procedures satisfy the Fourth Amendment's warrant requirement); *Duka*, 2011

WL 6794022, at *4 (FISC judge satisfies Fourth Amendment's "neutral and detached magistrate"

requirement).

### b. Alternatively, FISA Collection is Subject to the "Good-Faith" Exception

Even assuming *arguendo* that this Court determines that a particular FISC order was not

supported by probable cause, or that one or more of the FISA certification requirements were not

in fact met, the Government respectfully submits that the FISA materials – and the evidence

obtained or derived from the FISA collection – are, nonetheless, admissible under the "good

faith" exception to the exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897

(1984).[33]  The Seventh Circuit, relying on *Leon*, held that federal officers were entitled to rely in good faith on a FISA warrant.  *Ning Wen*, 477 F.3d at 897.  As the court noted:

> [T]he exclusionary rule must not be applied to evidence seized on the authority of a warrant, even if the warrant turns out to be defective, unless the affidavit supporting the warrant was false or misleading, or probable cause was so transparently missing that "no reasonably well trained officer [would] rely on the warrant."

*Id.* (quoting *Leon*) (alteration in original); *see also Duggan*, 743 F.2d at 77 n.6 (opining that *Franks* principles apply to review of FISA orders); *Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *25 n.8 ("[t]he FISA evidence obtained . . . would be admissible under *Leon's* 'good faith' exception to the exclusionary rule were it not otherwise admissible under a valid warrant").

**CLASSIFIED MATERIAL REDACTED**

**5.  CLASSIFIED MATERIAL REDACTED**

Irfan claims that he was targeted for FISC-authorized surveillance in violation of FISA's stipulation that no United States person may be considered a foreign power or an agent of a foreign power solely on the basis of activities protected by the First Amendment to the Constitution of the United States.[34]  50 U.S.C. §§ 1805(a)(2)(A), 1824(a)(2)(A).  For clarity, Irfan was not targeted personally for FISC-authorized surveillance, although his communications were captured and he is thus an aggrieved person.  That said, although *protected* First Amendment activities cannot form the *sole* basis for FISC-authorized electronic surveillance or physical search, not all speech-related activities fall within the protection of the First Amendment.  For

---

[33] "[E]ven if we were to conclude that amended FISA is unconstitutional, evidence derived from it would nevertheless be admissible in the government's case. . . .  The exclusionary rule precludes the admission of evidence tainted by a Fourth Amendment violation" only in those cases where its application will deter police misconduct. *Duka*, 2011 WL 6794022, at *12, citing *Leon*, 468 U.S. at 918.

[34] DE236 at  13-14.

34

instance, the defendant claims that conversations with his co-conspirators fall within the First

Amendment, without addressing whether such conversations are *protected* by the First

Amendment.  In fact, such conversations merit no such protection because they are statements

made in furtherance of the charged conspiracy and are evidence of the participant's criminal

intent: "[n]umerous crimes under the federal criminal code are, or can be, committed by speech

alone . . . if the evidence shows that the speech crossed the line into criminal solicitation,

procurement of criminal activity, or conspiracy to violate the laws, the prosecution is

permissible."  *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999); *United States v. Sattar*,

395 F. Supp. 2d 79, 101 (S.D. N.Y. 2005) ("First Amendment lends no protection to participation

in conspiracy, even if such participation is through speech"), *aff'd*, 590 F.3d 93 (2d Cir. 2009);

*United States v. Stone*, 2011 WL 795104, at *10 (E.D. Mich.) (defendants not charged with

advocacy, but "[r]ather they are charged with an actual agreement to commit actual acts of

violence").  Moreover, even activities that do clearly fall within the purview of the First

Amendment's protection may be considered by the FISC if there is other activity indicative that

the target is an agent of a foreign power.  *United States v. Rosen*, 447 F. Supp. 2d 538, 549-50

(E.D. Va. 2006); *United States v. Rahman*, 861 F. Supp. 247, 252 (S.D.N.Y. 1994), *aff'd*, 189

F.3d 88 (2d Cir. 1999).   Even protected First Amendment activities may therefore be considered

in combination with other activities that are evidence of a target's status as an agent of a foreign

power.

### 6.  Hafiz Khan's Motion to Clarify Should be Denied

### CLASSIFIED MATERIAL REDACTED

## IV.  THE FISA COLLECTION WAS BOTH LAWFULLY AUTHORIZED AND LAWFULLY CONDUCTED

**CLASSIFIED MATERIAL REDACTED**

**A.  <u>THE CERTIFICATIONS</u>**

Each FISA application was supported by a certification signed by a duly-authorized, high-ranking official of the United States Government.  The FISC properly determined that each of those certifications complied with FISA's requirements: *i.e.,* that: (1) the certifying official deemed the information sought to be foreign intelligence information; (2) a significant purpose of the surveillance or search was to obtain foreign intelligence information; and (3) the information sought could not reasonably have been obtained by normal investigative techniques.  *See* 50 U.S.C. §§ 1804(a)(6)(A)-(C), 1823(a)(6)(A)-(C).  As noted above, certifications submitted in support of a FISA application should be "presumed valid," and neither the FISC nor a reviewing district court should "second-guess the executive branch official's certification that the objective of the surveillance is foreign intelligence information."  *Duggan*, 743 F.2d at 77 & n. 6; *Gowadia*, 2009 WL 1649714, at *2-3.  In reviewing the certifications, a district court should apply the same standard as the FISC, which is the "clearly erroneous" standard.  *Badia*, 827 F.2d at 1463.  As discussed below, there is ample information both in the certifications themselves and in the declarations, to demonstrate that the certifications were not clearly erroneous.

**1. Foreign Intelligence Information**

**CLASSIFIED MATERIAL REDACTED**

**2.  "A Significant Purpose"**

**CLASSIFIED MATERIAL REDACTED**

**3.  Information Not Reasonably Obtainable Through Normal Investigative Techniques**

**CLASSIFIED MATERIAL REDACTED**

For the above reasons, the FISC properly found that the certifications were not clearly erroneous.

**B.  THE INSTANT FISA COLLECTION MET FISA'S PROBABLE CAUSE STANDARD**

**CLASSIFIED MATERIAL REDACTED**

**1.  CLASSIFIED MATERIAL REDACTED**

**CLASSIFIED MATERIAL REDACTED**

**2.  CLASSIFIED MATERIAL REDACTED**

**CLASSIFIED MATERIAL REDACTED**

**3.  CLASSIFIED MATERIAL REDACTED**

**CLASSIFIED MATERIAL REDACTED**

**4.  CLASSIFIED MATERIAL REDACTED**

**a.  CLASSIFIED MATERIAL REDACTED**

**CLASSIFIED MATERIAL REDACTED**

**b.  CLASSIFIED MATERIAL REDACTED**

**CLASSIFIED MATERIAL REDACTED**

5.  CLASSIFIED MATERIAL REDACTED

    a.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

    b.  CLASSIFIED MATERIAL REDACTED

    c.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

    d.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

    e.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

6.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

7.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

8.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

9.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

10.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

11.  CLASSIFIED MATERIAL REDACTED

       CLASSIFIED MATERIAL REDACTED

### C.  CLASSIFIED MATERIAL REDACTED

### CLASSIFIED MATERIAL REDACTED

### D.  <u>THE FISA COLLECTION WAS LAWFULLY CONDUCTED</u>

This Court's *in camera*, *ex parte* review of the FISA materials will demonstrate not only that the FISA collection was lawfully authorized, but also that it was lawfully conducted.  That is, the FISA-obtained and -derived information that will be offered into evidence in this case was acquired and retained by the FBI in accordance with FISA's minimization requirements, and the implementing standard minimization procedures ("SMPs") promulgated by the Attorney General and approved by the FISC.

#### 1. <u>Minimization</u>

If a reviewing court is satisfied that the electronic surveillance and/or physical searches were properly certified and lawfully authorized by the FISC, it must then determine whether the electronic surveillance and/or physical searches were lawfully conducted.  To make this determination, the court must examine whether the Government followed the relevant SMPs to appropriately minimize the information obtained pursuant to FISA.

### CLASSIFIED MATERIAL REDACTED

Under FISA and the SMPs, minimization "may occur at any of several stages, including recording, logging, indexing, or dissemination."  *IARA*, 2009 WL 5169536, at *6 (citing *Kevork*, 634 F. Supp. at 1017); Senate Report at 40; current SMPs, Section I.A., pp. 1-2.  At the acquisition stage, FISA does not "prohibit the use of automatic tape recording equipment."  *Rahman*, 861 F. Supp. at 252; *Kevork*, 634 F. Supp. at 1017.  Indeed, the FISC has noted that FISA surveillance devices are normally left on continuously and that consequently minimization

occurs (under the old SMPs) during the logging and indexing of the pertinent communications.[35] *See In re Sealed Case*, 310 F.3d at 740.

Generally, after a communication is collected and reduced to an intelligible form (*e.g.,* by transcription or translation), it is reviewed to determine whether it contains, or might contain, foreign intelligence information. *See In re All Matters Submitted to FISC*, 218 F. Supp. 2d 611, 618 (Foreign Intel. Surv. Ct. 2002); *rev'd on other grounds by In re Sealed Case*, 310 F.3d at 717. If it does contain such foreign intelligence information, or is necessary to understand or assess foreign intelligence information, the communication is not subject to minimization; *i.e.,* it "meets the standard" for retention. Moreover, FISA expressly states that the Government is not required to minimize information that is "evidence of a crime," whether or not it is also foreign intelligence information. 50 U.S.C. § 1801(h)(3); *see also Isa*, 923 F.2d at 1305.

**CLASSIFIED MATERIAL REDACTED**

The degree to which information is required to be minimized varies somewhat given the specifics of a particular investigation, such that less minimization at acquisition and retention is justified when "the investigation is focusing on what is thought to be a widespread conspiracy" and more extensive surveillance is necessary "to determine the precise scope of the enterprise." *In re Sealed Case*, 310 F.3d at 741; *United States v. Bin Laden*, 126 F. Supp. 2d at 286 ("[m]ore extensive monitoring and 'greater leeway' in minimization efforts are permitted in a case [involving] . . . [a] 'world-wide, covert and diffuse . . . international terrorist group.'"). Furthermore, the activities of foreign powers and their agents are often not obvious from an initial or cursory overhear of conversations. To the contrary, agents of foreign powers frequently

---

[35] **CLASSIFIED MATERIAL REDACTED**

engage in coded communications, compartmentalized operations, the use of false identities and other practices designed to conceal the breadth and aim of their operations, their organization, activities and plans.  *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 154 (2d Cir. 1998) (noting that two conspirators involved in the 1993 bombing of the World Trade Center in New York referred to the bomb plot as the "study" and to terrorist materials as "university papers").  As one court explained, "[i]nnocuous-sounding conversations may in fact be signals of important activity [and] information on its face innocent when analyzed or considered with other information may become critical."  *Kevork*, 634 F. Supp. at 1017 (quoting House Report at 55); *see also In re Sealed Case*, 310 F.3d at 740-41; *Bin Laden*, 126 F. Supp. 2d at 286.  Likewise, "individual items of information, not apparently significant when taken in isolation, may become highly significant when considered together over time." *Kevork*, 634 F. Supp. at 1017; *Rahman*, 861 F. Supp. at 252-53 (rejecting the notion that the "wheat" could be separated from the "chaff" while the "stalks were still growing").  This is especially true where the individuals involved use codes or cryptic language.  See e.g., *Hammoud*, 381 F.3d at 334 ("[a] conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals involved are talking in code"); *Bin Laden*, 126 F. Supp. 25 at 286; *Kevork*, 634 F. Supp. at 1017; *Thomson*, 752 F. Supp. at 81 (permissible to retain and disseminate "bits and pieces" of information until their "full significance becomes apparent").  As a result, "courts have construed 'foreign intelligence information' broadly and sensibly allowed the government latitude in its determination of what is foreign intelligence information." *Rosen*, 447 F. Supp. 2d at 551; *IARA*, 2009 WL 5169536, at *4.

Moreover, as noted above, FISA expressly states that the Government is not required to minimize information that is "evidence of a crime."  50 U.S.C. §§ 1801(h)(3), 1821(4)(c).  As a result, to the extent that certain communications of a United States person may be evidence of a crime or may otherwise establish an element of a substantive or conspiratorial offense, such communication need not be minimized.  *Isa*, 923 F.2d at 1305.

The nature of the foreign intelligence information sought also impacts the amount of information regarding a United States person that can properly be retained and disseminated.  As Congress explained, there is a legitimate need to conduct a thorough post-acquisition review of FISA information that involves a United States person who is acting as an agent of a foreign power:

> It is "necessary" to identify anyone working with him in this network, feeding him information, or to whom he reports. Therefore, it is necessary to acquire, retain and disseminate information concerning all his contacts and acquaintances and his movements. Among his contacts and acquaintances, however, there are likely to be a large number of innocent persons. Yet, information concerning these person must be retained at least until it is determined that they are not involved in the clandestine intelligence activities and may have to be disseminated in order to determine their innocence.

House Report at 58.  Indeed, courts have cautioned that, when a United States person communicates with an agent of a foreign power, the Government would be "remiss in meeting its foreign counterintelligence responsibilities" if it did not thoroughly "investigate such contacts and gather information to determine the nature of those activities."  *Thomson*, 752 F. Supp. at 82.

Congress also recognized that agents of a foreign power are often very sophisticated and skilled at hiding their activities.  *See Thomson*, 752 F. Supp. at 81 (quoting House Report at 58). Accordingly, to pursue leads, Congress intended that the Government be given "a significant

degree of latitude" with respect to the "retention of information and the dissemination of information between and among counterintelligence components of the Government."  *Id.*

In light of these realities, Congress recognized that minimization efforts by the Government can never be free of mistake, because "no electronic surveillance can be so conducted that innocent conversations can be totally eliminated."  Senate Report at 39.  The Fourth Circuit reached the same conclusion in *Hammoud*, 381 F.3d at 334, stating that the "mere fact that innocent conversations were recorded, without more, does not establish that the government failed to appropriately minimize surveillance."[36]

Accordingly, in reviewing the adequacy of minimization efforts, the test to be applied is neither whether innocent conversations were intercepted, nor whether mistakes were made with respect to particular communications.  Rather, as the United States Supreme Court stated in the context of Title III surveillance, there should be an "objective assessment of the [agents'] actions in light of the facts and circumstances confronting [them] at the time."  *Scott v. United States*, 436 U.S. 128, 136 (1978).  The test of compliance is whether a good faith effort to minimize was made.  *Hammoud*, 381 F.3d at 334 ("[t]he minimization requirement obligates the Government to make a good faith effort to minimize the acquisition and retention of irrelevant information"); *see also* Senate Report at 39- 40 (stating that the court's role is to determine whether "on the whole, the agents have shown a high regard for the right of privacy and have done all they reasonably could do to avoid unnecessary intrusion"); *IARA*,  2009 WL 5169536, at *6 (quoting Senate Report at 39-40).

---

[36] The reason is that although "the minimization requirement obligates the Government to make a good faith effort to minimize . . . it is not always immediately clear into which category a particular conversation falls.  A conversation that seems innocuous on one day may later turn out to be of great significance, particularly, if the individuals involved are talking in code."  *Hammoud*, 381 F.3d at 334, citing Senate Report at 39-40.

Moreover, absent evidence that there has been a complete disregard for the minimization procedures, suppression is not the appropriate remedy with respect to those communications that were properly acquired, retained, and disseminated.  Indeed, Congress intended that any suppression remedy should apply only to the "evidence which was obtained unlawfully." House Report at 93.  FISA's legislative history reflects that Congress intended only this limited sanction for errors of minimization:

> As the language of the bill makes clear, only that evidence which was obtained unlawfully or derived from information obtained unlawfully would be suppressed. If, for example, some information should have been minimized but was not, only that information should be suppressed; the other information obtained lawfully should not be suppressed.

*Id*; *accord IARA*, 2009 WL 5169536, at *7 ("this Court declines to suppress evidence obtained through FISA warrants properly issued and conducted"); *see also United States v. Falcone*, 364 F. Supp. 877, 886-87 (D.N.J. 1973), *aff'd*, 500 F.2d 1401 (3d Cir. 1974) (Title III).

## 2. The FISA Collection was Appropriately Minimized

### CLASSIFIED MATERIAL REDACTED

## V.  CONCLUSION

Defendant's motions should be denied.  Courts have uniformly held that the probable cause requirement of FISA comports with the requirements of the Fourth Amendment to the United States Constitution, *see, e.g.*,  *Isa*, 923 F.2d at 1304; and that FISA's provisions for *in camera*, *ex parte* review comport with the due process requirements of the United States Constitution.  *See, e.g.*, *Spanjol*, 720 F. Supp. at 58-59; *United States v. Butenko*, 494 F.2d 593, 607 (3d Cir.), *cert denied sub nom*, *Ivanov v. United States*, 419 U.S. 881 (1974);  *Damrah*, 412

F.3d at 624; *Warsame*, 547 F. Supp. 2d at 988-89. The defendant advances no argument to justify any deviation from this well-established precedent.

Even if this Court were to determine that the FISA collection had not been lawfully authorized or lawfully conducted, the FISA evidence would nevertheless be admissible under the "good faith" exception to the exclusionary rule articulated in *Leon*, 468 U.S. 897 (1984). *See also Ning Wen*, 477 F.3d at 897 (holding that the *Leon* good-faith exception applies to FISA orders); *Mubayyid*, 521 F. Supp. 2d at 140 n. 12 (noting that the Government could proceed in good-faith reliance on FISA orders even if FISA were deemed unconstitutional); *Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *25 n. 8; *Nicholson*, 2010 WL 1641167, at *6.

The Attorney General has filed a declaration in this case stating that disclosure or an adversary hearing would harm the national security of the United States. Therefore, FISA mandates that this Court conduct an *in camera*, *ex parte* review of the challenged FISA materials to determine whether the collection was both lawfully authorized and conducted. In conducting that review, the Court may disclose the FISA materials "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance [or search]." *See* 50 U.S.C. §§ 1806(f), 1825(g). Congress, in enacting FISA's procedures for *in camera*, *ex parte* judicial review, has balanced and accommodated the competing interests of the Government and criminal defendants, and has articulated the proper standard for disclosure; that is, only where the Court finds that disclosure is necessary to the Court's accurate determination of the legality of the FISA collection. *See id*. This Court will be able to render a determination based on its *in camera*, *ex parte* review, and the defendant has failed to present any colorable basis for supplanting Congress' reasoned judgment with a different proposed standard of review.

45

The Government respectfully submits that the Court can make this determination without disclosing the classified and highly-sensitive FISA materials to the defendants. Every federal court that has been asked to determine the legality of a FISC-authorized collection has been able to do so *in camera*, *ex parte* and without the assistance of defense counsel. The FISA materials at issue here are organized and readily understood, and an overview of them is presented hereinafter as a frame of reference.

Based on the foregoing analysis, the Government respectfully submits that the Court should: (1) conduct an *in camera*, *ex parte* review of the FISA dockets and the Government's classified submission; (2) find that the FISA surveillance was lawfully authorized and lawfully conducted in compliance with the Fourth Amendment; (3) hold that disclosure of the FISA dockets and the Government's classified submissions to the defense is not required because the Court is able to make an accurate determination of the legality of the surveillance without disclosing the FISA dockets or any portions thereof; (4) order that the FISA dockets and the Government's classified submissions be maintained under seal by the Court Security Officer or his/her designee; and (5) deny the defendant's Motions.[37]

---

[37] A district court order requiring the disclosure of FISA materials is a final order for purposes of appeal. See 50 U.S.C. § 1806(h). In the unlikely event that the Court concludes that disclosure of any item within any of the FISA materials may be required, given the significant national security consequences that would result from such disclosure, the Government would expect to pursue an appeal. Accordingly, the Government respectfully requests that the Court indicate its intent to do so before issuing any order, or that any such order be issued in such a manner that the United States has sufficient notice to file an appeal prior to any actual disclosure.

Respectfully submitted,

WIFREDO A. FERRER
United States Attorney

By:     /s/ John C. Shipley
        JOHN C. SHIPLEY
        Assistant United States Attorney
        Fla. Bar No. 0069670

        /s/ Sivashree Sundaram
        SIVASHREE SUNDARAM
        Assistant United States Attorney
        District Court No. A5501212
        99 N.E. 4th Street, Suite 800
        Miami, Florida, 33132-2111
        Tel: (305) 961-9001

        /s/ Stephen Ponticiello
        /s/ Bridget Behling
        STEPHEN PONTICIELLO
        BRIDGET BEHLING
        Trial Attorneys
        Counterterrorism Section
        National Security Division
        United States Department of Justice
        10th St. & Pennsylvania Ave., N.W.
        Washington D.C. 20530
        Tel: (202) 514-0849
        Fax: (202) 514-8714

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2012, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF for electronic delivery to all counsel of record.  An *ex parte, in

camera* classified version of the foregoing has been filed with the Clerk of the Court and reflected

on a half sheet filed today with the Clerk.

        /s/ John Shipley
        John Shipley
        Assistant United States Attorney