**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

FILED BY __ABM__
Deputy Clerk

**Oct 29, 2015**

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. **MIA**

Douglas J. Mincher
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 29, 2015

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  13-14048-SS
Case Style: USA v. Hafiz Muhammad Khan
District Court Docket No: 1:11-cr-20331-RNS-1

The enclosed judgment is hereby issued as the mandate of this court.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

Sincerely,

AMY C. NERENBERG, Acting Clerk of Court

Reply to:  Brenda H. McConnell
Phone #:  (404) 335-6209

Enclosure(s)

MDT-1 Letter Issuing Mandate

**UNITED STATES COURT OF APPEALS**
**For the Eleventh Circuit**
_____

No. 13-14048
_____

District Court Docket No.
1:11-cr-20331-RNS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

HAFIZ MUHAMMAD SHER ALI KHAN,

Defendant - Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: July 23, 2015
For the Court: Douglas J. Mincher, Clerk of Court
By: Djuanna Clark

Issued as Mandate:  10/29/2015

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14048

_____

D.C. Docket No. 1:11-cr-20331-RNS-1


UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

versus

HAFIZ MUHAMMAD SHER ALI KHAN,

                                        Defendant - Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 23, 2015)

Before TJOFLAT, WILSON and JILL PRYOR, Circuit Judges.

TJOFLAT, Circuit Judge:

        This appeal concerns the challenging twenty-nine day trial of Hafiz

Muhammad Sher Ali Khan.  A federal grand jury indicted Khan in 2011 on

terrorism-related charges.  At trial, the Government presented evidence

demonstrating Khan's involvement in the transfer of money to members of the

Tehrik-e Taliban Pakistan, a foreign terrorist organization also known as the

Pakistani Taliban.[1]  The jury convicted Khan on all counts: conspiring to provide

(Count 1), and providing or attempting to provide (Count 3), material support to

terrorists, in violation of 18 U.S.C. § 2339A; and conspiring to provide (Count 2),

and providing or attempting to provide (Count 4), material support to a foreign

terrorist organization, in violation of 18 U.S.C. § 2339B.  Khan now appeals his

convictions.  After careful review, we affirm.

## I.

Khan was born approximately eighty years ago in the Swat Valley, a region

of northern Pakistan located near the Afghanistan–Pakistan border.  Since 1967,

Khan has owned a madrassa in his native village.[2]  For more than four decades, his

madrassa has taught local children about the Quran and other religious topics.

Over time, Khan's madrassa grew.  It eventually expanded into a boarding school

that attracted children from surrounding villages.  Most of Khan's students were

---

[1] The Secretary of State designated the Pakistani Taliban as a foreign terrorist organization in September 2010.  *See* 75 Fed. Reg. 53,732 (Sept. 1, 2010).  It is distinct from the Afghan Taliban.  For convenience, we use the terms "Pakistani Taliban" and "Taliban" interchangeably.

[2] Literally translated from Arabic, "madrassa" means "school"; a madrassa is not necessarily a religious school, although it can be.  For convenience, we use the terms "madrassa" and "school" interchangeably.

poor: none paid the cost of tuition, room, or board.  To finance the school's day-to-day operations, Khan relied on donations from relatives and others interested in helping the madrassa flourish.  This was his life's work.  So central is his role as a spiritual leader that it is even reflected in his first name—"Hafiz" is a title he earned for having memorized the Quran in its entirety.

But after six decades in Pakistan, Khan decided to leave.  He came to the United States in 1994 and took up residence in Miami, Florida.  He was naturalized as an American citizen in 2000.  Prior to his arrest in 2011, Khan was an imam at a local mosque.

Khan's absence from Pakistan did not signal his madrassa's end.  Save for a period of time in 2009 when the Pakistani government temporarily shut the school down for its alleged connections to the Taliban, the madrassa still maintained operations in the Swat Valley.  And Khan remained actively involved.  For example, he carried on a legal dispute in Pakistan over a parcel of land he sought to acquire in the hopes of building an addition to the madrassa.

He sent money, too.  Using local financial institutions, Khan wired money to personal bank accounts he kept at the National Bank of Pakistan.  He then instructed friends and relatives in Pakistan who had access to these accounts to distribute the money on his behalf.  Sometimes, the remittances would go toward financing the madrassa.  For instance, Khan wired money to pay the salaries owed

3

to the madrassa's teachers, make repairs to the building, and buy oil to run the school's generator.  Other times, the money went to injured or incarcerated Taliban fighters.  Indeed, evidence admitted against Khan at trial revealed that Khan leveraged his relationship with the madrassa to support the Pakistani Taliban.

While Khan shuffled funds among accounts at home and abroad, the Government watched—and listened.  The Government's investigation began in late 2007.  It produced three types of evidence.  First, pursuant to the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801 *et seq.*, the Government intercepted approximately 35,000 telephone calls between Khan and his friends and relatives in Pakistan.  Second, the Government employed an informant, who— posing as a wealthy Taliban sympathizer—ingratiated himself with Khan by helping Khan run errands and attend medical appointments, all while surreptitiously recording their conversations.  Third, the Government subpoenaed financial records from the banking institutions Khan used to transfer his money from the United States to Pakistan.

In May 2011, Khan was indicted along with five codefendants: two of his sons, Irfan Khan and Izhar Khan; his daughter, Amina Khan; his grandson, Alam Zeb; and his business associate, Ali Rehman.  Ali Rehman, Alam Zeb, and Amina Khan—all of whom live in Pakistan—remain untried.  Efforts to extradite them to the United States failed.  The Government dismissed charges against Irfan Khan

4

prior to trial, and the District Court acquitted Izhar Khan following the Government's case-in-chief.  Hafiz Khan's case, however, proceeded.  Following trial, the jury convicted Khan on all counts of the indictment, and the District Court sentenced Khan to twenty-five years in prison.[3]

## II.

Khan advances three arguments on appeal.  First, Khan says the District Court abused its discretion by permitting the Government's translator to add certain words, in brackets, to translations of intercepted telephone calls between Khan and his contacts in Pakistan.  Second, Khan claims the District Court abused its discretion by allowing the Government's first witness at trial, FBI Agent Michael Ferlazzo, to testify as an expert witness without the proper notice or foundation; by letting Ferlazzo testify as a summary witness; and by limiting the scope of Khan's cross-examination of Ferlazzo.  And third, Khan contends the District Court abused its discretion by denying a continuance or a mistrial after the Internet connection supporting live-video-feed testimony of defense witnesses from Pakistan failed.[4]

---

[3] Khan was sentenced to 15 years as to Count 1.  He was sentenced to 10 years as to each of Counts 2, 3, and 4, to run concurrently with each other and consecutively with Count 1.

[4] Khan also challenges as legally inadequate the notice provided to him by the Government regarding its intent to use against him evidence obtained or derived from electronic surveillance.  *See* Doc. 17.  Having carefully reviewed the record and the briefs, and with the benefit of oral argument on this issue, we reject Khan's argument without further discussion.

We address each argument in turn.

## III.

Khan first argues that the District Court erred by permitting the Government's translator to add bracketed words when translating the FISA-intercepted telephone calls between Khan and Khan's relatives in Pakistan.  "We review evidentiary rulings for an abuse of discretion."  *United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005).  "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous."  *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004) (quotation marks omitted).

## A.

Khan's conversations anchored the Government's case-in-chief, his own words serving as powerful evidence of his guilt.  After all, the Government's evidence indicated that Khan routinely gave specific instructions that his money be funneled to aid Taliban fighters.  Because Khan spoke in Pashto and Urdu, the Government relied on translations performed by FBI-certified linguists to decipher Khan's conversations.

During discovery, the Government provided the defense with written translations of approximately two-hundred telephone calls and forty in-person

conversations.  The defense submitted specific objections to the way in which certain recordings were translated; the FBI linguists reviewed the objections, accepted some, and rejected others.  The parties eventually stipulated "to the foundational requirements for admitting the unclassified calls and transcripts" while "reserving any non-foundational objections based upon hearsay, relevance and the like" and "allowing disputes about the translation of particular words and phrases to be aired . . . through cross-examination or witness testimony consistent with the rules."  The District Court then entered an order finding that the foundation requirements for admitting the transcripts had been met and that they were not hearsay.

Soon afterwards—and prior to trial—Khan filed a motion to strike translations featuring bracketed words, that is, words that were not actually spoken during the audio recordings.  Khan argued that these insertions improperly "invade[d] the province of the jury" because "[w]hen a translator adds in brackets what was not heard on the audio [the translator is] assuming what the speaker intended to [say] when [the speaker] made a statement." [5]

---

[5] For example, the Government introduced a transcript of a telephone call between Khan and his grandson, Alam Zeb.  During the call, Khan asked his grandson a question.  The translation was as follows: "So are these Shagirdan [Taliban] of ours . . . are they doing something or not?"  Another statement during a phone call between Khan and his son-in-law was translated in a similar fashion: "[O]ver there the thing [Army base] is not there, you know.  So now the Army goes [in] where Talib [Taliban] are or if they have done something earlier, like they demolish their houses."

The District Court denied Khan's motion.  In so doing, however, it ordered the Government "to call a government translator as a witness to explain based upon their expertise how the bracketed words were prepared."

At trial, the Government moved to enter the transcripts into evidence.  The defense objected, arguing that the translations were not "fairly and accurately transcribed."  Outside the presence of the jury, the District Court overruled the objection.  The District Court explained:

> If somebody doesn't agree with a translation, then if that translator who prepared it is on the stand, as part of your cross-examination you could ask them about that.  If you want to present a translator to contest that you can do that [as well] . . . .

The District Court also reiterated its pretrial order that the Government call a translator to explain the significance of the bracketed words.

In keeping with this directive, the Government called Moazzam Shah, an FBI translator who worked on Khan's case.  The Government asked Shah to explain why he used brackets in some of his translations.  Shah responded that "sometimes during the course of translating from one language to another, you come across a word that signifies a concept or does not have a direct meaning in the target language" and that a literal translation would therefore "mislead an

---

Other examples include: "Man!  I had said this before that they [Taliban] have conducted the work in a totally wrong way"; "[S]o the government says [fears thinking], 'they [Taliban] are trying to snatch the Government from us'"; "I tell you, may Allah destroy these pig ones . . . I don't think that their leaders [Taliban] are telling them to do this."

English reader."  Shah explained that, in performing the translations, he never replaced words that were spoken during the course of the conversation; rather, he augmented the literal translation with bracketed words only when he was "one-hundred percent confident," based on the context of the conversation, that the addition correctly clarified what the speaker meant.

For example, the word "Shagirdan" in Pashto can mean "student"; it can also serve as a "substitute word" for Taliban.  Shah testified that he would insert the word "Taliban" in brackets following the word "Shagirdan" when he was confident, from the context of the conversation, that Shagirdan was used by the speakers as a type of "code word."  This frequently occurred during conversations about "fighting" and "lying low," in which case the word "student" would make little sense.

In the Court's charge to the jury prior to deliberation, the District Court instructed the jury as follows:

> Whether the transcripts contain accurate translations of the non-English portions of the recordings in whole or part is for you to decide.  In considering whether a transcript accurately describes the meaning of a conversation, you should consider any testimony presented to you regarding how and by whom the transcript was made, as well as any testimony disputing the translation of any words in the transcript.  You may consider the knowledge, training and experience of the translator if called as a witness, as well as the nature of the conversation and the reasonableness of the translation in light of all the evidence in the case.

B.

On appeal, Khan argues that Shah "testif[ied] beyond the scope of an expert" by using the bracketed words "to tell the jury what Mr. Khan *meant*" instead of performing a literal, word-for-word translation.  As we understand it, this is a slightly retooled version of the argument Khan pressed before the District Court—that Shah "invade[d] the province of the jury" by "telling the jury what Mr. Khan meant instead of what he said."

Khan seems to suggest that only literal, word-for-word translations could have been properly admitted against him at trial.  Anything more would have invaded "matters [left] for the trier of fact alone."  Fed. R. Evid. 704(b).  We do not find this argument persuasive.  Shah did what any translator would do: perform the act of "rendering from one language . . . to another."  Webster's Third New Int'l Dictionary 2429 (1993).  Interpreters and translators engage in a process far more complex than the "mechanical substitution of words in one language with their verbatim equivalent in another"; instead, taking statements in one language and expressing them in a different language "requires a continuing exercise of judgment and analysis of what is meant or intended to be said by the parties." Fernando Rochin Zazueta, *Attorneys Guide to the Use of Court Interpreters*, 8 U.C.D. L. Rev. 471, 472 (1975) (cited with approval in *Taniguchi v. Kan Pac.*

*Saipan, Ltd.*, \_\_\_ U.S. \_\_\_, \_\_\_, 132 S. Ct. 1997, 2004 n.4, 2005, 182 L. Ed. 2d 903 (2012) (discussing the distinction between translators and interpreters)); *see also* Am. Translators Ass'n, *Translation: Getting It Right: A Guide to Buying Translation* 22, *available at* http://www.atanet.org/publications/Getting_it_right.pdf ("[Translators] are above all effective bridges between the languages they work in; they can render the message of the original text, with appropriate style and terminology, in their native language.").  After all, "[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425, 38 S. Ct. 158, 159, 62 L. Ed. 372 (1918) (Holmes, J.).  For this reason, courts routinely rely on the expertise of translators and interpreters to transport these "living thoughts" from one language to another.

This is precisely what Shah did when he inserted bracketed words while translating the audio recordings.  Based on his knowledge of Urdu and Pashto, his complete review of the recordings, and his experience and training as an FBI-certified linguist, Shah inserted bracketed words when he was "one-hundred percent certain" that the addition of bracketed words would faithfully clarify the speaker's meaning.

As far as we understand it, Khan challenges this process under the guise of Rule 704, but that is a poor theory on which to travel, especially given how this case was litigated at trial. Khan could have raised a Federal Rule of Evidence 702[6] objection to Shah's qualifications as an expert witness—but he never did. The District Court afforded defense counsel wide latitude to vigorously cross-examine Shah about how he performed the translations. Furthermore, both the pretrial stipulation and the District Court's instructions during the trial permitted the defense to put its own translations into evidence, thereby allowing the jury to make the final decision as to which translation it found most credible.[7] *See United States v. Hogan*, 986 F.2d 1364, 1376 (11th Cir. 1993). And more still, the District Court explicitly instructed the jury that "[w]hether the transcripts contain accurate translations of the non-English portions of the recordings in whole or part is for

---

[6] Federal Rule of Evidence 702 permits expert testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

[7] As we have explained,

It has been said that it is within the discretion of the trial court to allow a transcript to be used by the jury to assist the jury as it listens to the tape. . . . We believe that the use of a transcript as a guide is analogous to the use of expert testimony as a device aiding the jury in understanding other types of real evidence.

*United States v. Onori*, 535 F.2d 938, 947 (5th Cir. 1976) (citation omitted) (quotation marks omitted); *see also infra* note 9.

you to decide."[8]  In fact, we have long sanctioned the type of procedure employed by the District Court, as well as the limiting instruction the District Court provided. *See United States v. Onori*, 535 F.2d 938, 948 (5th Cir. 1976).[9]

Defendants who object to the manner in which a translator has performed the difficult and delicate task of moving meaning between two languages have a number of tools at their disposal—Rule 702, cross-examination, and limiting instructions, to name a few.  On this record, however, Khan cannot complain that Shah improperly testified as to Khan's ultimate mental culpability.  The District Court thus did not abuse its discretion in permitting Shah to add bracketed words when translating Khan's conversations.

---

[8] Khan draws our attention to an exchange during Shah's second day of testimony when a juror indicated that she wanted to personally ask Shah a question about the use of bracketed words.  Although the District Court recognized that "our rules of procedure don't allow jurors to ask the question of witnesses," the District Court permitted the question.  The juror expressed confusion about why, in some of the transcripts, the words "that thing" were followed by a bracketed clarification (e.g., "that thing [Army base]"), whereas in other transcripts, the words "that thing" were not followed by a bracketed clarification.  Shah explained that he omitted bracketed clarifications when he could not be certain precisely what "that thing" referred to from the context of the conversation:

> When you see anywhere mentioned someone says "that thing" or "this thing" and there's no explanation in the bracket, it means that it could be more than one thing, and I'm not sure what exactly it was, and I'm not going to put guesswork into the brackets until in my mind I'm certain this is exactly what it means . . . .

This testimony only bolsters our conclusion that the District Court did not abuse its discretion.  The District Court went out of its way to ensure the jury understood the logic behind Shah's translation techniques so that, armed with this information, the jury could evaluate Shah's credibility as it saw fit.

[9] In *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit prior to October 1, 1981.  *Id.* at 1209.

IV.

Khan's next argument is that the District Court abused its discretion in several rulings it made during the direct and cross-examination of the Government's lead witness, FBI Agent Michael Ferlazzo.

A.

First, Khan claims the District Court erred by permitting Ferlazzo to testify as an expert without the proper notice or foundation. "We review a trial court's evidentiary rulings on the admission of expert witness testimony for abuse of discretion." *United States v. Jayyousi*, 657 F.3d 1085, 1106 (11th Cir. 2011) (quotation marks omitted).

1.

Ferlazzo joined the FBI in late 2009. He was assigned to work in the FBI's counterterrorism branch in Miami, Florida. Ferlazzo became a member of a squad that, in his words, "specifically investigates Sunni extremist matters." Ferlazzo brought a wealth of prior experience to his new role as an FBI agent. He graduated from the United States Military Academy at West Point, and he served for eight-and-a-half years in the United States Army. He was a platoon leader in Iraq from 2004 to 2005. After he was hired by the FBI, Ferlazzo spent five months at orientation for newly minted FBI agents, received advanced instruction in conducting terrorism investigations, and learned on-the-job from more senior

14

agents.  At the time of trial, Ferlazzo had worked with the FBI for approximately three years and had participated in more than thirty investigations.

Ferlazzo helped lead the agency's investigation into Khan, which had begun in 2007.  As a result, he reviewed transcripts of the FISA-intercepted telephone calls between Khan and Khan's relatives in Pakistan, along with transcripts of the in-person conversations between Khan and the Government's informant.  This was no simple task.  Ferlazzo examined all of the transcripts admitted against Khan at trial, which encompassed approximately 136 hours of recorded conversations.

The Government relied heavily on Ferlazzo's familiarity with this voluminous record.  Ferlazzo and the Government's attorney published select transcripts to the jury by reading Khan's conversations aloud during the Government's case-in-chief.  Most of these conversations were cryptic.  So, after a transcript had been read to the jury, Ferlazzo was often asked to explain the meaning of certain words or provide context for the conversation.  In short, the Government counted on Ferlazzo—based on his role as a lead investigator—to help the jury make sense of the evidence.

For example, during Ferlazzo's direct examination, the Government asked the agent to define various words that might have been unfamiliar to the jury, including "Sunni," "mosque," "madrassa," "Quran," "Urdu," "Pashto," the "Pakistani Taliban," "Sharia law," and "improvised explosive device."  Ferlazzo

also offered testimony about the history, goals, and methods of the Pakistani

Taliban.  The defense objected to Ferlazzo's testimony regarding the meaning of

the terms "Sunni," "Urdu," and "Sharia law," but the District Court permitted

Ferlazzo to testify about the meaning of all three.  Ferlazzo also explained the

details surrounding two terrorist attacks perpetrated by the Taliban against the

United States.  The defense did not raise an objection.  The court then took an

hour-and-a-half recess.

After recess but outside the presence of the jury, the defense voiced concern

about Ferlazzo's testimony.  The following colloquy ensued:

> DEFENSE COUNSEL: Judge, while you have a moment, I understood that a lot of the questioning that was going on here was background for this witness, but now we're moving into areas that are really expert where they're asking about specific attacks without providing a basis for it.
>
> Are we done with that area?  Are we going to move into the facts or are we going to continue on with this, is the question.  If we are, we're just going to lay an objection.
>
> PROSECUTOR: Judge, just as noted with the expert, we just touched on those [topics] briefly.  They're for an expert for later.
>
> THE COURT: Okay.

Direct examination continued, and the Government asked Ferlazzo to define

"Allah," and "mujahideen."  The defense objected but was overruled.

The District Court eventually called the lawyers to sidebar to address an

issue not relevant to this appeal.  After it was resolved, the defense again lodged an

objection to Ferlazzo's testimony:

| | |
|---|---|
| DEFENSE COUNSEL: | We've just had this agent give definitions of mujahideen and Sharia law.  There's expert witnesses who've written books on the definition of mujahideen.  So this agent who has not been offered as an expert to just give definitions but [their] experts are listed, he's simply not qualified. |
| THE COURT: | He may not be as qualified as they are, but he's an expert. |

Ferlazzo continued to testify.  He defined the terms "apostate," "Prophet," "jihad,"

and "Lashker."  The defense objected to questions about the meaning of "apostate"

and "Lashker" but was overruled.  Ferlazzo also identified various Pakistani

politicians, explained that the word "assembly" can refer to the legislative branch

of the Pakistani government, and briefly discussed the Iranian Revolution.  The

defense objected to questioning on these topics but was again overruled.

2.

On appeal, Khan objects—for the first time—to Ferlazzo's testimony

regarding the history, goals, and methods of the Pakistani Taliban; the meaning of

17

the term "jihad"; and the Pakistani government's offensive against the Taliban in 2009.[10]   Khan reiterates objections made during the trial to Ferlazzo's testimony regarding the terms "Sharia law" and "mujahideen"; the structure of the Pakistani government; the Iranian Revolution; and the identity of various Pakistani politicians.

It is undisputed that Ferlazzo was not listed as an expert witness prior to trial.  *See* Fed. R. Crim. P. 16(a)(1)(G) (requiring, at the defendant's request, pretrial disclosure of expert witnesses and a written summary of their testimony). Khan says Ferlazzo nonetheless testified as an expert and that the District Court erred in permitting him to do so.  *See* Fed. R. Evid. 702.  Not true, the Government responds: Ferlazzo actually testified as a lay witness based on his familiarity with the Khan investigation and his "extensive review of the transcripts in this case." *See* Fed. R. Evid. 701.[11]

We need not definitely resolve this disagreement.  To the extent certain aspects of Ferlazzo's testimony fell outside the Rule 701 rubric, their admission was harmless.  "[E]videntiary and other nonconstitutional errors do not constitute

---

[10] Ferlazzo's testimony about the 2009 offensive was elicited by defense counsel on cross-examination.  Because Khan "induced or invited the ruling he now claims was error," the invited-error doctrine bars us from ruling on the merits of this argument. *United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006) (per curiam).

[11] Federal Rule of Evidence 701 permits lay testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702."

grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990); Fed. R. Evid. 103(a) (providing that evidentiary errors require reversal only when "the error affects a substantial right of the party"); Fed. R. Crim. P. 52(a) (defining "harmless error" as "[a]ny error, defect, irregularity, or variance that does not affect substantial rights").

The harmless-error doctrine forecloses Khan's argument, because both the Government and the defense called experts who testified extensively about many of the same topics on which Ferlazzo opined.  The Government called Khuram Iqbal, an expert on the Pakistani Taliban.  Like Ferlazzo, Iqbal reviewed the transcripts of the recorded conversations admitted against Khan.  Like Ferlazzo, Iqbal testified about the meaning of Sharia law, mujahideen, and jihad.  And like Ferlazzo, Iqbal discussed the identity of various Pakistani leaders; the structure of the Pakistani government; the history, goals, and methods of the Pakistani Taliban; and the Iranian Revolution.  The defense called its own expert, Anita Weiss, who also offered testimony on several of these topics.

Taken together, Ferlazzo, Iqbal, and Weiss's statements relayed materially similar information to the jury.[12]  Accordingly, even assuming it was error to permit Ferlazzo's testimony, such error "had no substantial influence on the outcome" of the trial.  *Hawkins*, 905 F.2d at 1493.  And because "sufficient evidence uninfected by error supports the verdict, reversal is not warranted."  *Id.*

---

[12] The substantive overlap is striking.  Consider the following:

First, Ferlazzo characterized Sharia law as part of the Pakistani Taliban's goal of "replac[ing] the democratic government with an undemocratic process that is more religious, that is ruled by religious texts."  Iqbal characterized Sharia law as part of the Pakistani Taliban's goal of "replac[ing] the democratically elected government with caliphate.  Caliphate is a concept in Islam.  It's a political system of Islam which is in totally contrast [sic] with democracy."

Second, Ferlazzo explained that the terms "mujahid" and "mujahideen" can refer to "those engaging in violent jihad, fighting."  Iqbal put it this way: "[P]eople who are engaged in jihad."

Third, Ferlazzo testified that terrorist organizations use the word "jihad" to refer to "using violence . . . to obtain [the group's] goals."  Iqbal, for his part, said that the term jihad can "describe the systematic campaign of violence being waged by Pakistani Taliban and their affiliated groups."

Fourth, Ferlazzo and Weiss both identified Asif Zardari as the then-current president of Pakistan.  Ferlazzo and Weiss both testified that Nawaz Sharif was the then-former prime minister of Pakistan.  Ferlazzo also described Pervez Musharraf as a former Pakistani leader and army general; Weiss did as well, later explaining that Musharraf overthrew Sharif during a military coup d'état and that it was Musharraf who led Pakistan until Zardari's election in 2008.

Fifth, Ferlazzo explained that the word "assembly" can serve as a "reference to . . . the [Pakistani] legislative branch [which is] akin to our Congress."  As for Iqbal: "Assembly is equivalent [to] Congress in the U.S."

Sixth, Ferlazzo described the Pakistani Taliban as "a terrorist organization based in Pakistan" formed in 2007 and known for "using violence . . . to achieve [its] goals," which include the imposition of Sharia law.  Iqbal concurred, testifying that the Pakistani Taliban was formed in 2007 and "believes that violence or armed struggle is the only way to establish Sharia in Pakistan."

Seventh, Ferlazzo and Iqbal both testified that Ayatollah Khomeini led the Iranian Revolution.

B.

Second, Khan contends the District Court erred by allowing Ferlazzo to testify as a summary witness.  Khan raises this argument for the first time on appeal, so we review it for plain error.  *United States v. Smith*, 459 F.3d 1276, 1287 (11th Cir. 2006).  "To find plain error, there must be: (1) error, (2) that is plain, and (3) that has affected the defendant's substantial rights."  *United States v. Edmond*, 780 F.3d 1126, 1130 (11th Cir. 2015).

Citing *United States v. Rosado-Perez*, 605 F.3d 48 (1st Cir. 2010), Khan argues that Agent Ferlazzo "essentially testified as to the contents of the audio in summary form."  We disagree.

Of course, "prosecutors should not permit investigators to give overview testimony, in which a government witness testifies about the results of a criminal investigation, usually including aspects of the investigation the witness did not participate in, before the government has presented supporting evidence."  *Rosado-Perez*, 605 F.3d at 55.  But that is not what happened here.  Instead of jumping the gun and asking Agent Ferlazzo to "give overview testimony . . . about the results of a criminal investigation," the prosecution "laid a foundation that [Ferlazzo] had personal knowledge" of the recorded conversations because of his role as a lead investigator and his review of the admitted transcripts.  *Id.*; *cf. Jayyousi*, 657 F.3d at 1102 ("We have allowed a lay witness to base his opinion testimony on his

21

examination of documents even when the witness was not involved in the activity about which he testified."). Only after the proper foundation had been laid—and only after the transcripts had been published to the jury—did Ferlazzo offer his testimony. *See United States v. Atkins*, 746 F.3d 590, 601 (5th Cir. 2014) (finding no abuse of discretion where a Government agent's testimony "came only as the evidence was presented"). This hardly amounts to "a vice that equates to summarizing the Government's case-in-chief." *Id.*

At no point did Agent Ferlazzo testify as a summary witness. The District Court thus did not abuse its discretion.

## C.

Third, Khan argues that the District Court erred by limiting the defense's ability to thoroughly cross-examine Agent Ferlazzo.

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the [defendant] the opportunity of cross-examination." *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1366 (11th Cir. 1994) (alteration in original) (quotation marks omitted). In the crucible of cross-examination, we vet testimony for its accuracy, weed out perjury, and afford the criminal defendant a measure of constitutional dignity. No wonder Wigmore

famously extolled cross-examination as "the greatest legal engine ever invented for the discovery of truth." 5 John Henry Wigmore, *Evidence in Trials at Common Law* § 1367 (James H. Chadbourne ed., 1974).

Our circuit has been particularly solicitous of a defendant's confrontation rights when it comes to the Government's lead witness at trial. *United States v. Phelps*, 733 F.2d 1464, 1472 (11th Cir. 1984) ("Cross-examination of a government 'star' witness is important, and a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness . . . ." (citations omitted)). That said, the Confrontation Clause does not safeguard "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 294, 88 L. Ed. 2d 15 (1985) (per curiam). District courts "retain wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986); *United States v. Maxwell*, 579 F.3d 1282, 1296 (11th Cir. 2009) ("[A] defendant can only cross-examine a prosecution witness if the information sought to be elicited [is] relevant." (second alteration in original) (quotation marks omitted)); *Baptista-Rodriguez*, 17 F.3d at

23

1370–71; *Phelps*, 733 F.2d at 1472.  "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination."  *United States v. Garcia*, 13 F.3d 1464, 1469 (11th Cir. 1994).  We review for an abuse of discretion Khan's claims that the District Court erred in limiting the scope of his cross-examination.  *Maxwell*, 579 F.3d at 1295.

Khan advances two arguments in this regard.  Khan contends the District Court should have permitted him to more fully cross-examine Ferlazzo regarding (1) the Government's informant; and (2) an investigative report written by the Pakistani police and disclosed to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

## 1.

We begin with the informant.  Neither the Government nor the defense called the informant to testify as a witness at trial.  Agent Ferlazzo was not one of the informant's handlers, but he nevertheless testified about Khan's relationship with the informant based on his involvement in the investigation.

### a.

Playing the role of a wealthy Taliban sympathizer, the informant curried favor with Khan by helping him run errands and attend medical appointments.  Khan and the informant began communicating at least as early as May 2010: a

24

May 6, 2010, intercepted phone call marks the first time Khan mentioned the informant during a conversation with a relative in Pakistan.  From May to mid-June 2010, the informant did not wear a wire.[13]  The first recorded conversation between Khan and the informant admitted at trial took place on June 16, 2010.  These conversations often involved a discussion of current events where Khan would frequently express his support for the Taliban.  At some point, the informant also promised to donate $5,000 to Khan's madrassa.  Khan's interactions with the informant ended in October 2010.

On cross-examination, defense counsel asked Ferlazzo when the informant began working for the FBI.  The Government requested a sidebar.  The Government informed the District Court that Ferlazzo could not testify about events between the informant and Khan prior to May 2010.  That information, the Government contended, was classified pursuant to the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. III §§ 1–16.  The District Court instructed defense counsel to limit questions about the informant's relationship with Khan to the period from May to October 2010, pending an *in camera*, *ex*

---

[13] This was standard operating procedure.  As Ferlazzo explained, Government informants generally do not "start talking about substantive things right away" with potential suspects; only when the informant "had developed a relationship with Hafiz Khan" did the FBI begin to record their conversations.

*parte* hearing as prescribed by CIPA.[14]  The District Court further clarified that

defense counsel could not ask when the informant began working on Khan's case.

The defense complied, continuing the cross-examination and eliciting, among other

things, that the informant earned $126,000 for his cooperation with the

Government during the May–October 2010 time frame; that the informant had

received unemployment compensation before and after working for the FBI; and

that the informant filed for bankruptcy in 2002.

The next day, following a CIPA hearing, the District Court announced its

ruling outside the presence of the jury:

> THE COURT:    I am ruling that any matters relating to the
> Confidential Human Source [the informant]
> prior to May 2010, may not be inquired
> about because they are classified; and
> separately, I find that there are no *Brady*
> materials.
>
> I find that the information is not relevant, is
> hearsay, and because it is hearsay, the
> Government has no obligation to provide
> any *Giglio* during that time period
> concerning the [informant] . . . .
>
> DEFENSE COUNSEL:   That is over defense objection, Judge.

---

[14] CIPA § 8(c) provides, in pertinent part: "During the examination of a witness in any criminal proceeding, the United States may object to any question or line of inquiry that may require the witness to disclose classified information . . . .  Following such an objection, the court shall take such suitable action to determine whether the response is admissible as will safeguard against the compromise of any classified information."

This issue arose once more when the defense again asked Ferlazzo to discuss

Khan's relationship with the informant outside the May–October 2010 time frame:

| | |
|---|---|
| DEFENSE COUNSEL: | Agent, are there any other informants or agents that were investigating Mr. Khan or his family during the course of this investigation? |
| PROSECUTOR: | Objection, Your Honor.  Prior rulings. |
| THE COURT: | Sustained. |
| DEFENSE COUNSEL: | If there were any other informants or agents on this case during that time, you can't tell us, can you? |
| PROSECUTOR: | Objection, Your Honor.  Prior rulings. |
| THE COURT: | Sustained. |

b.

Khan presents us with two narrow evidentiary arguments, both of which we

can resolve with dispatch under the Federal Rules of Evidence.[15]

---

[15] CIPA does not alter the machinery of evidence law.  *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1363 (11th Cir. 1994) ("CIPA does not create new law governing the admissibility of evidence.").  Khan makes vague reference to procedural violations of CIPA, but his arguments lack merit.  For example, Khan suggests that it was improper for the District Court to have conducted an *in camera*, *ex parte* hearing following the Government's CIPA-based objection during trial.  CIPA contemplates such a hearing, and the District Court did not err in holding one.  *United States v. Campa*, 529 F.3d 980, 994–95 (11th Cir. 2008); *United States v. Kilmavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998) ("[E]x parte*, *in camera* hearings in which government counsel participates to the exclusion of defense counsel are part of the process that the district court may use in order to decide the relevancy of the information. . . . Such a hearing is appropriate if the court has questions about the confidential nature of the information or its relevancy." (citation omitted)).  Khan also believes it was error for the District Court to prevent him from asking about this information altogether.  Instead, Khan says he should have been provided with an unclassified summary of the otherwise classified testimony Ferlazzo

First, Khan tells us he should have been permitted to cross-examine Ferlazzo regarding the duration of the unrecorded contacts between him and the informant prior to May 2010.  Khan's theory appears to be that such information would have demonstrated that he made false statements to the informant about sympathizing with the Taliban in an attempt to secure the informant's $5,000 donation to the madrassa.

That is implausible.  Whether Ferlazzo testified that Khan and the informant maintained a relationship for two weeks or two years does not somehow make it more likely that Khan lied to the informant, simply motivated by money.  *See* Fed. R. Evid. 401(a) ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence.").  Besides, Khan testified extensively about his interactions with the informant.  And Khan has never made an entrapment defense.  As a result, we cannot say the District Court abused its discretion in ruling that cross-examination about such information was irrelevant.

Second, Khan insists that asking Ferlazzo about the existence of other FBI informants had the potential to bolster Khan's credibility.  This line of inquiry would have rested beyond the scope of direct examination and would not have involved "matters affecting the [testifying] witness's credibility," Fed R. Evid.

---

would have given on cross-examination.  Nothing in the text of CIPA necessarily compels this result.  Khan has not cited to any case—and we cannot find one—requiring the disclosure of an unclassified summary under such circumstances.

611(b)—that is, Agent Ferlazzo's. *See Van Ardsdall*, 475 U.S. at 680, 106 S. Ct. at 1436 ("[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias *on the part of the witness* . . . ." (emphasis added)). Excluding questions aimed to bolster Khan's credibility during the cross-examination of Ferlazzo was a choice well within the District Court's discretion.

Alternatively, Khan says the presence of other FBI informants could have impeached Ferlazzo's credibility. Khan has not explained how, other than to speculate about a "Rehmit Ghul." The record does not furnish any details about Ghul other than those Khan offered in his testimony: that Ghul encouraged him to collaborate with the informant. Ferlazzo testified that he had never heard of Ghul. It is anyone's guess how the presence of other informants makes it more or less likely that Ferlazzo was aware of Ghul's existence. We also note that the defense never articulated this theory of impeachment before the District Court. In any event, we cannot imagine how "a reasonable jury would have received a significantly different impression of [Ferlazzo's] credibility had counsel pursued the proposed line of cross-examination." *Garcia*, 13 F.3d at 1469. On the record before us, we find that the District Court did not abuse its discretion in curtailing the defense's cross-examination on this point.

29

2.

Khan's second argument concerns a report authored by the Pakistani police

detailing an investigation into Khan's contacts in Pakistan.  In keeping with its

*Brady* obligations, prosecutors disclosed excerpts of the report to the defense

during discovery in April 2012.  The United States neither requested nor

participated in the investigation that produced the report, and the record does not

reveal how the United States came into its possession.

The report relays various statements Khan's family members and associates

made to the Pakistani police.  These statements typically describe how they spent

the money Khan wired them from Miami.  For example:

> In an interview in Pakistan, Inayatullah stated that his father-in-law,
> Hafiz Khan, sent money from the United States as the share of his
> daughter Husna.  Inayatullah stated that he invested the money in a
> chips factory, on purchasing a piece of land on which he built a house
> in Nowshera [a city in Pakistan], and on the medical treatment of his
> wife who is suffering from heart disease.

Given the material-support charges pending against Khan, the report clearly

contains exculpatory information; after all, statements therein indicate that Khan's

various associates used his money not to aid the Taliban—as the Government

argued at trial—but rather to purchase land or care for sick relatives, among other

things.  Excerpts of the report disclosed to the defense mention, moreover, that the

Pakistani police ran a public-records search on Abdul Jamil (Khan's nephew) and

Alam Zeb (Khan's grandson) but found that neither individual maintained ties with

the Taliban.  And in discussing Noor Muhammad (one of Khan's contacts in Pakistan), the report also claimed that "law enforcement advised that no links with militants or any proscribed organizations were established during the course of an enquiry in Karachi, Pakistan."

Although favorable to Khan's defense, this information far from exonerates him—or anyone else, for that matter.  Decidedly, the report furnishes no details about the nature or extent of the Pakistani police's on-the-ground investigation: who conducted it, why it was conducted, what it entailed.  And it does not offer any conclusions regarding Khan's culpability, the credibility of the interviewees, their demeanor, or their motives.

Almost a year after the report's disclosure, the defense moved midtrial to compel the production of the entire, original report.  The District Court granted the motion in part.  It described the Government's disclosure as "detailed and generally complete" but required the Government to release to the defense "three brief additional excerpts from the report[] that may constitute *Brady* material."[16]  But Khan never tried to admit this document into evidence.  We suspect this is

---

[16] As far as we understand it, Khan's opening brief suggests that the District Court erred in denying this motion.  But the District Court did not deny this motion—it granted it in part.  To the extent Khan argues that the District Court erred in granting the motion only in part, we deem the argument waived, because Khan has not supported his assertion with an explanation or citation to authorities.  *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (collecting cases); *cf. Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong.").

31

because the *Brady* disclosure itself contains several layers of hearsay—what the interviewees said, what the Pakistani police report said they said, and what the Government's *Brady* disclosure said the Pakistani police report said the interviewees said—which would have rendered the document inadmissible as substantive evidence at trial.  *See* Fed. R. Evid. 802, 805.

So Khan tried a different tack.  Even though the Pakistani report had never been discussed, defense counsel sought to cross-examine Ferlazzo about the contents of the report.  The following exchange ensued:

| | |
|---|---|
| DEFENSE COUNSEL: | Are you aware that the Pakistani government investigated these people [Khan's contacts] and cleared them from being connected to the Taliban at all?  Are you aware of that? |
| FERLAZZO: | There was an investigation.  Whether or not they have been cleared is a different matter. |
| DEFENSE COUNSEL: | It is your position they haven't been cleared? |
| FERLAZZO: | Who? |
| DEFENSE COUNSEL: | Any of the people who you are claiming are Taliban in this case that are connected to Mr. Khan, any of them. |
| FERLAZZO: | There are still open indictments in Pakistan, and to go back to extradition— |

| DEFENSE COUNSEL: | There are open indictments? I'm sorry. I don't understand that term as you just said it. Explain that. |
| --- | --- |
| FERLAZZO: | FIRs.[17] |
| DEFENSE COUNSEL: | There are open FIRs in Pakistan? |
| FERLAZZO: | That's correct. |
| DEFENSE COUNSEL: | So we are going back to at least when Mr. Khan got arrested, May 14, 2011. From then until now, you are saying the Pakistani government is still investigating and they have made no conclusions. Is that your position? |
| PROSECUTOR: | Your Honor, we are going to need to have a brief sidebar. |
| THE COURT: | No. Do you have an objection? |
| PROSECUTOR: | Yes. Relevance. |
| THE COURT: | Sustained. |
| DEFENSE COUNSEL: | In your investigation, you are aware that—that Ali Rehman [Khan's business associate] was investigated by the Pakistani government, correct? |

---

[17] In Pakistan, an "FIR," or "first information report," is "a written document prepared by the police when they receive information about the commission of a cognizable offence." Centre for Peace Development Initiatives in Pakistan, *First Information Report: A Guide for Citizens* 2, *available at* http://www.nipsa.in/pakistan/resources/first-information-report-a-guide-for-citizens-centre-for-peace-and-development-initiative-2006.html; *cf. Barapind v. Enomoto*, 360 F.3d 1061, 1065 (9th Cir. 2004) (describing the first information report in India as "prepared by the Head Constable or other authorized officer in the police station having territorial jurisdiction over the offense" and "[setting] forth the facts regarding the case and the specific violation of the Indian Penal Code and other statutes").

PROSECUTOR:                    Objection, Your Honor.  Relevance.

THE COURT:                    Sustained.

Khan assigns error to the District Court's decision to sustain the Government's two relevance-based objections.  We are unpersuaded.  Before the Government objected to this line of questioning, defense counsel's cross-examination had already established that the Pakistani government investigated Khan's family and business associates and that those individuals had not been arrested.  This information does not strike us as particularly relevant to begin with, so the District Court acted well within its discretion in precluding further discussion of the repetitive and the marginally relevant.  *Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435.  After all, the Pakistani police report was beyond the scope of direct examination.  *See* Fed. R. Evid. 611.  The report was not in evidence.  And contrary to what Khan suggests, it offered no conclusions; it simply relayed hearsay statements.  As a result, the District Court did not abuse its discretion.

V.

We proceed to Khan's third major argument—that the District Court erred in denying him a continuance or a mistrial after the Internet connection supporting live video teleconferencing from Pakistan failed midtrial.

34

A.

To counter the Government's narrative that he sent money overseas to aid

the Taliban, Khan sought to procure the testimony of those living in Pakistan to

whom he wired financial support.  In short order, the defense, the prosecution, and

the District Court found themselves in something of an international quagmire.

1.

It was June 2012—six months before the start of the trial—when Khan

moved the District Court for leave to conduct depositions in Pakistan of three of

his codefendants, Ali Rehman, Amina Khan, and Alam Zeb.  These three fugitives

remained in Pakistan after efforts to extradite them to the United States failed.  *See*

*supra* Part I.  Khan also moved the District Court for leave to depose one

unindicted coconspirator and one fact witness, both of whom resided in Pakistan as

well.  Khan argued that these witnesses were unavailable to testify in the United

States and would provide testimony highly material to his defense.  Their

testimony would, Khan claimed, "[d]ispel misconceptions" about statements Khan

made during FISA-intercepted telephone calls, "explain how the money sent by

[Khan] was used," and "render first-hand accounts of the conditions in Pakistan

during the time period charged in the indictment."

Federal Rule of Criminal Procedure 15 offered Khan a mechanism to obtain

their testimony.  That rule permits depositions in criminal cases "in order to

preserve testimony for trial" because of "exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1). Such circumstances exist when (1) the witnesses are unavailable to testify at trial, (2) their testimony is material, and (3) countervailing factors do not "render taking the deposition[s] unjust to the nonmoving party." *United States v. Ramos*, 45 F.3d 1519, 1522–23 (11th Cir. 1995). In his Rule 15 motion, Khan argued that these three factors counseled in favor of permitting the depositions to go forward.

The Government opposed the motion. The Government argued that the defense had not come forward with enough evidence to support the "exceptional" showing required to justify a Rule 15 deposition, particularly one conducted in a foreign country. *E.g.*, *United States v. Alvarez*, 837 F.2d 1024, 1029 (11th Cir. 1988) ("Foreign deposition testimony, because of the absence of a sanction for perjury, is suspect."). More fundamentally, the Government also sounded concerns about the logistical difficulties that would confront both the defense and the prosecution if in-person depositions were to be taken on Pakistani soil.

Complications abounded. For example, the Department of Justice informed the United States Attorney's Office in the Southern District of Florida that the proposed Rule 15 depositions required prior approval from the government of Pakistan. United States officials attending the depositions, moreover, would need

to obtain diplomatic passports and Pakistani visas, a process that was estimated to take ten to twelve weeks.

And where, exactly, would these depositions take place?  Ordinarily, a United States embassy or consulate can host foreign Rule 15 depositions.  But because Khan sought to depose three of his fugitive codefendants, the United States Attorney's Office informed the District Court that "for security reasons, the . . . deponents would not be allowed to enter the U.S. embassy [in Islamabad, Pakistan] for any reason, for fear of attack, and to prevent them from observing the layout of the Embassy."  If the three proposed deponents did enter the embassy, they "would be turned over to Pakistani law enforcement, to be held for possible extradition to the United States, pursuant to an Interpol arrest warrant pending against them."

For these reasons, the depositions would have to be held at a private location.  But this outcome, the Government argued, would risk endangering any American official in attendance, particularly given that "these proposed depositions would be of Pakistani Taliban sympathizers, thus making U.S. officials associated with these depositions even larger targets for militants . . . ."

The District Court held two evidentiary hearings on the matter.  In response to the Government's suggestion that the defense obtain letters rogatory to secure

the foreign depositions,[18] defense counsel insisted that "we contacted the Pakistani Consulate and we do not need letters rogatory. . . . [W]e do not need the assistance of the Pakistani government."  By contrast, the Government contended that it had advised the defense about how to obtain letters rogatory and that any Rule 15 depositions would require explicit approval from the government of Pakistan.

2.

Despite the Government's misgivings, and in an extraordinary bid to safeguard Khan's right to a fair and full trial, the District Court granted Khan's Rule 15 motion.  The District Court found that Khan had established the type of "exceptional circumstances" contemplated by Rule 15 but that "due to security concerns . . . it would be unjust to require the prosecutors in this case to travel to Pakistan to take these depositions."

So the District Court fashioned a compromise.  In its order, the District Court explained that it would accommodate the Government's security concerns

---

[18] The Federal Rules of Criminal Procedure require Rule 15 depositions to "be taken and filed in the same manner as a deposition in a civil action."  Fed. R. Crim. P. 15(e).  The Federal Rules of Civil Procedure, in turn, permit depositions to be taken in a foreign country "under a letter of request, whether or not captioned a 'letter rogatory.'"  Fed. R. Civ. P. 28(b)(1)(B).

A "letter rogatory," or "letter of request," is "[a] document issued by one court to a foreign court, requesting that the foreign court (1) take evidence from a specific person within the foreign jurisdiction . . . and (2) return the testimony . . . for use in a pending case."  Black's Law Dictionary 988 (9th ed. 2009); *see also* 22 C.F.R. § 92.54.  The Department of State has statutory authority to transmit letters rogatory through diplomatic channels to the appropriate foreign tribunal or agency.  28 U.S.C. § 1781(a).  Alternatively, 28 U.S.C. § 1781(b)(2) empowers the federal courts to transmit such letters.

by having the depositions broadcast live, during trial, and before the jury using video-teleconferencing technology. This way, the prosecutors could participate in the depositions without traveling to Pakistan, and Khan could present a full defense by examining these material witnesses and having them testify about how they used the money he sent them.

The District Court attached several conditions to this arrangement. First, the District Court ordered the defense, by December 28, 2012, to submit to the Court "evidence . . . showing that the Pakistan government *explicitly* (a) permits these depositions to be held or (b) acknowledges that it is aware of these depositions and that no official permission is needed for them to occur." The rationale behind this requirement: "[T]he Court does not want all the preparations for the depositions to be laid . . . only to have the depositions fall through at the last minute because the Pakistan government will not allow them to occur." Second, the District Court ordered that the depositions be conducted at a facility in Islamabad that would support live, encrypted video teleconferencing with three cameras, "one showing the witness testifying in Pakistan, one showing the room where the deposition is held, and one in the Miami federal courtroom that will show the government's attorney conducting the examination." Third, the District Court required the presence of "one or more Pakistani officials that either alone or together are authorized to administer an oath and verify the identity of the

witnesses."  The District Court scheduled the depositions to begin on February 4, 2013, from 9:00 a.m. to 6:00 p.m. "every day—including weekends—until they finish."  It stressed that "time is of the essence" and that "[t]*here will be no more accommodations*."

On December 20, 2012, the defense submitted evidence of compliance with the District Court's order.  This evidence came in the form of an affidavit from a Pakistani lawyer, Atif Khan, who was involved in Hafiz Khan's defense as local counsel.  In his affidavit, Atif Khan testified that, based on his communications with Pakistani government officials, "no . . . permission or lack of permission [to conduct the depositions] is obtainable from the Government of Pakistan."  He went on to state, however, that "U.S. and state officials participating in depositions in Pakistan must first obtain permission from the Government of Pakistan."

Clearly, the defense had failed to comply with the District Court's instructions.  The defense did not provide evidence that the government of Pakistan either approved of the depositions or was affirmatively aware they would take place.  Instead, the defense submitted a contradictory affidavit of a local lawyer offering vague assurances from unnamed Pakistani officials and his "own independent research of the local laws."

At a pretrial hearing conducted on December 26, 2012, the District Court expressed its frustration, describing the affidavit as containing "exactly the kind of

ambiguity I was trying to avoid."  "I wanted something from the government of

Pakistan," the District Court admonished, "not some lawyer who said, 'I spoke to

somebody and they told me that.'"  Defense counsel countered: "They

[government of Pakistan officials] made it clear that if the government of Pakistan

is not a party [to the depositions], they don't care one way or the other, and they're

not going to put anything down saying anything."  For its part, the U.S. Attorney's

Office attempted to communicate with Pakistani authorities through a local FBI

legal attaché, only to confirm what they had been telling the defense and the

District Court all along—that the Rule 15 depositions would require prior approval

by the Pakistani government.  Prosecutors also tried to send a diplomatic note,

through the Department of State, to alert Pakistani officials to the depositions.

When pressed by the District Court, defense counsel stated unequivocally that "no

one over there [in Pakistan] is going to stop the depositions.  If that's the issue, like

the Pakistani government is going to march in and shut this thing down, there's no

indication of that at all."

Not so fast, prosecutors cautioned.  The Government continued to voice

apprehension about the clandestine nature of the depositions; the risk that one or

more of the deponents—all three of whom were fugitive codefendants in the

case—could be arrested should they appear to testify; the cost of financing the

video teleconferencing; and the possibility that American involvement with

individuals who allegedly maintained ties with the Taliban could cause a "diplomatic incident." But with defense counsel's assurances in mind, and out of an abundance of caution, the District Court ruled that the depositions would proceed.

Having already failed once to comply with the District Court's Rule 15 order, the defense then upped the ante during the trial itself. On January 23, 2013—well after trial had already begun—Khan moved to convert six Rule 17 witnesses[19] into Rule 15 deponents, because the witnesses could not successfully be brought into the United States to testify at trial. The Government opposed the motion, but after the defense provided a detailed recitation of the testimony the witnesses would offer, the District Court permitted the Rule 17 witnesses to testify from Pakistan.

### 3.

This extensive pretrial and midtrial wrangling was for naught. The video-teleconferencing technology worked for all of a day, enabling the defense to call one witness. On February 12, 2013, in the middle of the defense's direct examination of a second witness, the Internet connection failed, and the federal

---

[19] Federal Rule of Criminal Procedure 17 provides, in pertinent part: "Upon a defendant's ex parte application, the court must order that a subpoena be issued for a named witness if the defendant shows an inability to pay the witness's fees and the necessity of the witness's presence for an adequate defense. Fed. R. Crim. P. 17(b).

courtroom in Miami could no longer see or hear the testimony of the Rule 15 deponents in Pakistan.

The District Court dismissed the jury to confer with the parties.  Defense counsel, speaking on a cell phone from Pakistan, reported that Pakistani government officials had "suddenly" appeared at the hotel where the depositions were taking place and that hotel staff informed him that the internet-protocol address supporting the live video teleconferencing had been blacklisted by the Pakistani Telecommunications Authority.  The defense seemed to blame the prosecution, who had mentioned the location of the depositions during the cross-examination of the defense's first Rule 15 deponent.  Defense counsel said that "[u]p until [the disclosure of the deposition location], we had absolutely no interference or contact at all with any of the Pakistani government security people." [20]  The District Court responded:

---

[20] Although defense counsel seemed to suggest during trial that prosecutors may have caused the Internet connection to fail, Khan has not argued since then that the prosecution played any role whatsoever in foiling the video-teleconferencing technology.  To the contrary, the evidence indicates that prosecutors went out of their way to help facilitate the Rule 15 depositions by, among other things, sending a diplomatic note through the Department of State, contacting the FBI legal attaché in Pakistan, and assisting the District Court and the defense to explore other options when it became clear that taking the depositions in Pakistan was no longer viable.

Khan argues—for the first time in his reply brief—that the Government had an affirmative constitutional obligation to assist Khan by obtaining visas or requesting parole for the proposed witnesses, including his three fugitive codefendants, so they could testify in the United States.  But "[a]s we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court."  *Herring v. Sec'y, Dept. of Corrs.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (alteration omitted) (quotation marks omitted).  We therefore

That suggests to me that we're trying to do this in a way keeping it secret from the Pakistani government and my order originally specifically said not only do they have to know about it, but we want something back [from them] affirmatively saying that they either agree with it or they acknowledge that it can happen and they don't care.

. . . . [M]y order said I want something from the Pakistani government so we don't waste our time and go through this exercise and have something like this happen.

You told me you couldn't get something from the government, so I again bent over backwards to help you out and I accepted the affidavit from your lawyer and said, "Okay, we'll let it go forward because he spoke to somebody in the government." So it's totally contrary to the purpose of what we're trying to do here, to say this thing was thwarted because the Pakistani government found out the location. It's supposed to be open and notorious to them.

The District Court brought the jury back into the courtroom, explained that the video feed from Pakistan had been lost, and dismissed the jurors for the remainder of the afternoon.

Khan moved the following day—February 13, 2013—to relocate the depositions to another country. The District Court gave the defense additional time to secure nonimmigrant visas for the witnesses to enter the United States or, in the alternative, to travel to the United Arab Emirates ("UAE"). The District Court scheduled a status conference for February 15, and instructed the defense that any remaining depositions had to begin no later than February 19.

decline to consider this constitutional argument, particularly given that Khan's raising it so late on appeal has deprived the Government of an opportunity to brief the issue.

44

At the February 15 status conference, defense counsel told the District Court that hotel officials had instructed him to obtain a no-objection certificate ("NOC") from the local authorities to reestablish the Internet connection. The defense informed the District Court that efforts to obtain an NOC were in progress and that the defense was awaiting one final signature before the Internet connection would return. As for obtaining visas to the United States or the UAE, defense counsel asserted that he was "trying to explore every option to get this testimony."

The prosecution, however, strongly objected to taking the depositions in the UAE at the last minute, without that government's knowledge or consent; doing otherwise risked creating "a serious diplomatic incident." Given the "sensitivity of the relationship" between the United States and the UAE, prosecutors cautioned that obtaining visas and permission to take deposition testimony "would require significant high-level reviews and communications even before a formal request would be made."

In light of this evidence, the District Court concluded that Rule 15 depositions in the UAE were "off the table." It then presented the defense with an ultimatum: the defense could continue to make efforts to reestablish the Internet connection in Pakistan, but no further continuances would be granted. The trial would move forward on February 19.

45

On February 19, the defense informed the District Court that it was unable to obtain final approval of the NOC.  Recognizing that the District Court had already ruled it would not grant a continuance, the defense moved for a mistrial.  The District Court denied the motion orally and in writing:

> The Court has done everything possible to accommodate the defense. In spite of these efforts, forces beyond the control of the Court have prevented these depositions from being able to be concluded.  There is absolutely no evidence that the Government did anything to thwart this process.  To the contrary, the evidence is that the Government has engaged in only good faith efforts to comply with the Court's request for assistance in this matter.  The Court notes that all of these problems could have been avoided had the Defendant complied with the Court's initial condition that the Defendant obtain the explicit approval of the Pakistani government before the depositions started.

The District Court also denied as moot Khan's motion to relocate the Rule 15 depositions to another country, explaining that "defense counsel chose to try to reestablish a live videoconference feed with Islamabad, Pakistan, and take the witnesses' testimony there rather than make arrangements to take the witnesses' testimony in a third country."[21]

## B.

### 1.

Although the denial of a continuance may be "so arbitrary as to violate due process," *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 850, 11 L. Ed. 2d

---

[21] The defense was never able to obtain visas for the proposed witnesses.

921 (1964), this decision is ordinarily left to the sound discretion of the district court. "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons." *Morris v. Slappy*, 461 U.S. 1, 11, 103 S. Ct. 1610, 1616, 75 L. Ed. 2d 610 (1983).

Where, as here, the district court has denied a continuance to obtain testimony, we consider four factors in evaluating whether the district court abused its discretion: (1) the diligence of the moving party in obtaining the testimony; (2) "the probability of obtaining the testimony within a reasonable time"; (3) "the specificity with which the defense was able to describe the witness's expected knowledge or testimony"; and (4) the nature of the proffered testimony, that is, "the degree to which such testimony was expected to be favorable to the accused, and the unique or cumulative nature of testimony." *United States v. Wright*, 63 F.3d 1067, 1071 (11th Cir. 1995) (quotation marks omitted).

The first factor—the diligence of the moving party in obtaining the testimony—cuts against Khan. From the beginning, defense counsel repeatedly assured the District Court that the Rule 15 depositions would not require explicit approval from the government of Pakistan. From the beginning, prosecutors repeatedly warned the District Court that the Rule 15 depositions *would* require

47

such approval.  The Government even offered the defense an alternative: letters rogatory.  But the defense insisted it did not need letters rogatory either.

Despite the presence of compelling reasons to deny Khan's Rule 15 motion, the District Court went out of its way to accommodate the defense.  To prevent the testimony from falling through at the last minute, the District Court ordered the defense to submit to the Court "evidence . . . showing that the Pakistan government *explicitly* (a) permits these depositions to be held or (b) acknowledges that it is aware of these depositions and that no official permission is needed for them to occur."

The defense failed to comply with the District Court's order while still making a strategic decision to proceed with the depositions in the absence of official government of Pakistan approval or acknowledgment.  Exacerbating this problem, the defense chose, midtrial, to increase its reliance on the foreign testimony by moving to convert six of its Rule 17 witnesses into Rule 15 deponents.  The defense ran the risk that, in failing to obtain official approval, the depositions would be shut down.  And because the defense spent so much time and energy securing testimony through live video teleconferencing, it made another strategic choice: to forgo full consideration of alternative methods of obtaining the testimony that may have proven more reliable, such as letters rogatory or nonimmigrant visas into the United States or another country.  After all, when the

Internet connection failed, the defense had no viable alternative to the Rule 15

depositions precisely because it had placed so much stock in a method of testimony

the District Court and the prosecution had warned about from the get-go.

The second factor—"the probability of obtaining the testimony within a

reasonable time"—weighs against Khan as well.  *Wright*, 63 F.3d at 1071.  To be

sure, the defense informed the District Court that it was just one signature away

from obtaining an NOC and reestablishing the Internet connection.  But by the

time the District Court ruled it would not grant another continuance, approximately

a month had passed since the Government rested its case-in-chief.   Throughout the

course of this litigation, moreover, the defense's assurances regarding the Pakistan

depositions had routinely proven inaccurate.  And the defense still had not

produced an official statement from the government of Pakistan, as the District

Court had long requested.  In the face of such overwhelming uncertainty, who

knows how much longer it would have taken to get the Internet back up and

running?  A day?  A week?  A month?

We readily concede that the third and fourth factors—"the specificity with

which the defense was able to describe the witness's expected knowledge or

testimony" and "the degree to which such testimony was expected to be favorable

to the accused"—point in Khan's favor.  *See id*.  The Rule 15 deponents would

have offered testimony highly material to Khan's defense.  We do not doubt that

defense counsel acted in good faith in attempting to secure that testimony despite some very challenging circumstances.  But this appeal comes to us in an abuse-of-discretion posture, which means we must pay respect to the district court's on-the-ground decisions.  Indeed, "[t]he abuse of discretion standard of review recognizes that for the matter in question there is a range of choice for the district court and so long as its decision does not amount to a clear error of judgment we will not reverse." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004) (citation omitted) (quotation marks omitted).

Given that standard, and given the totality of the circumstances, we conclude that the District Court did not abuse its discretion when it denied Khan a continuance.

2.

Like the denial of a continuance, the denial of a mistrial is also subject to abuse-of-discretion review.  *United States v. Grzybowicz*, 747 F.3d 1296, 1311 (11th Cir. 2014).  For the reasons we have set out above, we also conclude that the District Court did not abuse its discretion in denying Khan's motion for a mistrial.

VI.

Accordingly, we AFFIRM Khan's convictions.

AFFIRMED.

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Douglas J. Mincher
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 23, 2015

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  13-14048-SS
Case Style:  USA v. Hafiz Muhammad Khan
District Court Docket No:  1:11-cr-20331-RNS-1

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Brenda H. McConnell at (404) 335-6209.

Sincerely,

DOUGLAS J. MINCHER, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1 Ntc of Issuance of Opinion