UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20331-CR-SCOLA

UNITED STATES OF AMERICA

vs.

HAFIZ MUHAMMAD SHER ALI KHAN,

Defendant.
_____/

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE (DE889)

Having displayed no compassion himself in providing material support for terrorism, plotting to "tear ... to pieces and soak ... in blood" "whoever is against the Sharia system!" (GX25), Khan asks this Court to exercise compassion and release him less than one-third into his 25-year sentence, citing the inevitable decay of his health that this Court surely anticipated when it sentenced him (already then 78) essentially to life imprisonment in 2013.  Khan makes this request even though, six years on, he is still vigorously contesting his conviction, filing a petition for certiorari *just a week ago* demanding a new trial (a request he hardly would make if he and his lawyers did not see him as possibly fit for a retrial).  Releasing Khan early would diminish the seriousness of his terrorist offenses and violate the Sentencing Commission's Policy Statement on early release, which does not require this Court to allow any convicted defendant, let alone a terrorist financier, the mercy of dying at home peacefully with his family.  Khan's words showed no mercy to the victims of Pakistani Taliban violence, and whatever sympathy this kind of situation may engender in the abstract, releasing this defendant would send entirely the wrong message to victims of terrorism and also jeopardize public safety.

**Background**

On March 4, 2013, the jury convicted Khan of all four counts in the indictment: conspiring to provide, and actually providing, material support to a conspiracy to murder, maim and kidnap persons outside the United States (Counts 1 and 3), in violation of 18 U.S.C. §2339A; and conspiring to provide, and actually providing, material support to the Pakistani Taliban, a designated foreign terrorist organization (Counts 2 and 4), in violation of 18 U.S.C. §2339B.

The jury's verdict was well-founded on evidence that Khan, between approximately 2008 and 2010, sent money and other assistance to contacts in Pakistan to further the goals of the Pakistani Taliban, whose objectives were the destruction of the lawful Pakistani government, the establishment of religious Sharia law, and the elimination of United States troops fighting against the Taliban in Afghanistan.  Khan shared each of these objectives (American soldiers defeated in Afghanistan:  GX104,107,117,122;  Sharia:  GX20,115,8,25,49,175;  destruction of Pakistani government: GX4,6,11,29,47,54,etc.).  He showed no compassion for the suffering of those he opposed, which was basically every man, woman, or child who did not endorse Sharia:

- When told that the Taliban had killed four Americans the day before, Khan wished that the Taliban would kill 4000 more (GX117)

- When asked about the militia that helped the Pakistani Army fight the Taliban, Khan replied:  "[T]hese motherfuckers! Pimps! … [May] "Allah utterly destroy them. … The destruction … if they do not revert to the right path; they do not obey this Prophet's religion . . . that may Allah cut them into small portions" (GX47).

- When told about the attempted New York Times Square bombing in May 2010 by Faisal Shahzad of the Pakistani Taliban, Khan exclaimed:  "It would have been great had it worked out" (GX102)

- When asked about the Taliban, he called them the "right fix" for Pakistan and the world (GX120)

- He wished for the Pakistani Assembly to be destroyed just as the Marriott hotel had

been in the notorious 2008 bombing that killed innocent families (GX4)

- He asked God to grant success to the Taliban so that Sharia would be implemented, while praising a mujahid who was covertly lobbing a grenade at soldiers (GX11)

- He wanted the Taliban to do an explosion, a "bang" as he called it, in Islamabad, and wanted the President of Pakistan to be tied to a cannon and its leaders to die as apostates (GX29)

- He wished for the death of "fifty thousand" uniformed American troops in Afghanistan (GX126)

On the witness stand, Khan denied knowingly sending money to the Taliban, while simultaneously stating that he would have been justified in doing so. Yet prior to his testimony, Khan had admitted that fact on multiple occasions, on the phone with contacts and family, to the source, and to the FBI (phone: GX50,32,92,12,36; CHS: GX104,110,112,125,128; FBI 302 interview report).

At sentencing, the Government argued for a term of at least 15 years' imprisonment (DE802). Khan argued for leniency, protesting his innocence and claiming that he was old, sick, and lame. This Court, citing especially Khan's perjury during trial, sentenced him to 25 years' imprisonment, knowing full well, we presume, that for then-78-year-old Khan, this was effectively a term of life imprisonment. The Court was fully aware of Khan's medical condition and life prospects, yet rather than varying downward as Khan wished, imposed a higher sentence.

Khan appealed his conviction, citing a bevy of errors by this Court. The Eleventh Circuit denied his appeal. *United States v. Khan*, 794 F.3d 1288 (11th Cir. 2015). Notably, Khan did not challenge the length of his sentence.

Undaunted, Khan filed a §2255 motion to set aside his conviction, claiming that one or all of his five lawyers were ineffective at his trial and insisting again that he was innocent. This Court

denied his motion, and the Eleventh Circuit recently affirmed that ruling as well.  *Khan v. United States*, 928 F.3d 1264 (11ᵗʰ Cir. 2019).  Among other things, the Eleventh Circuit reiterated that the evidence of Khan's terrorist support was undeniable:

> To describe the evidence of Khan's guilt as "overwhelming" would be an understatement.  The recordings left no doubt that Khan supported the Pakistani Taliban, terrorism, and jihad.  He said that he wanted to "tear ... to pieces and soak ... in blood" "whoever is against the Sharia system!"  He called for an Islamist revolution in the mold of Khomeini's.  He praised terrorist attacks and celebrated violence against Americans and Christians.  He prayed for the deaths of thousands and for "the Taliban [to be] victorious over" "the whole world."
>
> And together with the financial records, the recordings established that Khan translated his ideological enthusiasm into concrete acts of material support for terrorism.  He sent money to Jamil, Muhammad, and Daoud, all of whom, Khan said, were mujahideen.  Under the pretense of accepting charitable donations for the needy in Swat, Khan raised money that he admitted was actually "for the Mujahideen." And he had Rehman withdraw $35,000 from his bank account for the purpose of, according to what he told the confidential source, enabling the Taliban to buy guns.

*Id.* at 1280 (citations omitted).

Exactly a week before filing this motion, Khan filed a petition for a writ of certiorari with the United States Supreme Court.  *Khan v. United States*, U.S. Sup. Ct. No. 19-6111 (Sept. 27. 2019).  Khan filed his petition while simultaneously asking the Bureau of Prisons to support his compassionate release.[1]  Khan has not withdrawn his petition to our knowledge.  At present, Khan has served approximately eight years of his 25-year term (starting from his pre-trial detention after his arrest in May 2011).  Khan's motion does not say that his death is imminent or identify with specificity his "probable life expectancy," only that he is "nearing the end of his life" (DE889:7).

---

[1]     In his motion (DE889:3), Khan states he is not required to exhaust his administrative remedies with BOP because he made a request to BOP on this topic more than 30 days before his motion and had not yet received a reply. This means that Khan was seeking BOP's support for his compassionate release in August 2019, prior to filing his cert. petition seeking a new trial.

**Argument**

The compassionate release statute, 18 U.S.C. §3582(c)(1)(A), as amended by the First Step

Act on December 21, 2018, provides in pertinent part:

> (c)  Modification of an Imposed Term of Imprisonment.  The court may not modify a term of imprisonment once it has been imposed except that—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. §3582(c)(1)(A).

The relevant Sentencing Guidelines Policy Statement appears at USSG §1B1.13, and

provides that the Court may grant early release if "extraordinary and compelling reasons" warrant

the reduction, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they

are applicable," and if the Court determines that "the defendant is not a danger to the safety of any

other person or to the community, as provided in 18 U.S.C. § 3142(g)." *See also Dillon v. United*

*States*, 560 U.S. 817, 827 (2010) (where 18 U.S.C. §3582(c)(2) permits a sentencing reduction

based on a retroactive guideline amendment, "if such a reduction is consistent with applicable

policy statements issued by the Sentencing Commission," the Commission's pertinent policy

statements are binding on the court).  It is the defendant's burden to show that he is entitled to

5

compassionate release. *United States v. Heromin*, 2019 WL 2411311, at \*2 (M.D. Fla. June 7, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at \*3 (D.N.M. June 7, 2019) (citations omitted).

### A.    Khan Cannot Show That His Release Would Not Pose a Danger.

Khan claims that his current medical condition establishes "extraordinary and compelling reasons" for his release, specifically a "terminal" illness. Even assuming arguendo that it does, under the Policy Statement a district court has *no* discretion to release a defendant unless it finds that the "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. §3142(g)." Section 3142(g) is the portion of the pre-trial release statute dealing with, among other things, "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. §3142(g)(4). Khan remains a danger to the community.

Khan supported terrorism using just a phone and his address book, aided by friends and family in getting money to the Pakistani Taliban. The government did not allege that Khan physically participated in violence; instead, he used the power of his rhetoric and his extensive ties to Swat to collect money here and send it to Pakistani Taliban fighters overseas, jeopardizing the lives of American soldiers, Pakistani officials, and innocent bystanders alike. Neither his age (73-75) nor his condition prevented him from knowingly funding terrorists between 2008-10. What he did could be carried out by anyone at any age or condition with access to a phone, a bank account, and a reliable list of contacts.

While Khan may be more limited today in his activity than when the Court sentenced him, there is no evidence that his radical beliefs have subsided.  Khan continues to contest his guilt, and has never accepted responsibility for aiding terrorism or renounced his words.  To this day, Khan has never disowned calling for blood to be spilled in the name of Sharia.   As recently as his reply brief supporting his appeal of the denial of his §2255, Khan wrote that the charges against him "stem from money transfers to his family in Pakistan, whom the government alleges supported the Pakistani Taliban.  Appellant has denied these allegations at all times and insists on his actual innocence" (Reply Br.:8).  He is making the same arguments today in his just-filed cert. petition (Cert. Pet.:6-7).  If Khan believes that what he has done is not a crime, despite contrary decisions from a jury and multiple federal courts, there is nothing from stopping him upon release from using what effort he may have left to resume his terrorist support after its eight-year hiatus.

Moreover, even if Khan is impaired physically, it is not unimaginable that if released from prison early and available for home visits or unmonitored phone calls by aspiring mujahideen, he would become a living martyr to others who share his radical Islamist beliefs.  Simply his presence may provide an inspiration to a fighter.  The Court should not take the chance that this will occur or that Khan will find a way, just as he had before despite being old, lame, and sick, to aid murderers overseas.

Finally, releasing Khan early jeopardizes public safety by symbolically diminishing the seriousness of terrorism offenses.  For this Court to say that Hafiz Khan is worthy of compassion, despite committing perjury at trial, being unrepentant to this day, and showing no compassion for victims of the violence he funded, would send entirely the wrong message about acts of terrorism and the punishment that must come with them.  Khan cannot show that he is "not a danger to the

7

safety of any other person or to the community" as required by USSG §1B1.13(2) – an indispensable requirement for compassionate release.

### B.   The §3553(a) Factors Do Not Support Khan's Early Release.

Even if the Court were to find that Khan is not a danger to the safety of any other person or to the community, the §3553(a) factors – which this Court must consider also – in their totality weigh against his release. The Government addressed these factors in its sentencing memorandum in 2013 (DE802), and our arguments remain compelling today, notwithstanding the inevitable and expected decline in Khan's health.

First, **t**he nature and circumstances of Khan's offenses remain just as serious today as they did at the time of sentencing. Khan purposefully sent money to terrorist mujahideen engaged in a murderous fight against the Pakistani government and its perceived allies. Khan did so covertly, deceiving congregants at his mosque (GX10,12) who would never have knowingly allowed him to support violence. Although he did not preach violence or solicit donations from the pulpit, Khan undeniably used his position at the mosque to make his funding scheme happen, as he did with Dr. Subhani and in collecting money from admiring congregants such as Anwar Ansari. The fact that Khan brought his faith, and the mosque, into this scheme warrants a stronger punishment. Moreover, this was not a government "sting"; this was a real instance of a man sending money to people he knew were militants, because he wanted that money to be used to establish Sharia by any means necessary including force.

For years Khan sent money to terrorists overseas – terrorists who targeted not only Pakistanis, but Americans and many other innocent people. If not for this prosecution, Khan would have continued to do so, through his network of friends and family. His criminal activity in this

8

case was not isolated; on the contrary, it extended over the length of a multi-year conspiracy. During that time, Khan continued to engage in unlawful conduct even when he suspected that government agents were listening to his calls, and he also attempted to thwart justice by plotting excuses and advising others how to send money to the Taliban without detection. *See, e.g.*, GX 125 ("Therefore, I am telling you not to make obvious association with Taliban, and kick their asses as much as you want—the army—and ah—ah—those who are against Taliban—do it—and help Taliban as much as you want. … Whatever sympathizer of Taliban you see—if you like— even if he [UI] is not their—ah—a devoted person—because a devoted person is in hiding these days."). Khan, to this day, remains unrepentant, and has never disavowed his belief that violence against the Pakistani government is warranted.

   We also know that Khan was calculating, with a great capacity for detail when it comes to his money. Numerous calls introduced at trial demonstrate Khan's command of detail when discussing his bank accounts or how money would be divvied up among his Taliban associates and the intermediaries he used to get the money to them (*see, e.g.*, GX26,31,70,68,71,73,10,12,15,17,125,128,36,32,39). Khan also frequently discussed manipulating facts or making false claims in order to benefit himself. To take just one example, in October 2009, in the very same call in which he called for suicide attacks to be conducted "at the government places" and cursed Pakistan's leaders, Khan approved of falsely over-stating the volume of crops grown on his land in Pakistan so he could collect more money as compensation from the Pakistani government – the one he wanted destroyed. GX54 at 4-5. When it comes to money, or the Taliban, Khan knows perfectly well what he is doing and how to arrange it.

   Khan did not engage in violence himself, and the amount of money that he sent which was

provable at trial (a fraction of what he presumably sent) came to tens of thousands, not hundreds of thousands, of dollars.  But as our expert Khuram Iqbal explained without contradiction, a terrorist network needs individuals like Khan to supply money and support from overseas.  Iqbal also explained, again without contradiction, that money in Pakistan, especially Swat, goes a long way, particularly when used to purchase arms in the markets on the Afghan-Pakistan border and when sent in the form of valuable U.S. dollars.  Khan helped the Taliban put Pakistani and American lives in jeopardy and fostered violence, not peace.

Khan's personal history and characteristics likewise do not support leniency today any more than they did in 2013.  At his sentencing, Khan argued that he was entitled to a downward variance because he was a physically and mentally impaired man who, the jury's verdict notwithstanding, did not really mean to support terrorists, but instead sent money out of a love for education and humanitarian concerns.  This Court, knowing full well Khan's frail health, recognized that a 25-year sentence was justified by the seriousness of his crime and his perjury during trial.  From the start, the defense painted a picture of Khan as a fundamentally harmless man who is feeble, dependent upon others, and living in a different era.  The recordings showed otherwise.  We know from the calls that Khan, far from being a true man of faith, is inherently a crude man of anger and a proponent of violence, at least when it comes to Pakistan, jihad, the Taliban, and American soldiers overseas.

The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense (18 U.S.C. §3553(a)(2)(A)-(C)) similarly still support Khan's incarceration.  The charges of which he was convicted – material support of terrorists – are among the most grave in federal law.  Reducing Khan's sentence

inappropriately not only fails to reflect the serious threat posed by terrorist financing, and provide inadequate punishment for that crime, it sends completely the wrong message about respect for our terrorism laws.  Federal terrorism laws stand for the principle that individuals cannot use their own value systems (be they shaped by religion, politics or self-interest) to assist murders, kidnappings and violence overseas.  Khan, in his criminal conduct and in his perjury at trial, willfully disregarded that principle, and the laws of this country, and deserves a just punishment. Khan also went further, providing advice to others about how to covertly finance terrorism, lying to well-meaning mosque congregants about the money he collected from them, and using his position as a religious leader to both advance, and conceal, his crimes.

The Court cannot leave the impression that funding violence overseas only merits a few years in jail until the day comes when a terrorist's body weakens sufficiently than he can seek compassionate release.  Equally important, a severe sentence remains symbolically necessary to prevent people from believing that lying on the witness stand in a federal courtroom carries no additional consequences.  A defendant has a right to testify, but if he does so, he must tell the truth, and not seek to disrupt the trial or provide false evidence.  That applies in any trial, but certainly no less so in the trial of a terrorist financier who was already on record (in recorded conversations) as saying he would lie to support his goal.

Khan writes in his motion that he is a dying man and poses no future danger to anyone. But Khan began this scheme, according to the indictment, in 2008, when he was already 73. Neither age nor poor health prevented Khan from sending thousands of dollars to militants; only detention did that.   Khan surely knew, when he embarked on a career of terrorist support at his age, that if he were caught and punished as a terrorist supporter, he might spend his remaining

11

years in jail.  Neither he nor his family should be surprised by that outcome.

The other §3553 factors further cut against releasing Khan early.  Although a court may consider "[t]he need for the sentence imposed [] to provide the defendant with needed … medical care," 18 U.S.C. §3553(a)(2)(D), there is no claim that  BOP has failed to provide that to Khan.  Khan's medical care in BOP will remain equal or greater to what he would receive living outside, and likely at no greater expense to the public than if he were on his own with his expenses paid for by Medicare or Medicaid.[2]  To be clear, Khan does not propose living with a medical professional, but instead with a family member, Ikram, who has no home-care expertise to our knowledge.

Khan's proposal that he reside with Ikram actually adds insult to injury.  Although not a co-defendant, Ikram's alleged participation in terrorist attacks in Pakistan was the subject of trial evidence.  Moreover, Ikram's application for United States citizenship has been denied, a decision recently upheld by this Court and not disclosed by Khan's motion.  *See Khan v. United States Citizenship and Immigration Serv.*, 15-23466-Civ-Gayles, DE297.  While Ikram has persisted in litigating that issue, he is a Pakistani national and thus may face removal proceedings.

As for Khan's Guidelines, they remain unchanged from 2013, when Khan's Guidelines range was life imprisonment, capped at 720 months.  The Guidelines generally can be assumed to be a "rough approximation" of a sentence that would "achieve §3553(a)'s objectives."  *Rita v. United States*, 127 S. Ct. 2456, 2458 (2007).  Whatever Khan's remaining lifespan may be, releasing him after just eight years' imprisonment is tantamount to an enormous downward

---

2       The Court will recall that in the recordings Khan discussed committing Medicare fraud.  *See* Government's 404(b) Notice.

variance that would also, on this record, create a substantial disparity with other convicted terrorist financiers.  *See* DE802.

Khan cites no precedent for any court granting a compassionate release to a man convicted of multiple terrorism offenses.  While the statute does not preclude that possibility, this Court should not be the first to do so, especially for this man.  Khan's terrorist support was not aberrant behavior.  Over a span of three years, he repeatedly and despite warnings sent money and provided other assistance to militants who he knew engaged in violence.  This Court expressly described the evidence against him as "overwhelming," and the record at trial proved that Khan – despite knowing the Taliban are terrorists – supported them anyway because their goals were his.  Khan engaged in this conduct despite his advanced age, and despite the alleged impairments that the defense now may say require leniency.  Khan took the stand in this courtroom and lied repeatedly under oath, about matters large and small.  Khan's perjury was not due to age or health.  It was willful and premeditated, as we know from the recordings (*e.g.*, GX92,77) where Khan expressed his intent to lie about his Taliban ties.  He does not deserve sympathy from this Court.

C.    **Other Facts Must Be Considered in Evaluating Khan's Medical Condition.**

All of these concerns only come into play if the Court makes a threshold determination that Khan's medical condition provides an "extraordinary and compelling" reason for considering compassionate release.  USSG §1B1.13(1)(A).  Khan asserts a variety of ailments in his motion that he says meet the criteria of USSG §1B1.13 Application Note 1(A).  Khan had significant ailments and major health issues at the time of his sentencing, so his current condition appears to be the expected progression of those issues.  We also have utmost respect for medical professionals within BOP.  But some caution is warranted nonetheless before taking his claims at face value.

After all, Khan just filed a certiorari petition with the Supreme Court denying his guilt and

seeking a new trial; surely his lawyers did not make that filing without consulting him or anticipating his fitness for a new trial. Moreover, this is not the first time Khan has claimed dementia. The Court will recall the findings of the BOP report regarding Khan's condition and competency issued on October 1, 2012, which concluded that Khan was exaggerating many of his purported symptoms at that time in an effort to avoid trial. The Court noted this fact in its order finding Khan competent to stand trial. *See* DE 539, 540. The BOP found that Khan was malingering to try to fail his competency-related tests, deliberately refusing to answer certain obvious questions and manipulating his responses to others. *See, e.g.,* BOP Report, Oct. 1, 2010 (copy available to Court) at 6-7. This Court subsequently found that the BOP's assessment was correct and that Khan is "exaggerating his memory difficulty" (DE359:2).

If the Court is considering releasing Khan early, these facts, among others, should be addressed on a more fulsome record. Ultimately, however, even if Khan's medical condition constitutes an extraordinary and compelling reason that could justify his release, he cannot establish that he is not a danger to the community, or that the releasing him would be consistent with §3553(a). Either of those conclusions by itself is enough to reject his request.

We recognize that compassionate release can be an important component of the criminal justice system in the right circumstances, but this plainly is not one of those rare situations. Many inmates die in prison without the comfort of family in their final days, because compassionate release is based upon more than merely poor health. There is certainly nothing unusual, or unjust, about a convicted terrorist supporter dying in prison if he has not completed his term of imprisonment. The Blind Skeikh, for example, received a life sentence despite the fact that he was sightless, old, and sick. The Second Circuit affirmed his conviction and sentence, *United States v.*

*Rahman*, 189 F.3d 188 (2nd Cir. 1998), and he died rightly alone in prison.   *See, e.g.,*

https://nypost.com/2017/02/18/world-trade-center-bomber-blind-sheikh-dies-in-prison/.     Hafiz

Khan should be at or near the bottom of any list of defendants eligible for compassionate release.

## Conclusion

For all of the foregoing reasons, the Court should deny Khan's motion.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:     /s/ John C. Shipley
        John C. Shipley
        Assistant United States Attorney
        FL Bar No. 0069670
        Sivashree Sundaram
        Assistant United States Attorney
        District Court No. A5501212
        United States Attorney's Office
        99 N.E. 4th Street, Suite 800
        Miami, Florida 33132-2111
        Telephone Number (305) 961-9000
        Fax Number (305) 536-3675
        John.Shipley@usdoj.gov
        Sivashree.Sundaram2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2019, I electronically filed the foregoing with the Clerk

of the Court using CM/ECF for electronic delivery to all counsel of record.

<u>/s/ John Shipley</u>
Assistant United States Attorney